## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**

Apr 01, 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES,

*ex rel.* JEFFREY MAZIK
    818 Navaronne Way
    Concord, California 94518

STATE OF CALIFORNIA,
STATE OF COLORADO,
STATE OF GEORGIA,
STATE OF HAWAII,
THE DISTRICT OF COLUMBIA,
STATE OF MARYLAND,
COMMONWEALTH OF VIRGINIA,
STATE OF WASHINGTON

Plaintiffs,

v.

KAISER PERMANENTE, INC.
1 Kaiser Plaza
19th Floor
Oakland, CA 94612

    Serve: *Registered Agent*:
    The Prentice-Hall Corporation System, Inc.
    251 Little Falls Drive
    Wilmington, Delaware. 19808

and

KAISER FOUNDATION HEALTH PLAN, INC.
1 Kaiser Plaza
Oakland, California 94612

    Serve: *Registered Agent*:
    The Prentice-Hall Corporation System, Inc.
    251 Little Falls Drive
    Wilmington, Delaware 19808

and

EASTERSEALS, INC.

**SEALED**

Civil Action No.:   2:19-cv-0559 JAM KJN
                 _____

**FILED UNDER SEAL**
PURSUANT TO 31 U.S.C. § 3730
(False Claims Act)

**DO NOT ENTER IN PACER**
**DO NOT PLACE IN PRESS BOX**

1

141 W Jackson Blvd, Suite 1400A
Chicago, IL 60604

  Serve: *Registered Agent*:
  Julie Hubbard
  141 W Jackson Blvd,  Suite 1400A
  Chicago, IL 60604

Defendants.

## COMPLAINT AND JURY TRIAL DEMAND

1.     This is a civil action by Plaintiff-Relator Jeffrey Mazik, by and through

undersigned counsel, who files this Complaint on behalf of himself, the United States of

America, and the states of California, Colorado, Georgia, Hawaii, Maryland, Washington, the

District of Columbia, and the Commonwealth of Virginia, against Defendants Kaiser Permanente

Inc. ("KP"), Kaiser Foundation Health Plan, Inc. ("Kaiser") and Easterseals, Inc. (formerly

known as Easter Seals), for damages and civil penalties arising out of the Defendants' collective

violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100

Stat. 3153 (1986) and the corresponding statutes in the various states.

2.     Defendants' fraud is based on failing to identify and/or self-disclose identified

overpayments to the government within sixty (60) days, as mandated by federal statute and

agency rules and regulations applicable to health care providers that receive funding from

Medicare and Medicaid programs.

3.     Defendants' unlawful retention of overpayments are caused by a variety of

collective, fraudulent efforts, including:

(a)  Intentional, improper use of code auditing tools to avoid detecting significant
      overpayments;

(b)  Failure to self-report and refund excess amounts that require the overpayment
      recovery process to occur within the mandated 60-day timeline;

2

(c) Failure to investigate and determine the root cause of overpayments that are
identified, and failure to follow up and research to determine whether other similar
overpayments resulted from the same root cause; and

(d) Dismissal and rejection of recommendations to promptly address overpayments and
enforce associated compliance measures to prevent improper billing of claims,
specifically advised by third-party compliance consultants.

4.       Despite Relator's repeated notice to Defendants of the overpayments that he

identified and warnings to take corrective steps to not only refund, but to correct clear

weaknesses in order to avoid certain future overpayments, Defendants failed to take proper

corrective action to report and refund over $1 billion in overpayments from government payors,

detected as a result of claims submitted from 2010 thru 2017. This conduct is ongoing through

the present day.

5.       Kaiser's cover-up negatively impacted all of the regional offices. When the claim

overpayments issue was brought to the attention of a regional office, Kaiser took extra measures

to make it impossible for each region to fully understand precisely how alarming Kaiser's

violations of the federal and state False Claims Acts were, as well as the extent of the fraud. It

further refused and rejected all efforts to take corrective action to avoid certain future

overpayments in all regions.

6.       Relator, as part of his normal job duties, identified hundreds of millions of dollars

in claim overpayments while working in compliance. Once Relator identified them as potential

overpayments, Kaiser had an obligation under the law to further investigate and disclose to the

government. Instead of taking prompt and proper corrective actions pursuant to the 60-Day

Overpayment Rule, Kaiser resisted, obstructed, and dismissed Relator's efforts to take

appropriate action for those overpayments.

3

7.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

## JURISDICTION AND VENUE

8.    This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. This case arises from the wrongful conduct of the Defendants incident to obtaining funds from the federal government.

9.    This Court has personal jurisdiction over the Defendants under 31 U.S.C. § 3730(a), which authorizes nationwide service of process and because the Defendants have at least minimum contacts with the United States.

10.    31 U.S.C. § 3732(a) provides: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in any proscribed by section 3927 occurred." (b) Venue is proper in the State of California in that, among other things, Defendants regularly transact business within the State and its principal place of business is in California.

11.    Relator pre-disclosed the core facts and claims to the United States Attorney's Office for the Eastern District of California on January 22, 2019.

12.    As part of the compliance leadership team at Kaiser, Relator has insider knowledge of the information contained herein and is an original source. The government would

not have known about this fraud, its details, and its breadth and scope, without the personal knowledge provided by the Relator.

## PARTIES AND ENTITIES

### *Relator Jeffrey Mazik*

13.     Relator Jeffrey Mazik is a resident of California. Relator was the Senior Practice Leader for Kaiser's National Compliance Office, with over 25 years of expertise in fraud control, audit, and compliance. Relator joined Kaiser on May 28, 2008, where he served as the Information Technology Audit Specialist, managing various IT audit projects.

14.     He transitioned to his new role as Senior Practice Leader – Fraud Control Program on or about March 19, 2012. He served in a key leadership role reporting directly to the Vice President of Compliance Operations and managing Kaiser's national fraud control program. Relator's duties and responsibilities included working closely with regional compliance leadership to implement compliance and fraud control initiatives; leading comprehensive risk assessments, using data analytics to drive compliance and fraud control focus areas and fraud mitigation initiatives; investigating cases of potential fraud, waste, and abuse; developing corrective action plans to address root causes of fraud risks, particularly for areas including medical claims, accounts payable, inventories, cash handling, durable medical equipment, IT and payroll; and overseeing Board reporting and mandatory regulatory reporting for the fraud control program.

15.     Relator continued to personally observe the ongoing fraud until his retaliatory discharge, on or about January 5, 2017.

### *Defendants Kaiser Permanente and Kaiser Foundation Health Plan, Inc.*

16.     Defendant Kaiser Permanente ("KP") is the largest managed care organization in the U.S., with its principal place of business at 300 Lakeside Drive, Oakland, California 94612. Founded in 1945, KP is comprised of the following interdependent entities: the Kaiser Foundation Health Plan, Inc. and its regional operating subsidiaries; Kaiser Foundation Hospitals; and the regional Permanente Medical Groups. KP operates in eight states including Hawaii, Washington, Oregon, California, Colorado, Maryland, Virginia, and Georgia, as well as the District of Columbia. KP offers a variety of provider services for health plan members through the Permanente Medical Groups. Each Permanente Medical Group operates as a separate for-profit corporation in its individual territory. Bernard Tyson serves as the CEO of KP.

17.     As of September 2018, Kaiser reports 12.2 million health members, 217,173 employees, 39 hospitals, 690 medical offices, 22,013 physicians, and 58,345 nurses. As of December 2017, the Kaiser Foundation Health Plan and the Kaiser Foundation Hospitals reports a combined $3.8 billion in net income and $72.7 billion in operating revenues.

18.     Defendant Kaiser Foundation Health Plan ("Kaiser") is one of three entities that make up Kaiser Permanente, with its principal place of business at 1 Kaiser Plaza Oakland, California 94612. Kaiser is one of the largest non-profit organizations in the United States, serving 52 local markets within 8 regional offices – Northern California; Southern California; Washington; Colorado; Georgia; Hawaii; Mid-Atlantic States; and Northwest. Each region is primarily funded by reimbursements from its respective regional Kaiser Foundation Health Plan entity.

### Defendant Easterseals

19.     Defendant Easterseals (formerly known as Easter Seals) is a non-profit organization that serves as a managed network of providers servicing those with physical

disabilities, mental disabilities, and special needs. Easterseals headquarters offices in the Board of Trade Building in Chicago and in Washington, D.C., providing assistance to 75 affiliates through management training, implementation of best practices, consultation services, fundraising, marketing, advocacy, and corporation relations. Founded in 1919, Angela F. William serves as the President and CEO of Easterseals.

20.     Easterseals has a network of 75 locations across the nation, including in California, providing services to people with disabilities and special needs in their local communities. Each location operates independently as its own corporation under the Easterseals name.

21.     In 2012, Kaiser Northern California partnered with Easterseals (then Easter Seals) to develop a Behavioral Health Provider Network (BHPN) to serve their members living in Northern and Central California. The partnership resulted in significant growth for both Kaiser and Easterseals, increasing Easterseals' revenue from $13 million in FY 2012 to $126 million in FY 2016 with a budget of $203 million in FY 2017.

## LEGAL BACKGROUND

### A.  False Claims Act ("FCA")

22. The FCA provides in, pertinent part, that any person who:

>(a)(1)(A) knowingly presents, or causes to be presented, a false or Fraudulent claim for payment or approval;

>(a)(1)(B) knowingly makes, uses, or causes to be made or used, a False record or statement material to a false or fraudulent claim;

>(a)(1)(C) conspires to defraud the Government by getting a false or Fraudulent claim allowed or paid; or

>…

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

…

is liable to the United States for any civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-401, [which is currently not less than \$10,957 and not more than \$21,916] plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729.

23.    For purposes of the False Claims Act, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b).

24.    The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

25.    The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

8

26.     The FCA contains an independent requirement to correct errors that will cause, or have caused, a government overpayment. The Act attaches liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government. 31 U.S.C. § 3729(a)(1)(G).

27.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), the FCA civil penalties were adjusted to not less than $10,957 and not more than $21,916.

**B.  *Federal and State-Funded Health Care Programs***

**i.      The Medicare Program**

28.     Medicare is a federally-funded health insurance program administered through Centers for Medicare and Medicaid ("CMS"), headquartered in Baltimore, Maryland.

29.     Medicare is divided into four major components, all of which are relevant to this action. Part A pays for skilled nursing facility stays, inpatient hospital stays, hospice care, and home health visits. Part B covers physician visits, outpatient services, preventive services, and home health visits. Part C, the MA program, allows beneficiaries to enroll in a private health organization, such as a HMO, and receive all Medicare benefits. Part D is the voluntary, subsidized outpatient prescription drug benefit.

30.     To administer the Medicare program, private insurance companies act as agents of the HHS, making payments on behalf of program beneficiaries and providing other administrative services. 42 U.S.C. §§ 1395h and 1395u. These companies are called "carriers." *See* 42 C.F.R. §§ 421.5(c). Through local carriers, Medicare establishes and publishes the criteria

for determining what services are eligible for reimbursement or coverage. This information is available to providers who seek Medicare reimbursement.

1. <u>Medicare Contracts and Claims Submission: General Background</u>

31.     Medicare reimburses health care providers for the costs of providing covered health services to Medicare beneficiaries. *See* 42 U.S.C. § 1395x(v)(1)(A).

32.     To bill Medicare Part A, a provider must submit an electronic or hard-copy claim form called the UB-04 (also known as the CMS 1450) to the appropriate Medicare carrier. To bill Medicare Part B, a provider must submit an electronic or hard-copy claim form called the CMS 1500 to the appropriate Medicare carriers. These forms describe, among other things, the provider, the patient, the referring physician, the services(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.

33.     In addition, each Medicare provider must sign a provider agreement and by so doing must agree to comply with all Medicare requirements including the fraud and abuse provisions. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

34.     At all times relevant to this action, the local carriers that reviewed and approved any one of the improper claims (especially those related to the diabetes test strips) at issue in this case based their review upon the enrollment information and claim information provided by the Defendants and relied on the veracity of that information in determining whether to pay the claims submitted by Defendants.

35.     As a prerequisite to payment, Medicare also requires providers to submit annually a Form CMS-2552-10 (previously form HCFA-2552), more commonly known as the Hospital

Cost Report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

36.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or responsible designee of the administrator. Through this certification, the provider confirms that the cost report is "a true, correct, and complete statement" and that the services identified "were provided in compliance with [the laws and regulations regarding the provision of the health care services]."

### ii.     The Medicaid Program

37.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the federal government and those states participating in the program.

38.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid program.

39.     Each provider that participates in the Medicaid program must sign a provider agreement with his or her state, certifying that they will comply with Medicaid rules and requirements.

40.     Kaiser participates in each of the state's Medicaid program - Medi-Cal (California); Health First Colorado (Colorado); Georgia Families and PeachCare for Kids (Georgia); QUEST Integration (Hawaii); HealthChoice (Maryland); Oregon Health Plan

11

(Oregon); Virginia Premier (Virginia); and Washington Apple Health (Washington), as well as Medicaid in the District of Columbia.

### C.  *The 60-Day Overpayment Rule*

41.     Overpayments under the statute are defined as payments received in excess of amounts properly payable under Medicare and Medicaid statutes and regulations. Overpayment can occur due to a variety of reasons, including fraud, mistake and negligence. Most overpayments commonly occur when there is insufficient documentation; medical necessity errors; duplicate payments; upcoding; and/or administrative and processing errors.

42.     An identified overpayment is a debt owed to the government. Thus, the federal statute requires health care providers to recover all identified overpayments by reporting and returning overpayments within sixty (60) days after the date on which the overpayment is identified. The Affordable Care Act ("ACA") provides, in pertinent part:

**SEC. 1128J. MEDICARE AND MEDICAID PROGRAM INTEGRITY PROVISIONS**

(d) REPORTING AND RETURNING OF OVERPAYMENTS –

(1) IN GENERAL – If a person has received an overpayment, the person shall –
    (A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.
    (B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

(2) DEADLINE FOR REPORTING AND RETURNING OVERPAYMENTS – An overpayment must be reported and returned under paragraph (1) by the later of –
    (A) the date which is 60 days after the date on which the overpayment was identified; or
    (B) the date any corresponding cost report is due, if applicable.

(3) ENFORCEMENT – Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31, United States Code) for purposes of section 3729 of such title.

(4) DEFINITIONS – In this subsection:
    (A) KNOWING AND KNOWINGLY – The terms "knowing" and "knowingly" have the meaning given those terms in section 3729(b) of title 31, United States Code.
    (B) OVERPAYMENT – The term "overpayment" means any funds that a person receives or retains under title XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such title.

*See* Pub. L. 111-148. ACA was amended by the Health Care Education Reconciliation Act of 2010 (Pub. L. 111-152).

43.    In practice, should providers identify an overpayment, which can date back to six (6) years of the date the overpayment for the claim was received, also referred to as the "look back period," the provider is required to promptly report and return the overpayment to the government as outlined above in Section 1128J(d) of the Social Security Act.

44.    Under the Part A and B, to report and return overpayments, providers are instructed to use existing processes. Specifically, the rule states that providers and suppliers must use an applicable claims adjustment, credit balance, self-reported refund process, or other appropriate process to report and return Medicare Parts A and B overpayments.

45.    Regardless of the process used, the refund should include an explanation of the statistical sampling methodology used if an overpayment was calculated by extrapolation.

46.    In addition to the federal statute, on February 12, 2016, CMS published the 60-Day Overpayment Rule (effective March 14, 2016) implementing Section 6402(a) of the ACA, to provide clarity to the 2010 legislative provision requiring providers to report and return overpayments within the specific timeline. 42 C.F.R. § 401,405 (2016).

47.     The 60-Day Overpayment Rule, which implements Section 1128J(d) of the Social Security Act ("the Act"), entitled "Reporting and Returning of Overpayments," requires federal overpayments for healthcare services to be reported and returned by the later of: (1) sixty (60) days after identifying the overpayment or (2) the date any corresponding cost report is due, if applicable. Section 1128J(d) of the Social Security Act, codified at 42 U.S.C. § 1320a-7k(d).

48.     Specifically, the 60-Day Overpayment Rule requires that any "overpayment" must be returned within 60 days of being "identified." An overpayment is identified "when the person has or should have, through exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment." 42 C.F.R. § 401,405 (2016).

49.     The standard for the identification of an overpayment relies upon providers exercising "reasonable diligence." CMS describes the standard to include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments and investigations conducted in a timely manner by qualified individuals in response to obtaining credible information of a potential overpayment. *Id.*

50.     CMS describes "credible information" as including "information that supports a reasonable belief than overpayment **may have** been received. *Id.* (emphasis supplied).

51.     The 60-day clock begins to run when either the provider's proactive efforts to investigate identified overpayments, conducted with reasonable diligence, or, on the day the provider received credible information of a potential overpayment if the provider or supplier failed to conduct reasonable diligence and received an overpayment.

52.     Any overpayment failed to be reported to CMS and retained after the 60-day deadline is a violation of the False Claims Act, also referred to as a "reverse false claim." 42

U.S.C. § 1320a-7k(d). Since the 60-Day Overpayment Rule, providers are also strictly subject to the six year "lookback period," which applies to overpayments for claims received before the 60-Day Overpayment Rule's effective date (March 14, 2016), but after the ACA's enactment (March 23, 2010).

53. An "obligation" under the statute can be a certain, ascertainable amount owed, or it can be when a potential overpayment is identified, but the precise amount due it not yet determined. The "obligation" therefore, "arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'" S. Rep. No. 111-10, at 14 (2009), *reprinted at* 2009 U.S.C.C.A.N. 430, 441.

54. In sum, the federal statutory provisions and the CMS 60-Day Overpayment Rule are provided to explicitly prevent health care providers from simply ignoring evidence of potential overpayments, triggered from improper claims billing processes. Even absent the 60-Day Overpayment Rule, providers have been subject to the provisions under Section 1128J(d) of the Act, since 2010.

### D. *Medicare Coverage of Diabetes Test Strips*

55. Medicare covers services and testing supplies, such as diabetes test strips ("DTS") for diabetic patients. To be eligible for Medicare coverage, patients' diabetic condition must be treated and managed by a licensed physician. *See* Medicare LCDs for Glucose Monitors (L11530, L27231, L11520, and L196 for Jurisdictions A, B, C, and D respectively); *see also* CMS, *Medicare Benefit Policy Manual*, Pub. No. 100-08, ch. 13 § 13.1.4.

15

56.     To receive Medicare payments, providers must document the appropriate diabetes diagnosis code for beneficiaries. *See* Medicare LCDS for Glucose Monitors (L11530, L27231, L11520, and L196) (Each LCD states that for Medicare coverage of home blood glucose monitors and related accessories and supplies, the patient must have diabetes codes 249.00-250.93).

57.     Generally, providers can bill Medicare for a DTS claim, for up to three months at a time. Each claim must indicate the number of DTS units as well as the start and end dates associated with the claim.  *See* HHS OIG, *Inappropriate and Questionable Medicare Billing for Diabetes Test Strips*, OEI-04-11-00330 (August 2013).

58.     Medicare covers up to 100 DTS (i.e. two 50-count boxes) per month (*averaging 3 per day*) for insulin-dependent beneficiaries and up to 100 DTS every three months for non-insulin-dependent beneficiaries. *Id*. (Emphasis added).

59.     If a patient's doctor documents why it is medically necessary, Medicare will cover additional test strips for the patient.

60.     Although additional DTS can be prescribed to a patient, only if reasonable and deemed medically necessary and documented as such on physician records, Medicare generally requires providers to adhere to prescribing a maximum of three per day for each patient.

61.     To receive Medicare payment for mail order DTS, suppliers submit claims using the HCPCS code A4253 and modifier KL. The KL modifier must be included on each claim to specify that the item was provided via mail order. Claims without the KL modifier indicate that the DTS was provided via non-mail order. *See* HHS OIG, *Inappropriate and Questionable Medicare Billing for Diabetes Test Strips*, OEI-04-11-00330 (August 2013).

62.     Notably, suppliers could refill an order for mail order or non-mail order DTS only when beneficiaries have nearly exhausted the previous supply and specifically request additional DTS. Suppliers are not permitted to automatically dispense a quantity of DTS on a predetermined basis. Instead, suppliers will have to contact the beneficiary before dispensing the refill to verify the quantity of DTS that is needed for the next billing period. CMS, *Medicare Program Integrity Manual*, Pub. 100-08, ch. 4, § 4.26.1

63.     Prior to 2011, Medicare reimbursed DTS providers on the basis of established fee schedule amounts, which is used to reimburse a physician and other providers on a fee-for-service basis. In 2011, Medicare replaced those fee schedule amounts with a competitive bidding program for selected durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) providers, which includes providers that offer diabetes testing supplies. *See* HHS OIG, *Inappropriate and Questionable Medicare Billing for Diabetes Test Strips*, OEI-04-11-00330 (August 2013).

64.     CMS evaluated bids submitted by DMEPOS providers to determine the competitive bidding payment amounts and awarded contracts to providers who offered lower prices and met applicable quality and financial standards. *Id.*

65.     Contracts are awarded to the Medicare suppliers who offer the best price and meet applicable quality and financial standards. Contract suppliers must agree to accept assignment on all claims for bid items and will be paid the single payment amount.

66.     Medicare beneficiaries who maintain a permanent residence in which CMS has implemented a competitive bidding program for mail order diabetic supplies may purchase their diabetes testing supplies from a mail order contract supplier in which the beneficiary resides; or any enrolled Medicare supplier if the diabetic testing supplies are furnished at a storefront and

are not subject to a competitive bidding program established for non-mail order diabetic supplies.

CMS, *Medicare Program Integrity Manual*, ch. 36, § 20.5.4.1

67.     Mail order contract suppliers will be reimbursed at the single payment amount for mail order diabetic supplies in which the beneficiary maintains a permanent residence. In situations where a competitive bidding program has not been established for non-mail order diabetic supplies, noncontract suppliers that do not furnish items through mail order will be reimbursed at the fee schedule amount for the state in which the beneficiary maintains a permanent residence. Medicare payment will not be made to noncontract suppliers that furnish mail order diabetic testing supplies to Medicare beneficiaries residing in a CBA. *Id.*

68.     Mail order diabetic suppliers must use the HCPCS modifier KL on each claim to indicate that the item was furnished on a mail order basis. The modifier must be used for both competitive bidding and non-competitive bidding mail order diabetic supplies. Suppliers that furnish mail order diabetic items that fail to use the HCPCS modifier KL on the claim may be subject to penalties under of the False Claims Act. *Id.*

## FACTS AND ALLEGATIONS

69.     Since at least 2010, Defendants engaged in pervasive and deliberate fraudulent practices by avoiding statutory and regulatory obligations to monitor, investigate, and certify the accuracy and truthfulness of claims submitted to the government. After identifying claim overpayments, Defendants failed to report and return identified overpayments from Medicare and Medicaid and subsequently, and failed to investigate further and correct recurring overpayments.

70.     Defendants' intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of

transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the government, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

71.     To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

72.     Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

73.     Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

74.     On various occasions, Kaiser selectively, only reported and repaid claims overpayments that were egregiously high or wildly anomalous – ones that would clearly invite inquiries or an investigation from the government.

75.     Moreover, while Relator and a few others in compliance were successful in getting Kaiser to purchase and use, in part, various standard compliance and fraud detection tools and software, which if used properly would detect claims overpayments, Kaiser intentionally misused these tools to avoid overpayment identification and detection

76.     Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, but turned on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously, actively working to avoid detecting and correcting the fraud.

77.     By failing to report and return hundreds of millions of dollars in overpayments, Kaiser secured a steady stream of revenue from member claims at the expense of government payors.

A.      ___Failure to Report and Unlawful Retention of Identified Overpayments___

78.     Relator came across his first batch of overpayments while performing his regular duties in compliance. It was not until later, when he detected more and more instances of overpayments occurring at all of the regional offices in various areas of claims assessment, that he started to realize the absence of the mechanisms and processes necessary to fully detect, investigate, disclose, repay and correct claims overpayments. He eventually discovered Kaiser's refusal to make changes to comply with the 60-Day Overpayment Rule.

79.     When Relator joined the compliance office in 2012, he reported to Mia Okinaga, who was then the Vice President of the National Compliance Office. Ms. Okinaga personally recruited Relator to join the compliance team. She considered Relator a valuable addition to the team, announcing to the department that his role would focus on integrating regional and national departments to enhance the effectiveness of monitoring and tracking fraud control activities at Kaiser.

80.    Relator worked closely with Ms. Okinaga, who actively pushed her initiative to direct Kaiser and the regional offices to effectively utilize various diagnostic compliance and fraud detection tools developed by vendors such as Verisk Health ("Verisk") and FICO, to substantially reduce losses from health care billing error, abuse, and fraud.

81.    Relator also worked closely with Jay Loden, Assistant Director of Information Analytics and Compliance Technology, on tools and analytical studies, Judy Sarles, Senior Director, on compliance systems, and Daren Pursche, Director of Government Audit & Reimbursement, on external and internal compliance standards.

82.    Ms. Okinaga was eventually pushed out because she lacked the full support from senior management in the compliance office to prioritize those initiatives. This was because by prioritizing the use of the tools provided by Verisk and FICO at Kaiser, she was detecting and uncovering significant overpayments that had previously been intentionally concealed.

83.    Kaiser made the announcement that Ms. Okinaga's position was eliminated on August 21, 2015.

84.    A few months after Ms. Okinaga's departure from Kaiser, in mid-February 2016, Relator detected significant amounts of overpayments from all of the regions, discovering that they had not been recorded or included in any claims adjustment, credit balance, or a self-reported refund. He then prepared a Webex presentation to report his findings to Ms. Janiga and Ms. Pursche. In this presentation, he pointed out that the 60-Day Overpayment Rule required Kaiser to review and investigate all identified overpayments.

85.    Relator's analysis served to properly "identify" overpayments within the meaning of the ACA, and these overpayments matured into "obligations" in violation of the FCA when

they were not reported and returned by Kaiser within sixty days. The purpose of Relator's analysis was to put his superiors on notice and lay out options for the necessary corrective action.

86.     The presentation was received with disinterest from Ms. Janiga and Mr. Pursche. They admitted that compliance had "never done this before."

87.     Relator also knew that Kaiser had not performed this analysis before because he was told from Kaiser personnel who provided him the data to perform this analysis, that the type and amount of claims data he requested for his review had neither been performed by anyone, nor been requested before from anyone at Kaiser.

88.     The level of review that Relator conducted as to overpayments had never been done before Relator took it upon himself in 2016.

89.      There was no follow-up action requested of Relator, no request for his data or root-cause analysis conducted by Ms. Janiga, Mr. Pursche or anyone else.

90.     Avoiding its statutory obligation, Kaiser dismissed, ignored and buried Relator's findings. His superiors refused to investigate any further, and also started a campaign to refuse Relator, himself, any ability to investigate further.

91.     The overpayments identified by Relator were not reported and repaid to the government within the mandated time frame. Relator would have been a part of the recovery process for further investigations as to the overpayments he identified. There was none.

92.     Relator subsequently discovered that Kaiser was also misrepresenting its structure and operations to the government in efforts to avoid detection, which occurred during a phone call with the U.S. Department of Health & Human Services: Office of Inspector General (HHS OIG) on June 30, 2016.

93.     The call was a kick-off call held by HHS OIG with Kaiser to discuss medical loss ratio reporting and audits, addressing issues surrounding claims accuracy and claims recovered through fraud reduction efforts. Several people participated on the call including: Relator Mazik, Ms. Janiga, Brian Mesaris, OPM-OIG Auditor, Stephanie Oliver, OPM-OIG Manager, and Robin Richardson, OPM-OIG counsel.

94.      During the call, OIG asked Kaiser about its general stance on claims operations, informing Kaiser that part of OIG's initiative was to address potential problems and raise additional concerns that prevented Kaiser from maintaining accuracy and consistency of claims payments.

95.     In response to a majority of the OIG's questions, Ms. Janiga explained that the questions were irrelevant because "claims were not [Kaiser's] business." This was a clear misrepresentation to the OIG since Kaiser reported, on average, annual revenue of at least $7 billion in medical claims.

96.     Ms. Janiga also misrepresented that Kaiser and its regional offices were "fully integrated," so there was no need for the OIG to inquire into its claims process. This was also a misrepresentation, since, in fact, that was only partly true in certain regions.

97.     These misrepresentations were intended to preclude the OIG from inquiring into Kaiser's claims process, which could lead to the discovery of a lack of compliant processes and significant overpayments.

98.     Ms. Janiga was aware that Relator knew that her statements were untrue. She was concerned that if he spoke during the OIG call, Relator might contradict Ms. Janiga and correct her misrepresentations to the OIG. She was also concerned that Relator might raise his compliance and overpayments findings with the OIG.

99.     So in the middle of the phone call with the OIG, Ms. Janiga messaged Relator on intercompany messaging and instructed him to "[not] say a word."

100.    Relator understood this as a direct order not to correct or contradict anyone on the call, especially Ms. Janiga's misrepresentations to the OIG. He did as instructed and stayed quiet on the call.

101.    This episode had the intended, chilling effect on Relator, confirming his worries that Kaiser was not interested in compliance on this issue, let alone fraud detection and correction, but would intentionally misrepresent and misdirect government efforts to question it and review its policies.

102.    Despite the disinterested feedback and lack of investigation following Relators' presentation analysis and Ms. Janiga's instruction to keep quiet during the OIG call, Relator continued his efforts to pinpoint the ongoing issues Kaiser had with overbilling, which led to an even bigger issue of the accruing number of overpayments.

103.    Instead of taking prompt and proper corrective actions, Kaiser continued to resist, obstruct and dismiss Relator's efforts.

104.    Representative examples of overpayments that Relator identified are provided below. The few examples provided for this Complaint are demonstrative but do not fully portray the large-scale fraud that occurred and continues to occur, at all the regional offices.

***Representative Examples of Identified Overpayments***

***$1 Billion in Overpayments From Government Payors***

105.    Relator's findings in early February of 2016 were only the beginning of an ongoing series of overpayments he identified throughout the year.

106.     In response to potential risk assessments related to claim overpayments, provided by outside consultants, Relator performed a claims data analysis that uncovered claim overpayments associated with Medicare and Medicaid members.

107.     On September 2, 2016, Relator reviewed and performed an audit of claims data from all of the regional offices, dating back from August 3, 2010 through July 30, 2016. He discovered that during those six years, over $1.4 billion in overpayments and of those, $1 billion in overpayments associated with Medicare and Medicaid claims, occurred.

108.     The overpayments were not self-disclosed and not repaid to the government. Relator memorialized a rough calculation of his audits in his notes. His contemporaneous, handwritten notes showing his analysis follows:



109.     Relator's calculations show that nearly 64% of the total value of overpayments from government payors referred to Medicare reimbursements and 36% of the total overpayments from government payors referred to Medicaid and Medi-Cal reimbursements.

Further, his analysis confirms that federal and state payors should have been refunded for overbillings, aged well past sixty (60) days.

110.    When Relator brought his calculations to Mr. Purshe's attention, he again dismissed it and Kaiser avoided its statutory obligation to promptly report and return overpayments to the government for claims that were obtained several years before 2016. *See* Section 1128J(d) of the Social Security Act (Identified overpayments can date back to 6 years of the date the overpayment for the claim was received.).

111.    Based on his findings, especially for overpayments that dated all the way back to 2010, it was evident that the improper way Kaiser handled overbillings for claims was not a recent issue. Instead, Kaiser had been strategically burying overpayments and concealing the fraud for years in various ways detailed below.

### *$10 Million in Overpayments*

112.    In addition to overpayments Relator identified in 2016, Relator had also identified overpayments in 2015. At that time, he did not realize that they were overpayments that had never been reported and refunded to the government, until he began to piece together the evidence he had gathered and realized that Kaiser had never taken corrective action to disclose claims errors and report and refund overpayments to the government.

113.    In 2015, Relator worked with several FICO representatives to conduct a claims data review of regional offices in Colorado, Georgia, Mid-Atlantic, Northwest, and Southern California, as part of his year-end project. Kaiser used multiple claims review software programs, including FICO, to detect billing problems both prior to and after payment.

26

114.    A properly utilized FICO tool detected anomalous billing patterns; assigned fraud risk scores to members in order to prioritize suspects for further investigation; assessed billing problems; and identified collusion between providers and facilities.

115.    FICO tools used for identifying opportunities for cost savings and improvements associated with possible fraudulent activity. Upon detection of claims errors and calculated overpayments, Kaiser was required to report and refund overpayments within 60 days.

116.    In conducting the year-end claims data review for some of the regions, Relator worked closely with Eileen Guiney, Senior Consultant at FICO, who assisted Relator with reviewing claims.

117.    Relator identified over $10 million in overpayments, demonstrating that Kaiser was neither compliant with claims recovery rules and regulations, nor prioritizing efforts to address avenues for claims cost containment.

118.    On December 29, 2015, Relator memorialized his findings in several spreadsheet documents, entitled "FICO Savings Summary." The first tab is a summary of over $10 million in overpayments that should have been reported and repaid to the government. Relator created this chart relying on Ms. Guiney's input for each case analysis.

| REGION | VALIDATED CASES | | PIPELINE CASES | |
|---|---|---|---|---|
| | # CASES | EST TOT SAVINGS $ | # CASES | EST TOT SAVINGS $ |
| CO | 1 | $235,000 | 12 | $1,263,141 |
| GA | 1 | $350,000 | 11 | $874,171 |
| MA | 1 | $90,000 | 0 | $0 |
| NW | 3 | $341,000 | 29 | $642,944 |
| SC | 0 | $0 | 28 | $6,274,425 |
| | | | | |
| PROGRAM | 6 | $1,016,000 | 80 | $9,054,681 |

119.    The "Validated Cases" refer to overpayments confirmed by Kaiser. The "Pipeline Cases" refer to cases that were vetted by FICO as likely overpayments at the time but had not yet been confirmed by Kaiser.

120.    Information presented in the second and third tab include a detailed synopsis as to how Relator calculated the figures shown in the first tab. The "Issue Description" column is included in both tabs, which are comments from Ms. Guiney about why certain claims payments need to be corrected.

121.    For example, Ms. Guiney flagged an improper billing incident associated with an anesthesia code. She noted that there were "examples where the code [was] billed [without] an anesthesia service and sometimes more than once also [without] an anesthesia code." Moreover, Ms. Guiney not only noted that "the potential overpayment for this provider alone for this time period [was] $10,240.00," but advised "recoup[ment] [of] all payments for code 99135 for all providers and or going forward deny all claims for code 99135 and determine the amount saved based on what has been previously paid."

| PROV_NAME | ▼ | ISSUE_DESC | ▼ | EST SAVINGS $ | ▼ |
|---|---|---|---|---|---|
| Veit, Andrew | | Procedure Code 99135 – billed with the anesthesia code (we have examples where the code is billed w/o an anesthesia service and sometimes more than once also w/o an anesthesia code) is a qualifying circumstance. Not covered by many payors.  Need to know if Kaiser has a policy – the potential overpayment for this provider alone for this time period is **$10,240.00**. If Kaiser does not have a policy and if they determine that code 99135 should be included in the payment for the anesthesia then they have a couple of options: recoup all payments for code 99135 for all providers and or going forward deny all claims for code 99135 and determine the amount saved based on what has been previously paid. | | $10,240 | |

122.    The above snapshot is just one of the detailed issue descriptions that Ms. Guiney provided to help Relator with his claims review project and ultimately, calculating

overpayments. Relator's spreadsheet provides a number of cases that result in overpayments due to upcoding, duplicate billing, medical necessity errors, insufficient documentation, and administrative and processing errors.

123.     Relator informed Mr. Loden and Mr. Kelly of the audit progress, under the impression that their receipt of the savings summary chart would lead to proper compliance measures and reporting of the information to higher ups in the claims cost containment office to move the recovery process forward, refund overpayments and avoid future recurrence of the same issues.

124.     Later, in 2016, after noticing that the same claims came up again as overpayments, Relator knew that there had been no investigation, no correction and no follow-up initiative to identify the root causes of the problematic claims he had reviewed at the end of 2015. Kaiser had again avoided its obligation to investigate, disclose and refund.

125.     On two separate occasions, during a verbal conversation with vendors Ms. Guiney and Ms. Allmon, respectively, Relator confirmed his suspicions that Kaiser frequently neglected recovery efforts after overpayments were detected and that it failed to run outside claims data studies for regional review and follow-up, resulting in numerous cases needing further investigation and massive, recurring overpayments.

*$5.3 Million in Overpayments in the Georgia Region*

126.     In addition to FICO, Relator also worked with Verisk in 2015, identifying $5.3 million in overpayments in Kaiser's Georgia Region. Relator discovered these overpayments while doing a comparative analysis between the functionalities provided by McKesson ClaimsXten (another claims data vendor) and Verisk.

127.    Relator, Mr. Loden, Sean Kelly, Project Manager, and Dave Bohnenstingel, Strategic Account Manager at Verisk, worked together on this project, using claims data only from the Georgia region.

128.    Their efforts identified $5.3 million in overpayments for the Georgia region alone, which obligated Kaiser to report and repay to Medicare and Medicaid immediately. Moreover, their analysis discovered that the root cause of those overpayments was because Kaiser purposefully turned on only 25 of the 54 different edit rules provided by ClaimsXten.

129.    The simple fix would be to turn on the edits in order to capture the overpayments and avoid future overpayments. This did not happen.

130.    Relator, Mr. Kelly, Mr. Loden, and Mr. Bohnenstingel presented their findings to Ms. Janiga and Ms. Sarles. Neither supervisor provided any substantive feedback on how to address the identified overpayments in the Georgia region.

131.    In fact, neither compliance management nor Georgia Regional Claims management did anything to attempt to collect, reimburse the government, determine the root cause, or identify other similar overpayments.

132.    There was also no request to perform a similar analysis for all of the other regions, which would return more identified overpayments. Kaiser, avoiding its obligation altogether, failed to perform further investigations or overhaul a recovery process.

133.    Subsequently, the findings were also brought before Mr. Killeen and Bill Withers, Vice President of the Georgia Region Claims Department.

134.    Mr. Kileen's response to the overpayments was indifferent. Mr. Withers was interested in learning more about the issue, but Mr. Kileen got in the way of any follow-up with the matter by acknowledging his receipt of the issue.

135.    In the end, nothing was done to address the overpayments identified for the Georgia region or to avoid recurrence.

136.    In fact, not only did Kaiser refuse to let Relator continue with his claims analysis in other Regions, the Claims Cost Containment office's refusal to address overpayments made it impossible for the regional groups to understand the full extent of the overpayments issue. Therefore, they could not and did not correct it.

***$380,000 in Overpayments Due to Upcoding***

137.    Another example shows that despite knowledge of failures and deficiencies in claims due to up-coding, Kaiser took no corrective action to report and return identified overpayments.

138.    In fact, Relator's efforts to resolve those issues were met with extreme hostility by one of his superiors, Laurel Sutcliffe, Director of the National Compliance Office.

139.    Relator began reporting to Ms. Sutcliffe in July 2016. Ms. Janiga stepped away from her duties as Relator's direct supervisor and Ms. Sutcliffe began supervising Relator. Ms. Sutcliffe was a key Kaiser figure who actively tried to prevent Relator from further investigating potentially overpayments, and who prevented him from performing his job in compliance. Like Ms. Janiga, Ms. Sutcliffe was not entirely familiar with claims operations.

140.    CMS defines an overpayment in the same way as defined in the ACA, which refers to "any funds that a person receives or retains [under Medicare or Medicaid programs] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. §1320a–7K(d)(4)(B). CMS also provides examples of common types of overpayments, which includes payments in excess of the allowable amount for an identified covered service (*e.g.,* due to upcoding or miscoding).

141.    As it applies to situations that trigger upcoding, new patient visits generally require more time than follow-up visits for established patients. Thus, Medicare pays codes for new patients at higher reimbursements rated than codes for established patients. CMS, *Avoiding Medicare Fraud & Abuse: A Roadmap For Physicians*, ICN 905645 (November 2017) available at:  https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Avoiding_Medicare_FandA_Physicians_FactSheet_905645.pdf

142.    Here, Kaiser engaged in upcoding by, instead of billing for an established patient follow-up visit, using a higher-level code that correlates with a new patient office visit.

143.    On October 12, 2016, Relator submitted a request to Kaiser's data analytics team, Mr. Loden and Sean Kelly, Senior IT Compliance Consultant, to identify instances of where the "initial procedure" was done more than once for a single member. Relator wanted to know if Kaiser was overbilling Medicare by billing for a new patient office visit *every* time a patient went into the doctor's office, even though the patient was coming back for a follow-up visit.

144.    Relator shared his plans to do so with Andrea Allmon, Senior Director of Product Management at vendor FICO, and asked for guidance on how to investigate and review the claims spectrum associated with this particular matter. In an email response to Relator, dated October 12, 2016, Ms. Allmon advised Relator to "search for the word 'initial'" and that "there are many pairs where there is 'initial' and 'subsequent'":

From:   Andrea Allmon <andreaallmon@fico.com>
To:     Jeffrey P Mazik/PO/KAIPERM@KAIPERM
Date:   10/12/2016 04:24 PM
Subject:   FW: Procedure Code look-up files

---

**Caution:** This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

---

You can search for the word "initial" and there are many pairs where there is "initial" and "subsequent"
This file is a bit old.

**From:** Jeffrey.P.Mazik@kp.org [mailto:Jeffrey.P.Mazik@kp.org]
**Sent:** Wednesday, October 12, 2016 4:29 PM
**To:** Andrea Allmon <andreaallmon@fico.com>
**Subject:** Re: FW: Procedure Code look-up files

Awesome, thanks Andrea!  I'm going to submit a request to our data analytics team to identify all instances of where we have an "initial" procedure done more than once for any given member.  I'll let you know what we find...

**Jeffrey P. Mazik**
Fraud Control Program

**Kaiser Permanente**
National Compliance, Ethics & Integrity Office
One Kaiser Plaza, 12th Floor
Oakland, CA 94612

Office: 510-267-5951
Mobile: 530-919-8324

NOTICE TO RECIPIENT: If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

145.    In her response, Ms. Allmon added that while there could be scenarios where more than one new patient visit could be appropriate, Relator's claims data investigation was a "great project" and that "it [would] pay off," implying that Relator's efforts would be helpful for Kaiser's claims cost containment directive in the claims and billing regime.

146.    Utilizing the FICO tool, Relator directed a limited initial review - of just one out of the 160 "initial procedure" codes - code 99306, for one of the regions – Northwest Region.

147.    Relator identified $380,000 in overpayments associated with code 99306 for the Northwest Region and immediately shared his findings with the Northwest Region. In the October 19, 2016 email, with the subject line, "Potential Overpayments in NW Region" to Judy

Lee Warford, Coding Consultant, and Timothy Molloy, Northwest Regional Compliance Manager Investigations and Training, Relator shared a list of instances "using multiple initial 99306 codes, which should likely have been billed as subsequent codes … ."

148.    After notifying the Northwest Region, he briefed Ms. Sutcliffe of his findings, emphasizing that the identified overpayment amounts was limited to one code and one region, and that there would be more overpayments in other associated codes at the other regional offices.

149.    Instead of promptly reporting the identified overpayments and running a similar review of all other regions and all other billing codes, Kaiser avoided its obligation and Ms. Sutcliffe verbally criticized Relator for performing the investigation and sharing the results of the claims data review with the regional office without her prior approval.

150.    In an intentional refusal to investigate and an active campaign to obstruct Relator from investigating overpayments, Ms. Sutcliffe told Relator that he was forbidden from further looking into code 99306, or any other codes for other regional offices.

151.    In response to Ms. Sutcliffe's hostile receipt of his findings during their meeting, Relator sent Ms. Sutcliffe a list of the overpayments he had already sent to Tim and Judy.

152.    Though Relator was obligated to notify his superiors and regional offices of his findings, Ms. Sutcliffe was angered by his reports and prevented him from making further inquiries or reports. She actively shut down further investigation into claims overpayments.

153.    Ms. Sutcliffe did not follow-up with Relator's analysis or discuss the matter further with other senior level staff, let alone report and refund the government within the mandated timeframe. Kaiser again failed to meet its legal obligations.

154.     In short, Defendants' motive and intent to dismiss fraudulent claims and prevent detection of overpayments were apparent, as indicated by negative responses and open hostility from various Kaiser senior staff to Relator's notification of massive claims overpayments and systemic failures.

***Overpayments Due to Overbilling of Diabetic Test Strips***

155.     In another representative exmpale, overpayments also resulted from unusually high billing for multiple diabetic test strips (DTS) claims submitted for the same member by the same supplier.

156.     According to CMS, suppliers that bill for extremely high amounts of DTS warrant further scrutiny.

157.     Medicare covers different amounts of DTS depending on a member's medical condition. Specifically, Medicare covers up to 100 DTS (*i.e.*, 2 units) every month for insulin-dependent beneficiaries and every 3 months for non-insulin-dependent beneficiaries. Medicare allows additional DTS only if deemed medically necessary and documented in physician records.

158.     In 2014, Kaiser conducted a review of DTS claims for all the regional offices, in which Regional Compliance with Area Compliance officers were tasked with reviewing utilization with physicians and pharmacists.

159.     In monitoring DTS for overutilization, Kaiser learned that alarming quantities of DTS, in excess of Medicare utilization guidelines, were being prescribed to members. A majority of those claims had no physician documentation determining medical necessity for additional DTS. Moreover, most of the physicians claimed to not know how the beneficiaries had obtained such high quantities of DTS.

160.    The onus was on Kaiser to develop and implement policies and procedures set forth by CMS and designed to monitor and track DTS claims that exceeded Medicare thresholds.

161.    However, the regional compliance offices did not have a proper auditing process to catch billing errors associated with DTS claims to ensure that those claims were being handled properly, pursuant to CMS rules and regulations.

162.    Instead, after identifying the suspiciously high number of DTS and noting the lack of proper documentation, Kaiser nevertheless intentionally allowed these tainted claims to continue to be submitted to the government, taking necessary corrective steps, and without implementing any proper compliance measures to verify errors and inaccuracies in DTS claims.

163.    Such overbilling of DTS per member also caused massive overpayments that were never disclosed and reported to the government, let alone refunded.

164.    On the issue of overpayments associated with DTS, Relator provided a detailed compilation of claims data results for the Northern California regional office, which was prepared by Sue Preston, National Director, Enterprise Regional Compliance at Kaiser, for the purposes of including the information in Kaiser's December 2014 National Fraud Control Program Board Report.

165.    The final Board Report shared the method of how the DTS claims review was conducted and applauded several accomplishments with their approach for mitigating the risks involved with DTS claims. Below is a slide from the Board Report, showing how the review was conducted.



166.    The last step to the review indicated that "[c]ases are handled locally or referred to investigations."

167.    However, notably absent are steps addressing any corrective action, self-disclosure and refund to the government. This was because DTS claim overpayments were not disclosed to the government or corrected. Selective identification was the first and last step. There was no follow-up with the overpayments identified from the Northern California region.

168.    The chart[1] below indicates high numbers of diabetes test strips prescribed to each member. For example, Member C.P. was prescribed 18,800 strips within a span of 11 months, totaling an unreasonable and medically unnecessary number of 1,709 strips per month, when only 100 strips per month are permitted per Medicare.

---

[1] To protect patient confidentiality, no patient names or full dates of birth are used herein.

| PCP AREA CD | PCP AREA DE | MRN | Reviewed | PATIENT NAME | PART D | Total 12 Month GTS Baseline (Jun2013- | Avg GTS/ Month (boxes) Baseline (Jun2013-May2014) | Total KP Spend per month Baseline Jun2013-May2014) @ $13.8 per Box |
|---|---|---|---|---|---|---|---|---|
| OAK | OAKLAND MEDICAL CENTER AREA | 12003749 | 1 | | N | 7,000 | 5.83 | $80.50 |
| SRF | SAN RAFAEL MEDICAL CENTER AREA | 8739999 | 1 | | N | 6,200 | 5.17 | $71.30 |
| OAK | OAKLAND MEDICAL CENTER AREA | 13369865 | 1 | | N | 5800 | 4.83 | $66.70 |
| OAK | OAKLAND MEDICAL CENTER AREA | 15476073 | 1 | | N | 5500 | 4.58 | $63.25 |
| OAK | OAKLAND MEDICAL CENTER AREA | 8069450 | 1 | | N | 4,800 | 4.00 | $55.20 |
| OAK | OAKLAND MEDICAL CENTER AREA | 8274390 | 1 | | N | 2700 | 2.25 | $31.05 |
| SCL | SANTA CLARA MED CENTER AREA | 954606 | 1 | | N | 18,800 | 15.67 | $216.20 |
| OAK | OAKLAND MEDICAL CENTER AREA | 6543221 | 1 | | N | 12,300 | 10.25 | $141.45 |
| SAC | SACRAMENTO MEDICAL CENTER ARE | 12827757 | 1 | | N | 10,400 | 8.67 | $119.60 |
| DRV | ANTIOCH MEDICAL CENTER AREA | 12004299 | 1 | | N | 9100 | 7.58 | $104.65 |

169.     Kaiser's failure to follow up with member prescriptions for DTS claims caused another stream of unlawful transactions. Members who obtained a surplus of diabetic test strips, as a result of the overbilling and refusal of Kaiser to correct the issue, were then selling their overabundance of supplies on Ebay and other similar web sites, substantially profiting from those sales.

170.     Kaiser was fully aware of this secondary market but did not correct the overbilling and prevent the resale of the DTS strips on the secondary market by its members. Instead, it continued.

171.     It is unlawful to resell diabetic test strips acquired through Medicare and Medicaid. Kaiser's practice of overbilling and refusal to take corrective measures and notify the government caused and perpetuated the unlawful transactions.

172.     The aforementioned examples illustrate only the representative incidents that occurred in some of the regional offices. There are millions of false claims that were submitted to CMS during the relevant period that were intentionally not investigated as overpayments, which were unlawfully retained, never reported and repaid to the government.

173.     Kaiser's motive and intent to retain overpayments were evident in its actions including improperly utilizing claims fraud review tools to *minimize* detection of errors and

anomalies, prioritizing financial relationships with external provider contracts, rather than providing accurate and prompt compliance directives to those providers to submit proper and accurate claims, and ignoring recommendations from outside compliance consultants to enforce mechanisms to address overpayments.

*(a) Improper use of claims auditing tools developed by McKesson and Verisk*

174.    One way in which Defendants actively allow overbillings and permit them to reoccur, which led to unreported and unrecovered overpayments, was by intentionally turning on only some of the available and purchased claims review tools and turning off the rest of the equally necessary tools so as to decrease the likelihood of detection.

175.    At best, Kaiser uses them at minimum capacity so as to avoid finding massive overpayments. Kaiser engaged in such practices to decrease the chances of catching claims errors and anomalies.

176.    In an effort to appear facially compliant, Kaiser contracts with various data analytics vendors to perform claims review of Kaiser's outside claims for each regional office. Typically, the vendors provide software applications that perform various types of reviews, detecting claims that are incorrectly billed or coded outside of an established payment, medical or contract policy; intentionally manipulated claims that technically fall within plan rules; and derived from administrative costs associated with inefficient manual processes.

177.    McKesson and Verisk are notable key vendors that contracted, and still continue to contract, with Kaiser to perform claims data review, purportedly in efforts to monitor and detect potential overpayments and other fraud.

178.   McKesson offers a rules-driven auditing process, utilizing a software called ClaimsXten to provide Kaiser with a robust set of rules which, if used properly, detects abusive billing and prevent wasteful payments.

179.   A few, select code auditing rules that ClaimsXten offers to Kaiser are highlighted below in an internal document entitled, "Summary of the ClaimsXten Rules." This document lists 54 edit rules:

**1.   Procedure Code Invalid (Proc_Invalid)**

Identifies invalid procedure codes and revenue codes. Revenue codes are validated only if submitted in the procedure code field of a facility claim.

**2.   Modifier Validation (MOD_INVALID)**

Identifies claim lines containing modifiers and determines if the modifier submitted was a valid modifier on the date of service

**6. Deleted Code (Deleted)**

Identifies procedure codes that have been deleted

**7. Incomplete Diagnosis (DIAG_INCOMP)**

Identifies claims containing incomplete ICD-9 diagnosis codes.

**8. Invalid Diagnosis (DIAG_INVALID)**

Identifies claims containing invalid diagnosis codes

**28. CMS Correct Coding Initiative (NTIS_ALL)**

Identifies claims containing code pairs found to be unbundled according to the Centers for Medicare and Medicaid Services' (CMS) National Correct Coding Initiative (NCCI).

**29. McKesson Unbundling (UNBUN_PAIRS)**

Identifies claim lines containing procedure codes typically not recommended for reimbursement when submitted with certain other procedure codes on the same date of service

180.    McKesson and its ClaimsXten Rules were put in place to help Kaiser monitor and detect problematic claim payments before they go out the door and to reduce any additional expense.

181.    If properly used, Kaiser would have been able to do just that. It was not.

182.    Relator discovered that Kaiser improperly utilized the ClaimsXten Rules by intentionally turning on less than half of the available edit rules (25 out of 54), so that errors would go undetected, and Kaiser would continue overbilling the government.

183.    The compliance office was under the assumption that McKesson and Verisk were providing duplicative claims edits. Thus, the compliance office initiated a project to perform an in-depth analysis comparing the two claims review tools, to see if they were using the same metrics to track claims and if so, whether it was necessary and cost-effective to continue utilizing both programs at Kaiser.

184.    This was an initiative directed by Compliance Office management working in conjunction with Claims Cost Containment Administration at Kaiser - Sean Killeen, Executive Director, and Alice Stolz, Claims Edit/COB Specialist – both senior level members of the Claims Cost Containment Administration.

185.    The purpose of the analysis was to figure out if Kaiser really needed the tools provided by both McKesson and Verisk, from a cost reduction point of view.

186.    However, as a result of comparing Verisk and ClaimsXten editing functionalities, Relator identified massive overpayments in the Georgia region, discussed in detail, *supra* 29-31

187.    The compliance team's findings were consistent with a presentation that discussed Kaiser's plan to implement an uniform claims platform (Tapestry), prepared by Ms. Stolz. The first slide, titled "Comparison of Verisk Rules and ClaimsXten Rules" shows some of the rules

active in Georgia that were not activated in the ClaimsXten Rules, indicating that both Verisk

and ClaimsXten were necessary to review external claims.

## Comparison of Verisk Rules and ClaimsXten Rules

| Rules active in GA; No corresponding CXT Rule |
|---|
| ASM Does not match surgeon |
| ASR Reduction for assistant |
| AWP Anesthesia no surgeon |
| COS Cosmetic procedure |
| EFR Endoscopic Family Reduction |
| CSR Reduce, surgical team |
| IOP Inpatient only procedure |
| M52 Modifier 52 reduction |
| M53 Modifier 53 reduction |
| M73 Modifier 73 reduction |
| M74 Modifier 74 reduction |
| MTR Multiple Therapy Procedures |
| RASM Surgeon and Assistant do not match |
| UPA Unreasonable paid amount |

188.    The two slides below, also titled "Comparison of Verisk Rules and ClaimsXten

Rules," indicate the different reporting capabilities between Verisk Rules (left) and the

ClaimsXten Rules (right). Both capture different claims edits and the chart also shows that

ClaimsXten Rules use more modifiers than Verisk, confirming the need to utilize both programs

– at full capability -- as platforms for detecting fraud.

42

## Comparison of Verisk Rules and ClaimsXten Rules

| Rules Set to N for GA | Corresponding CXT Rule |
|---|---|
| | AGE |
| | AGE_CODE_REPLACEMENT |
| AGE Inappropriate for age | ICD_AGE_MADV |
| ASD Services associated with non-covered services | CPT_NOT_COVERED_FAC |
| DEL Deleted Code | DELETED_CODE |
| | BASE_CODE_QUANTITY |
| | FREQ_XWALK_FILTER |
| | MUE_MULT_LINES_FACILITY |
| | MUE_MULT_LINES_MADV |
| | PROC_MULT_DOS_FILTER |
| FOT Frequency Over Time | PROC_SINGLE_DOS_FILTER |
| | BASE_CODE_QUANTITY |
| | FREQ_XWALK_FILTER |
| | MUE_MULT_LINES_FACILITY |
| | MUE_MULT_LINES_MADV |
| | PROC_MULT_DOS_FILTER |
| FRE Reimbursable once per day | PROC_SINGLE_DOS_FILTER |
| GDR Antepartum care included in global code | OB_PACKAGE_RULE |

## Comparison of Verisk Rules and ClaimsXten Rules

| Rules Set to N for GA | Corresponding CXT Rule |
|---|---|
| | ASE CODE  UA TIT |
| | FRE    WA    FI TER |
| | MUE MU T  I ES FACI IT |
| | MUE MU T  I ES MAD |
| | PROC MU T DOS FI TER |
| | PROC SI   E DOS FI TER |
| | SAME DA   A |
| MA  E ceeds daily limits | SAME DA   A  2 |
| CD    ational Co erage Determination | Additional Rule Set A ailable |
| CD    ational Co erage Determination | Additional Rule Set A ailable |
| PSUS Documentation needed | Part of the Asst Surg, Co Surg, Team Surg and Unlisted edits |

189.    Despite the findings, Kaiser did nothing to comply with the law relating to overpayments. Kaiser was only interested in cost savings and maintaining its provider network.

*(b) Relationship With External Providers*

190.    Kaiser also failed to meet monitoring and supervisory obligations as a Medicare Advantage plan participant, failing to ferret out and take corrective action against providers that intentionally failed to report and recover identified overpayments.

191.    CMS provides strict requirements governing MA plans' contractual relationship with external providers, affiliates, vendors, and other entities (also known as First Tier, Downstream, and Related Entities (FDRs), which are defined by CMS as any party that enters into a written arrangement with a Medicare Advantage organization to provide certain healthcare services) that the MA plan will rely upon to provide services to the members of the MA plan.

192.    Pursuant to federal laws and CMS regulations, MA plans have the obligation to take responsibility for administering their MA plans, including truthful and accurate monitoring and oversight of all delegated functions to FDRs, comprised of the following duties and responsibilities:

- Sponsor must have a system in place to monitor FDRs per 42 C.F.R. §§ 422.503; 422.504; 423.505;
- Plan must have training and education for all employees and management of all FTRs per 42 C.F.R. § 422.503(b)(4)(C)(1);
- Plan must have established, effective lines of communication between all entities to report compliance issues per 42 C.F.R. § 422.503(b)(4)(D);
- Compliance must not be delegated per 42 C.F.R. § 422.503(b)(4)(vi); 42 C.F.R. 422.504(i)(1);
- The Plan must maintain and have "well publicized disciplinary standards" to "encourage the good faith participation in the compliance program" per 42 C.F.R. § 422.503(b)(4)(E); and
- The Plan must have a system for "promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensure ongoing compliance with CMS requirements" per 42 C.F.R. § 422.503(b)(4)(G).

193.    CMS also provides that corrective actions, including performing a root cause analysis, must be designed to correct the underlying problem. The corrective action must be tailored to address the particular fraud, problem or deficiency identified, and must include timeframes for specific achievements. *See* 42 C.F.R. § 422.504(i)(1).

194.    In doing so, the plan sponsor must ensure that FDRs correct deficiencies and provide documentation of all identified deficiencies and corrective actions taken. *Id*.

195.     Kaiser contracts with the Permanente Groups, which subcontract with Easterseals, to provide health care services for members diagnosed with autism. Although Easterseals directly submits the claims for payments to the government, Kaiser continues to be responsible for both Permanente and Easterseals' compliance with the requirements pursuant to the federal statute and applicable provisions implied in their contract.

196.     However, Kaiser fails to perform the most basic functions of an MA plan, failing to ensure that Easterseals properly identifies overpayments and takes appropriate corrective actions to follow-up, directly violating federal laws and CMS contractual provisions.

197.     The "Easter Seals Statewide Contract" from 2013 included a compliance provision that required FDRs like Easterseals (also known as downstream entity) "to comply with all applicable Medicare laws and regulations (including without limitation those designed to prevent or ameliorate fraud, waste, and abuse) …"

### Attachment 1

### FEDERAL PROGRAM COMPLIANCE

**A.     Medicare Advantage Program**

Kaiser Foundation Health Plan, Inc.  ("Health Plan") has entered into a Medicare Advantage Organization contract with the Centers for Medicare and Medicaid Services ("CMS").  Health Plan has contracted with Permanente to provide certain services under such Medicare Advantage contract.  CMS and Health Plan require Permanente to include the provisions in this Section A in any subcontracts.  Section A of this Exhibit is incorporated by reference into and made part of the Agreement with respect to Services rendered to Members enrolled in the Medicare Advantage program ("MA Members").  In the event of a conflict or inconsistency with any term or condition in the Agreement relating to Services rendered to MA Members, Section A of this Exhibit shall control.  Permanente shall itself, or shall cause Health Plan to, satisfy the obligations of Health Plan under this Exhibit.

12. **Compliance.** [42 CFR §422.2, §§422.504(h),(i)&(j), §422.562(a), §422.516, §422.503(b)(4)(vi), §422.2268, MMCM Ch. 11, §100.4 and 120, MMCM Ch. 21, §50.7.2]  Contractor shall comply and shall require any subcontractors providing services to MA Members, to comply with all applicable Medicare laws and regulations (including without limitation those designed to prevent or ameliorate fraud, waste and abuse), state and federal laws (including criminal laws, the False Claims Act, Anti-Kickback statute, Health Insurance Portability and Accountability Act or HIPAA, Civil Rights Act of 1964, Age Discrimination Act of 1975, Rehabilitation Act of 1973, Americans with Disabilities Act, Genetic Information Nondiscrimination Act of 2008), with CMS instructions, with Health Plan's policies and procedures, with applicable elements of Health Plan's compliance program (including, without limitation, reporting of compliance issues, cooperation with Health Plan's routine monitoring and auditing of providers, and annual training and education, e.g., related to fraud, waste and abuse), and with applicable contractual obligations under Health Plan's Medicare Advantage contract, as amended from time to time.  Failure to comply with Health Plan's compliance program may result in a corrective action or other appropriate action under the Agreement.  In the event of changes to the governing laws, regulations, or CMS requirements applicable to the Medicare Advantage program, this Exhibit shall be amended to the extent required by any such later required changes.  Contractor shall cooperate, assist and provide records, data and information, as requested by Health Plan or Permanente, for Health Plan's compliance with Medicare requirements.

198.    Part of maintaining compliant relationships with outsourced services require plan sponsors, like Kaiser, to oversee procedures for auditing and reporting. In other words, an MA plan like Kaiser is not a simple pass-through entity. Plan sponsors must undertake corrective actions in response to potential noncompliance or potential fraud. 42 C.F.R. §§ 422.503(b)(4)(vi)(G), 423.504(b)(4)(vi)(G).

199.    Kaiser's failure to properly oversee and monitor the operations of its external providers caused Easterseals to continue overbilling Medicare, which Easterseals intentionally never disclosed to the government or engaged in efforts to refund identified overpayments. Even after identification of overpayments at those entities, Kaiser (and Easterseals) refused to correct those issues, resulting in similar, repeated billing and claims errors.

200.    In March 2013, the Southern California Permanente Medical Group (SCPMG) Internal Audit Unit conducted an external provider audit at the request of Blaine Yanabu, Director of the SCPMG Internal Audit. The main objective of the audit was to determine billing and claims payment accuracy for Easterseals.

201.    This particular audit randomly selected thirty members for review. There were 116 claims billed to Easterseals at the amount of $158,630. Of those claims, SCPMG's Medicare

Fraud Prevention Unit discovered significant billing errors by Easterseals that resulted in the aggregate, an overpayment amount of $67,312.

202.    Based on the audit and the medical records received from Easterseals, the audit summary revealed a 50% billing error resulting in 40% claims payment inaccuracies.

203.    A selection of a draft copy of an internal memorandum prepared by Luz McCullough, SCPMG Internal Audit, who reported up to Mr. Yanabu, is provided below. The memorandum summarized the audit, outlined potential reasons for claims errors, and listed opportunities for improvement and areas for focus.

204.    The outcome summary in the memorandum indicated that there was a "wide variation of billing accuracy from member to member" reflected in the audit scores below, and that "there [was] significant discrepancy in between the intensity of service provided to KP members referred to Easterseals and the amount paid for the services billed."

| Summary | CPT Count |
|---|---|
| Count of Billed CPT | 647 |
| Count Billed Correctly | 323 |
| Overall Billing Accuracy | 50% |

| Error Categories | Error Count | Amounts Overpaid |
|---|---|---|
| Missing Records | 198 | $35,865 |
| Upcoding (Time-Based Codes) | 89 | $13,975 |
| Service Billed Not Supported by Documentation | 31 | $5,234 |
| Billing for "No Show" | 13 | $5,855 |
| Unauthorized Services | 19 | $6,383 |
| Total | 350 | $67,312 |

205.    The memorandum also revealed Easterseals' lack of ability to provide proof of documentation of services provided. To this, Easterseals agreed and provided attestations that the

records were missing. For example, 57% of the records requested were attested missing. The net value of missing records was $35,865 in overpayments.

206.    No follow-through or further audits were conducted after the memorandum was provided to Mr. Yanabu. There was no corrective action taken to curb future overpayments. Instead of promptly addressing any potential shortcomings, Kaiser did not correct any of the major deficiencies associated with Easterseals for several years.

207.    In fact, Kaiser repeatedly paid Easterseals *additional funds* to purportedly "fix" the problem. Easterseals never fixed the problems and the same issues reoccurred.

208.    The primary reason for Kaiser's deliberate failure to ensure that KP and Easterseals complied with CMS rules and regulations and failed to correct overpayments, was because Kaiser solely prioritized maintaining the contractual relationship with Easterseals, in which both Kaiser and Easterseals generated significant revenue.

209.    In other words, the significant revenue that its partnership with Easterseals brought to Kaiser was far too high for Kaiser to terminate its contract with problematic external providers, or to even require strict compliance with Medicare rules. Kaiser wanted to avoid the possibility of losing a provider.

210.    Kaiser senior management knew about these problems, identified overpayments, but failed to correct those overpayments, and allowed Easterseals to continue overbilling that resulted in massive overpayments.

211.    A few years later, as part of his initiatives to dig into overpayments, Relator asked Ms. McCullough for the summary of the initial work Kaiser did with Easterseals.

212.    He not only discovered that the last time Kaiser did an audit for Easterseals was back in 2013 (when massive overpayments were found), based on the handful of claims they

reviewed that year, but that upon reviewing other claims data review, the FICO tool was still discovering similar claims errors and billing inaccuracies in 2015 and 2016. This is because they had not been fixed.

213.    In sum, there were numerous claims and providers that Verisk and FICO identified as overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of "provider abrasion."

214.    Rather than recouping money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

*(c)  Lack of Process to Identify, Investigate, Report, and Repay Overpayments*

215.    Kaiser lacked overall initiative to improve the monitoring and tracking of claims review and facilitating corrective actions for fraud control at all the regional offices.

216.    As a result, Kaiser Permanente of the Northwest suffered a compliance setback in 2010 when it agreed to pay $1.8 million to settle a False Claims Act case in connection with Medicare billing errors between 2000 and 2004.

217.    Kaiser-Hawaii, signed off by the Kaiser national Chief Compliance Officer, was also under a Corporate Integrity Agreement ("CIA") from 2005 through 2010. The CIA required Kaiser-Hawaii to perform independent reviews aimed at assessing billing and coding practices. The CIA also required Kaiser-Hawaii to "correct the problem, including preventing the underlying problem and the [o]verpayment from recurring."

218.    The exact overpayment amounts did not have to be fully ascertained before overpayment reporting was triggered under Kaiser's CIA. Instead, "if not yet quantified, within 30 days after identification, Kaiser-Hawaii [could] notify the payor of its efforts to quantity the [o]verpayment amount along with a schedule of when such work was expected to be completed."

219.     Though on clear notice of these failures, to the extent that Kaiser put into place inquiries, reviews, and systems to identify, report, refund and correct overpayment in Hawaii, Kaiser failed to roll out or nationalize those procedures to the rest of the company.

220.     Instead, in spite of the CIA, there was no company-wide, active system to identify, report and correct overpayments in any region from 2010 at least until Relator was wrongfully terminated from Kaiser.

221.     Since there was no such process in place, Kaiser had very few investigations related to identified claim overpayments.

222.     Though Kaiser conducted fraud, waste and abuse investigations, a miniscule amount of these were related to claims since Kaiser did not want to upset its providers or, as it said, to avoid "provider abrasion." During the nine-year period from 2006-2014, there were a total of 5,253 substantiated fraud, waste and abuse investigations, but only 2% of those were claims related.

223.     On one occasion, the Maryland Insurance Administration inquired into the "unusually low" number of suspicious claims in 2015 and the non-existent suspicious claims reported for 2014.

224.     When the state agency inquired into why Kaiser's Mid-Atlantic Region's 2014 annual report submission contained such low numbers of suspicious claims, Kaiser should have, but did not, report or disclose to the state that the reason for the unusually low number was because it had no process to fully identify, investigate, report and correct claims overpayments.

225.     Given the misrepresentations, Kaiser's cover-up and failure to disclose truthfully to the government, the government was not on notice of the fraud until Relator's disclosure related to this case.

*(d) Failure to Enforce Compliance Mechanisms Recommended by Third Party
    Compliance Consultants*

226.    Kaiser's lack of initiative was also evident in Kaiser's failure to adhere to the

recommendations of outside compliance consultants, hired to identify regulatory risk such as

overpayments, and enforcement of related compliance issues. The more Relator tried to steer

Kaiser in the direction of full compliance and disclosure, the more he was sidelined and closed

out from data and documents, which prevented the systemic operational and compliance

violations from being corrected going forward.

227.    For example, as part of a strategic effort to appear compliant and interested in

identifying and fixing problems, Kaiser hired consultants Diversified Compliance Group (DCG).

228.    DCG, a third-party consulting company, was hired to conduct compliance risk

assessments, interpret changing Medicare and Medicaid regulations and help Kaiser understand

the impacts of proposed and enacted legislation, and assist Kaiser's compliance office with

controlling costs, and identifying and mitigating risks associated with the evolving rules and

regulations.

229.    DCG conducted quarterly meetings with Kaiser to address challenges and

potential issues and prioritize the compliance department on the key activities and initiatives that

Kaiser should try to achieve and commit to promoting a culture of compliance for Kaiser and its

regional offices.

230.    Despite the recommendations of the outside compliance consultants, hired to

identify overpayments and enforce related compliance issues, Kaiser failed to follow them,

demonstrating knowledge, willfulness, and clear motive and intent to conceal the fraud, which

became more evident to Relator towards the end of his tenure at Kaiser.

231.     On February 2016, Relator attended one of the DCG quarterly meetings. DCG, as always, suggested opportunities to create or enhance shared services across Kaiser's compliance program and realign the work streams where appropriate and establish and refine compliance performance metrics for key lines of business and functions in operation at all the regional offices.

232.     Relator observed key players at Kaiser who attended the meeting, acknowledging the information, but choosing to not do any follow-up on the matters that were being discussed and the areas of vulnerability and liability that were identified by the consultant.

233.     Relator's findings of subsequent overpayments confirmed that Kaiser was not taking the proper and necessary corrective action on these issues.

234.     On November 10, 2016, Relator attended another DCG meeting. This particular DCG presentation discussed how the recently-enacted CMS' 60-Day Overpayment Rule could impact the "return of overpayments." A slide from DCG's presentation indicates as such:

**DIVERSIFIED COMPLIANCE GROUP** LLC

HEALTHCARE FINANCE CONSULTING

November 2016 Compliance Leadership Meeting

November 10, 2016

KAISER PERMANENTE.                    Confidential and Proprietary © 2016 by DCG LLC All rights reserved

- In this section, we will focus on the model and pathway developed by CMS to ensure the integrity of federal expenditures.
  - Distinction between providers and subcontractors
  - State "enrollment" of Network Providers
  - Certification of data submissions
  - Program integrity functions
  - Return of overpayments

 KAISER PERMANENTE.

14

235.     During the presentation, Relator noted several key issues that applied to Kaiser and its current failures and noncompliance in relation to handling overpayments leading up to the presentation, particular to the various claims data review Relator conducted earlier that year that had not been followed up on, had not been reported, had not been refunded and had not been corrected.

236.     Mid-presentation, Relator sent Ms. Sutcliffe a Skype message requesting a meeting to discuss his concerns and ways to adhere to the compliance requirements that DCG was interpreting for Kaiser during the presentation. Relator knew that failing to consider and implement DCG's advice would be a critical risk for Kaiser's role as a provider receiving government funding for member care.

237.     Ms. Sutcliffe responded that concerns about Kaiser's ability to comply with the 60-Day Overpayment Rule were "not a priority" and that Kaiser needed to focus on "initiatives," implying that those initiatives did not involve complying with the rules and regulations that DCG was interpreting for Kaiser's operations of member care. A snapshot of the Skype message between Relator and Ms. Sutcliffe on November 10, 2016 about the DCG presentation is provided below.





238.     Ms. Sutcliffe actively prevented Relator from doing his job as a compliance

employee because she did not want Relator to fully uncover the failures and concealment at

Kaiser.

**B.** **_Retaliation Against Relator and Wrongful Termination_**

239.     As recounted above, after Ms. Okinaga left her position at Kaiser, multiple

operational and compliance issues became apparent.

240.     Relator uncovered multiple instances of identified overpayments that were not further investigated, were not disclosed, were not refunded and were not corrected. Rather than act positively on the information given by Relator, Kaiser failed to take proper measures to comply with rules, regulations and laws on overpayments.

241.     Instead, the more Relator spoke up about Kaiser's improper processes for handling overpayments, and lack thereof, the more tension there was between Relator and his superiors and direct retaliation, especially his direct supervisor, Ms. Sutcliffe.

242.     There were several instances where Relator directly brought the overpayments issue to Ms. Sutcliffe's attention. On October 12, 2016, Relator approached Ms. Sutcliffe with $380,000 of identified overpayments. As explained in detail, *supra* at 31-35, Relator had investigated further into overpayments resulting from upcoding by billing for an established patient follow-up visit, using a higher-level code that correlates with a comprehensive new patient office visit. Relator's analysis for just one procedure code of the total of 152 initial procedure codes, identified roughly $380,000 in overpayments.

243.     Ms. Sutcliffe did not question his findings. However, rather than acknowledge Relator's efforts and the associated cost savings, and proceed to disclose, refund and correct systematic overpayments, Ms. Sutcliffe severely criticized him for performing such an analysis without her prior approval. Ultimately, he was forbidden to look into the issue further.

244.     Ms. Sutcliffe's combative attitude created an impossible work environment for Relator. For example, Relator became fearful of speaking up completely, let alone be able to bring identified overpayments to the discussion table for fear of further retaliation.

245.     Moreover, as of today, those massive overpayments that Relator identified for Ms. Sutcliffe, have never been disclosed and repaid to the government.

246.     After that incident, it was becoming evident that Ms. Sutcliffe had decided to increase the intensity of her retaliation against the Relator. At various points in October 2016, Ms. Sutcliffe increased adverse action when she denied Relator access to software tools necessary for him to fully and properly perform his role and for Kaiser to attempt to correct its severe compliance issues. Examples include the following:

- October 15, 2016: Ms. Sutcliffe denied Relator's request for access to the Claims Data Warehouse (CDW), Kaiser's internal data repository system to collect and analyze claims information. Relator was looking to review some of the CDW data, specifically for his ongoing triage of FICO-identified providers.

- October 16, 2016: Ms. Sutcliffe denied Relator's request for access to Kaiser Permanente Health Connect (KPHC), Kaiser's internal electronic health record database system. Similar to his needs for CDW access, Relator was also looking to review some of the KPHC claims data, specifically for his ongoing triage of FICO-identified providers.

- October 17, 2016: Ms. Sutcliffe pushed off, and ultimately never followed up with, Relator's request for access to the Member Complaint's database system. She told Relator that she needed to discuss with Ms. Janiga first, but never approved this request.

247.     In sum, Relator was denied access to every data repository necessary to perform his compliance job. Given that he had never had any problems with access during his long career at Kaiser, and these tools were necessary for his job, by refusing to allow him access, Kaiser actively stopped or prevented Relator from being able to perform his regular job.

248.     This was done in retaliation for his persistent investigations, finding and recommendations on claims overpayments.

249.     Ms. Sutcliffe's denial of Relator's access was meant to be punitive and to sideline the Relator. Moreover, it was also a stripping of his duties and responsibilities even though claims data review was the central role assigned to Relator on the compliance team.

250.     As he had done throughout his long career, Relator performed his duties proficiently at Kaiser.

251.     But as soon as Ms. Sutcliffe was notified that Relator was conducting in-depth claims data review and had identified $380,000 in overpayments, Relator was placed on a Performance Improvement Plan (PIP). The PIP noted four areas of improvement – communication; develop skills; time management and results; and strategy and relationship building.

252.     Ms. Sutcliffe subsequently used the Skype message conversation on November 10, 2016 (during which Relator suggested Kaiser was not in compliance), *supra* at 52-54, as an example of how Relator failed to "stay focused" and added it as one of the reasons for placing him on a PIP.

253.     Although Relator had a strong speculation that he had been placed on a PIP because he had spoken up about massive overpayments and refused to drop the issue, Relator made every effort to demonstrate objective and measurable improvement in each of the four areas.

254.     Ms. Sutcliffe's deliberate retaliatory actions continued throughout November and December 2016. Furthermore, Relator's repeated requests for software and tools necessary to perform his job were rejected, ignored, and rebuffed.

255.     The tension between Relator and Ms. Sutcliffe hit its peak in early December, when Ms. Sutcliffe severely limited Relator's communication with all Kaiser employees, including those outside the office and off the clock.

256.     On one occasion, Ms. Sutcliffe forbid Relator from holding any meetings with anyone at Kaiser that was above her level, without prior, express approval from Ms. Sutcliffe.

257.     On November 2016, Relator had coffee with Rob Belch, Senior Vice President, Internal Audit Services at Kaiser, who was also a social friend. While walking back to Mr. Belch's office, Mr. Belch introduced him to Derric Gregory, a new member of Mr. Belch's team, covering the MSSA area, including claims.

258.     When Relator returned to his desk, he circulated an email introduction for Mr. Gregory and Ms. Sutcliffe. Mr. Gregory had requested an introduction, in order for the compliance office and the MSSA office to establish a relationship and seek opportunities for everyone to work together in the future.

----- Forwarded by Jeffrey P Mazik/PO/KAIPERM on 11/30/2016 02:34 PM -----

From: Jeffrey P Mazik/PO/KAIPERM
To: Derric A Gregory/CA/KAIPERM@KAIPERM
Cc: Rob Beltch/CA/KAIPERM@Kaiperm, Laurel J Sutcliffe/CA/KAIPERM@MSO365
Date: 11/30/2016 02:33 PM
Subject: Internal Audit Services - New Health Plan/Claims Contact

Hi Derric,

It was great to meet you briefly this morning, and thanks for the offer to work together to better understand the potential touch points between our Fraud Control Program team, and your Internal Audit Services audit team covering the Health Plan area, and specifically the Claims area.  I'd like to introduce you to my manager, Laurel Sutcliffe, Senior Manager, Fraud Control Program, reporting to Marita Janiga,

Laurel: I had coffee this morning with Rob Belch in IAS, and he was gracious enough to do a quick introduction to Derric, who is the Executive Director now responsible for the audit coverage of the various Health Plan functions, including Claims.

Rob had suggested that we convene a meeting to discuss the 2017 IAS audit plan for the claims area, our claim related data analytics capabilities, including FICO, and generally how we can work together going forward to accomplish our common goals.

Thanks everyone, and looking forward to our continuing partnership.

Jeffrey P. Mazik
Fraud Control Program

259.     After circulating the email, Relator sent a side note to Ms. Sutcliffe, emphasizing that he "was just having coffee with Rob, as a friend" and that he "didn't reach out to [Mr. Belch] to make this connection." Relator's initiative in trying to foster and establish new business relationships for the compliance team was evident and he also engaged in efforts to

update Ms. Sutcliffe on the status of all of his communications, as indicated in the email to Ms.

Sutcliffe below.

> **From:** Jeffrey P Mazik [mailto:jeffrey.p.mazik@nsmtp.kp.org]
> **Sent:** Wednesday, November 30, 2016 2:43 PM
> **To:** Laurel J. Sutcliffe <Laurel.J.Sutcliffe@kp.org>
> **Subject:** Fw: Internal Audit Services - New Health Plan/Claims Contact
>
> Hi Laurel,
>
> I just want to emphasize that I was just having coffee with Rob, as a friend; I didn't reach out to him to make this connection, but once he offered to introduce me to Derric, it seemed like a great opportunity to help make an important connection for us.
>
> Here's a ppt slide that Derric shared with me that shows his coverage areas.
>
> *(See attached file: Health plan chevron.pptx)*
>
> **Jeffrey P. Mazik**
> Fraud Control Program
>
> **Kaiser Permanente**

260.    Ms. Sutcliffe told Relator that "even if this conversation was [a] just friends

meeting, [Relator] should have disengaged when it came to business…."

> RE: Internal Audit Services - New Health Plan/Claims Contact
> Laurel J Sutcliffe
> to:
> Jeffrey P Mazik
> 12/01/2016 11:27 AM
> Hide Details
> From: Laurel J Sutcliffe/CA/KAIPERM@O365COEX
> To: Jeffrey P Mazik/PO/KAIPERM
> History: This message has been replied to.
> Jeff,
>
> I understand you may have been having coffee with Rob as a friend, however your conversation clearly turned toward business.  Rob is an SVP in Internal Audit and as a courtesy you should have mentioned you would be talking with him.  Prior to having any meetings with managers above my level I let Marita know as a courtesy so she is aware of who I am speaking with and what I am speaking about.  I feel that it is inappropriate for you to be speaking with Rob or Derric about the work we are doing without discussing with me first.  Even if this conversation started as just friends meeting, you should have disengaged when it came to business and said that you would need to defer or speak with me first.  Please make sure to communicate with me in the future regarding meetings of this nature.
>
> Thanks,
>
> **Laurel J. Sutcliffe**
> Sr. Manager, Fraud Control Program

261.    This directive from Ms. Sutcliffe restricted Relator's access to communicating

with key people at Kaiser. It also purposefully disincentivized internal complaints and

whistleblowing. In addition, Relator's situation also directly hindered him from accomplishing one of the PIP objectives of building relationships with others.

262.     Ms. Sutcliffe further retaliated after she was informed that Relator was conducting data analytics review in November, by reinforcing her instructions to forbid Relator from communicating with other employees, via phone, instant messaging, and Skype. Instead, Relator was told to use email communication only, and that he was required to copy Ms. Sutcliffe on every one of his incoming and outgoing emails.

263.     Despite failure of management to follow up on identified overpayments and take corrective action, and despite being chastised and retaliated against for highlighting significant overpayments, Relator went well above the requirements of his position, over substantive resistance and delay from Kaiser's senior compliance management. Relator continued to inquire into and identify overpayments.

264.     There were several times when Relator advised his superiors that Kaiser was not meeting, but was violating, the 60-Day Overpayment Rule requirements. At least one of those times was in writing to Ms. Sutcliffe during or immediately following a DCG presentation on the 60-Day Overpayment Rule.

265.     As indicated in the string of emails provided below, dating back to November 3, 2016, Relator was leading a claims review project "to do some data analytics on pharmacy claims" and was working with Gloria Napue, Senior Claims Operations Manager at Kaiser Permanent Insurance Company (KPIC) and Remedios P. Osorio, who worked in Regulatory Strategy & Contracts at KPIC.

From: Gloria J Napue/CA/KAIPERM
To: Remedios P Osorio/CA/KAIPERM@KAIPERM
Cc: Jeffrey P Mazik/PO/KAIPERM@KAIPERM
Date: 11/03/2016 08:14 AM
Subject: Fw: KPIC - Pharmacy Analytics: NC/SC membership group ID listing for CY2015 / 2016

Hi Medy,

Jeff Mazik is trying to do some data analytics on pharmacy claims.  However, he is having difficulty recognizing which groups are KPIC.  Would you be able to give him a listing of the KPIC groups with a pharmacy benefit?

**Have a blessed day and Thrive!!!**
**Gloria J Napue**
**Kaiser Permanente Insurance Company (KPIC)**
**Sr Claims Operations Manager**
**10740 4th St**
**Rancho Cucamonga CA 91730**
**Phone: 909-762-9245**

From: Remedios P Osorio/CA/KAIPERM
To: Gloria J Napue/CA/KAIPERM@KAIPERM
Cc: Jeffrey P Mazik/PO/KAIPERM@KAIPERM
Date: 11/03/2016 09:34 AM
Subject: Re: Fw: KPIC - Pharmacy Analytics: NC/SC membership group ID listing for CY2015 / 2016

*(See attached file: ProdResults_10.31.2016.xlsx)*

Hope this is what you need.
If you need KPIC memberhip information, please reach out to KPIC Data Reporting.

Thank you,
~ *Medy O.*

266.    During the process, Relator reached out to Derek Ho, via instant messaging (IBM Sametime) to confirm information that Relator obtained from KPIC employees. Relator was working collaboratively to identify any potential issues or overpayments in the pharmacy claims regime.

267.    Given that he was on a PIP, Relator forwarded his conversation with Mr. Ho via instant messaging to Ms. Sutcliffe, in making an effort to communicate the status of his project

to Ms. Sutcliffe. In the subject line, Relator informed Ms. Sutcliffe that he was trying "to be more efficient" and looped her in on the working process.

From: Jeffrey P Mazik [mailto:jeffrey.p.mazik@nsmtp.kp.org]
Sent: Thursday, December 01, 2016 1:42 PM
To: Laurel J. Sutcliffe <Laurel.J.Sutcliffe@kp.org>
Subject: fyi, to be more efficient, I'm getting the person who needs the data together with the person supplying the data.

| | |
|---|---|
| Hi Derek - Remedios reached out to me to see if we have what we need. Being in the middle, I may not be interpreting what he provided correctly. Can you please give him a call directly? | |
| Derek Ho/CA/KAIPERM<br>sure | 1:36:50 PM |
| I am on a call I will contact him little later | 1:37:03 PM |
| Jeffrey P Mazik/PO/KAIPERM<br>please let me know if I can help further | 1:37:18 PM |
| and how things go with your discussion | 1:37:32 PM |
| Derek Ho/CA/KAIPERM<br>ok. help me help you. | 1:37:43 PM |
| Jeffrey P Mazik/PO/KAIPERM<br>I'm sorry but I just didn't see a Group ID listing in what he sent... but I may have missed it | 1:38:11 PM |
| Derek Ho/CA/KAIPERM<br>so do I. | 1:38:23 PM |
| Jeffrey P Mazik/PO/KAIPERM<br>yes, exactly | 1:38:26 PM |
| Derek Ho/CA/KAIPERM<br>anyways, I will review and circle back with him | 1:38:42 PM |
| Jeffrey P Mazik/PO/KAIPERM<br>perfect, thanks Derek | 1:38:54 PM |

268.    Ignoring his efforts to do so, Ms. Sutcliffe immediately restricted Relator to communicating only via email, forbid him from talking to other employees in person, phone, or instant messaging, because she did not want Relator to continue to conduct the data analytics, for fear of identifying overpayments.

269.     In sum, despite Relator's suggestions and continuous recommendations to take proper measures to comply with stringent billing methods applicable to Medicare and Medicaid claims, the more Relator tried to address issues and recommend corrective actions, the more Relator was sidelined, refused access to personnel, software and tools, severely limited in communications, and excluded from access to his duties.

270.     Moreover, because Relator was one of the few that spoke out about Kaiser's improper processes for handling overpayments, and lack thereof, Relator was openly stripped of his duties and responsibilities, as well as opportunities to build and maintain relationship with Kaiser employees, which was a big part of integrating various sectors of Kaiser that dealt with claims and/or claims data review. He was basically stripped of his ability to perform many of his core duties.

271.     On December 13, 2016, Relator met with Ms. Janiga, summarizing the retaliation he had received from Ms. Sutcliffe, due to his raising overpayments and claims compliance issues. Ms. Janiga failed to take any action to address Relator's situation.

272.     On December 23, 2016, Relator also requested a meeting with Jacqueline Thomas, HR. He had planned to complain about his harassing environment as a result of bringing unwelcomed compliance issues to light and not letting them go. The meeting schedule was adjusted several times and ultimately, the meeting never happened.

273.     Instead, mere days later, on January 5, 2017, Relator was notified that his employment with Kaiser was terminated. Ms. Sutcliffe inaccurately stated in Relator's Termination Memo that Relator did not maintain "consistent and satisfactory performance" as one of the reasons for termination, when in fact, that was not true.

274.     In fact, since Relator's start date at Kaiser in 2008, he had received numerous performance reviews, which were consistently "successful" and "excellent." Between 2012 and 2016, he performed exceedingly. It was not until Relator made his first presentation on overpayments and Ms. Sutcliffe came into the picture in 2016, that he received his first, below-level "performance needs improvement" performance review. Ms. Sutcliffe did not provide any reasons or substantive feedback for the sudden, low grade.

275.     Ms. Sutcliffe spearheaded goals to purposefully take multiple actions to render Relator incapable of performing the compliance job for which he was hired. In spite of all of this, he went above and beyond to continue to try to perform his work.

276.     Meanwhile, Relator continued to be sidelined and closed out from critical data and personnel, which prevented the systemic operational and compliance violations to be corrected going forward.

277.     The False Claims Act, 31 U.S.C. § 3730 (h), prohibits the discharge, demotion, suspension, threatening, harassment or other discrimination against an employee because of any lawful act done by the employee on behalf of the employee or others in furtherance of an action under the FCA.

278.     Relator engaged in protected activity when he voluntarily ran reviews and investigations into overpayments that had never been run before and that his superiors told him not to focus on.

279.     He engaged in protected activity when he put into writing to his boss that Kaiser was not in compliance with the 60-Day Overpayment Rule.

280.    He also engaged in protected activity when he continued to inquire and investigate overpayments despite being chastised for doing so and told not to inquire into overpayments.

281.    He further engaged in protected activity when he advised his next level supervisor about the retaliation he had been experiencing under Ms. Sutcliff.

282.    Kaiser violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance of efforts to stop one or more violations alleged in this action. Defendant knew of Relator's protected activity as he had reported his findings to his superiors.

283.    As a result of Defendants' actions, Relator has suffered damages in an amount to be shown at trial, including but not limited to statutory damages, loss of pay, interest, attorney's fees, front pay, reinstatement, and make whole damages.

## COUNT 1
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)
### (All Defendants)

284.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

285.    This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

286.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(A), provides that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ... is liable to the United States Government for any civil penalty of not less than $5,500 and not more than $11,000 [occurred

after September 29, 1999 but before November 2, 2015, and no less than $10,957 and not more than $21,916] for each violation of the FCA, … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

289.    Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

290.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

291.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

292.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

293.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported

refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

294.   Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by submitting false claims, and unlawfully retaining overpayments from those false and fraudulent claims that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

295.   Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

296.   By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

297.   In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, further failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

298.    There were numerous false claims intentionally submitted by Easterseals that were overpaid, but Kaiser and KP did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. Instead, Easterseals continued to knowingly and intentionally submit false claims for payment.

299.    Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

300.    For those claims that Kaiser, KP, and Easterseals submitted or caused to be submitted, it was foreseeable, and in fact the intended result, that those claims would be submitted. Further, at all times relevant to this herein, Defendants acted with the requisite scienter.

301.    The United States was unaware of the fraud and fraudulent schemes detailed herein and but for this disclosure, would not have discovered it, the mechanisms being used to perpetrate and mask the fraud, and the true breadth and scope of the fraud.

302.    The United States and the Government payors would not have paid the claims if they had known the claims were false because compliance with Medicare and Medicaid is a statutory condition of payment.

303.    As a result of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States Treasury, through Medicare, Medicaid and other federal health care programs' payments of these claims, has suffered damage in an amount to be determined at trial, believed to be hundreds of millions of dollars, plus a civil penalty for each such false claim presented or caused to be presented by Defendants.

## COUNT 2
## False Claims Act

**31  U.S.C. §§ 3729(a)(1)(B)**
**(All Defendants)**

304.     All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

305.     This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

306.     The Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(B) provides that any person who:

> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ... is liable to the United States Government for any civil penalty of not less than $5,500 and not more than $11,000 [occurred after September 29, 1999 but before November 2, 2015, and no less than $10,957 and not more than $21,916] for each violation of the FCA, … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

307.     Defendants Kaiser and KP knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the United States Government through the entities administering government funds pursuant to the Medicare program, further failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

308.     Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim

overpayments that are identified, resulting in massive overpayments. In doing, Kaiser made and used false records or statements material to a false or fraudulent claim. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

309.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled and should have timely returned.

310.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

311.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

312.    Kaiser was intentional and strategic, making it appear externally that it was compliant, presenting false records and statements associated with the false claims, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

313.     Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

314.     By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

315.     In addition, Defendant Easterseals knowingly and intentionally submitted false records and statements in order to submit false or fraudulent claims for payment, further failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

316.     There were numerous false claims intentionally submitted by Easterseals that were overpaid, but Kaiser and KP did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. Instead, Easterseals continued to present false reports and statements material to submitting false claims for payment.

317.     Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

318.     For those records and statements that Kaiser, KP, and Easterseals submitted or caused to be submitted, it was foreseeable, and in fact the intended result, that those claims

would be submitted. Further, at all times relevant to this herein, Defendants acted with the requisite scienter.

319.    In reliance on the false and fraudulent records presented or caused to be presented by the Defendants, the United States authorized payments to be made which greatly enriched the Defendants and which damaged the United States Government.

320.    The United States was unaware of the fraud and fraudulent schemes detailed herein and but for this disclosure, would not have discovered it, the mechanisms being used to perpetrate and mask the fraud, and the true breadth and scope of the fraud.

321.    The United States and the Government payors would not have paid the claims if they had known that records and statements associated with the claims were false because compliance with Medicare and Medicaid is a statutory condition of payment.

322.    As a result of Defendants' fraudulent course of conduct, with actual knowledge of falsity and/or in deliberate ignorance or reckless disregard that such records, statements, and representations were false, Defendants made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to the government for the Medicare program and Medicare made payments to Defendants and suffered damages. The United States Government is entitled to full recovery of the amount paid by the Medicare program for the false or fraudulent records or statements submitted by Defendants.

323.    Defendants' false representations, statements and records, caused the government, through its proxies under the Medicare program, to make payments to Defendants.

324.    As stated in the preceding paragraphs be submitted by Defendants, the United States Treasury, through Medicare, Medicaid and other federal health care programs' payments of these claims, has suffered damage in an amount to be determined at trial, believed to be

72

hundreds of millions of dollars, plus a civil penalty for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT 3
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(C)
### (Defendants Kaiser and KP)

325.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

326.    This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

327.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(C) provides that any person who:

> (a)(1)(C) conspires to commit a violation of [false claims 31 U.S.C. § 3729(a)(1)(A); false statements 31 U.S.C. § 3729(a)(1)(B); and 31 U.S.C. § 3729(a)(1)(G)] … is liable to the United States Government for any civil penalty of not less than $5,500 and not more than $11,000 [occurred after September 29, 1999 but before November 2, 2015, and no less than $10,957 and not more than $21,916] for each violation of the FCA, … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

328.    Kaiser and KP worked in concert, conspiring with one another to participate in a fraudulent scheme to defraud the government by failing to identify and/or self-disclose identified overpayments to the Government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

329.    Kaiser and KP, collectively, knew, intended and worked in concert to violate CMS regulations and governing laws, to deceive the Medicare program and to obtain and keep funds to which they are not entitled and should have returned. As described herein, in order to intentionally conceal identified overpayments from the government and purposefully fail to fully identify all claim overpayments or investigate potential claim overpayments that are identified, Kaiser and KP conspired to submit and continued to submit false or fraudulent claims to the Medicare program, causing the Government to pay for claims inundated with false reports and statements.

287.    As a result of Kaiser and KP's wrongdoing and improper conduct, Medicare made payments to Kaiser and KP based upon false and fraudulent claims. Despite Relator's repeated efforts to put Kaiser and KP on notice of the overpayments that he identified and take corrective steps to not only refund, but to correct clear weaknesses in order to avoid certain future overpayments, Kaiser and KP failed to take proper corrective action to report and refund over $1 billion in overpayments from government payors detected as a result of claims submitted from 2010 thru 2017.

330.    The United States Government was damaged and is entitled to full recovery of the amount paid by the Medicare program to Kaiser and KP as a result of their fraudulent conspiracies.

331.    As set forth in the preceding paragraphs in this Complaint, Kaiser and KP knowingly violated 31 U.S.C. § 3729(a)(1)(C) and damaged the United States by their action in an amount to be determined at trial and believed to be many millions of dollars.

**COUNT 4**
**False or Fraudulent Retention or Avoidance**
**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(G)**

**(All Defendants)**

332.     All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

333.     As set forth above, Kaiser, KP, and Easterseals, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, and knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

334.     The term "obligation" means:

an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, form a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment ...

31 U.S.C. § 3729(b)(3).

335.     Kaiser, KP, and Easterseals have a duty and obligation to notify, report and return any overpayments to the Secretary, state, intermediary, carrier or contractor as appropriate within sixty (60) days of identifying the overpayment or the date any corresponding cost report is due.

336.     Defendants have actual knowledge that significant Medicaid and Medicare overpayments exist. Instead of reporting and returning overpayments, they knowingly and intentionally concealed, or knowingly and improperly avoided, an obligation to pay money to the United States government.

337.     Defendants have known of these overpayments for more than sixty (60) days and no corresponding cost report is due.

338.    By virtue of Defendants knowing refusal to repay overpayments to Medicare or Medicaid, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

**COUNT 5**
**Retaliation**
**(False Claims Act 31 U.S.C. § 3730(h))**
**(Defendant Kaiser)**

339.    Relator hereby restates, incorporates and re-alleges all other paragraphs of this Complaint as if fully set forth herein.

340.    Relator joined Kaiser's compliance department with a wealth of compliance and audit knowledge, experience and expertise. He gained more in his nine years at Kaiser.

341.    From 2008 through 2016, Relator consistently earned Excellent or Successful performance reviews.

342.    In March 2016, Relator was awarded and recognized company-wide with the "Putting the Excel in Excellence Award" for his excellent work on a DME project related to an audit Relator performed and spearheaded, in which he identified and saved Kaiser money.

343.    However, almost immediately after Relator first raised his concerns about Kaiser's overpayment obligations and voiced his findings, searching for root causes and identifying the grand scope of the problem, his superiors began a systematic effort to retaliate against him.

344.    In April 2016, Laurel Sutcliffe became Relator's supervisor.

345.    Relator brought his concerns about overpayments and Kaiser's ability and willingness to comply with the 60-Day Overpayment Rule to his supervisor and others, including most often to Ms. Sutcliffe.

346.    Rather than act positively on the information given by Relator when he told his Ms. Sutcliffe that he had real concerns with Kaiser's ability to comply with the 60-Day Overpayment Rule, she responded that it was "not a priority" and for him to "stay focused."

347.    In the summer of 2016, for the first time ever in his career, Relator received a "Needs Improvement" performance review from Ms. Sutcliffe.

348.    By the fall of 2016, it was becoming evident that Kaiser had decided to increase the intensity of its retaliation against Relator. Kaiser refused Relator access to certain materials and software he needed to perform his job and also refused to let Relator speak to anyone without a supervisor present. This included all emails he sent, stripped him of his job duties and responsibilities in retaliation for his continued efforts to identify and repay overpayments and find their root cause to avoid more overpayments in the future.

349.    Using the FICO tool, Relator identified an issue in which it appeared that multiple providers across all regions were incorrectly using the "initial" higher paid procedure codes rather than the "ongoing" procedures codes, and therefore overbilling Kaiser, who in turn overbills government payor. Relator consulted Andrew Allmon from FICO, who confirmed the efficacy of the issue and sent an email to Relator noting that this was a "great project. I think it will pay off."

350.    Given the identified issue, Relator set up a meeting with Ms. Sutcliffe in October and he briefed her on his initial findings regarding this upcoding and overpayments. His analysis for just one procedure code (99306), out of 152 initial procedure codes, identified $380,000 in overpayments. Rather than engage in efforts to broaden the inquiry and disclose the overpayments to the Government, Ms. Sutcliffe only criticized Relator for performing the analysis without her express approval. She forbade him from doing anything further with this data, his findings, analysis or conclusion.

351.    The analysis was dismissed, and the identified overpayments were never disclosed to the Government.

352.    In October 2016, within days of his meeting with Ms. Sutcliffe about the upcoding and overpayments, Kaiser denied Relator's requests to use standard tools and software necessary for his job. This included his request to use the Tableau data analytics tool, his request to access the Claims Data Warehouse, his request to access Kaiser Permanente HealthConnect in order to use data for the ongoing triage of FICO identified providers, and his access to the Member Complaints database. All of these were reasonable and necessary for Relator to perform his job and all were denied in an effort to strip Relator of his ability to perform his job.

353.    At the end of October, Relator was put on a Performance Improvement Plan (PIP) for the first time in his career. Ms. Sutcliffe then used the fact that Relator had raised concerns about Kaiser's ability to comply with federal law in his retaliatory PIP, as an example of Relator not "staying focused."

354.    Relator continued to go above and beyond to continue to try to perform his work. He also addressed and met each of the items put on his retaliatory PIP.

355.    On December 13, 2016, Relator met with Marita Janiga (Ms. Sutcliffe's manager) to inform her of Ms. Sutcliffe's retaliatory actions. Ms. Janiga failed to take appropriate corrective action.

356.    On December 23, 2016, Relator emailed Jacqueline Thomas from Human Resources. He formally requested a meeting to notify HR of Ms. Sutcliffe's retaliation. Instead of granting the requested meeting with HR, Relator was terminated and walked out of the building on January 5, 2017. His former friends and colleagues have refused to speak with him since.

357.    His termination was in retaliation for his continued protected activity to identify and stop fraudulent overpayments.

358.    The False Claims Act, 31 U.S.C. § 3730 (h), prohibits the discharge, demotion, suspension, threatening, harassment or other discrimination against an employee because of any lawful act done by the employee on behalf of the employee or others in furtherance of an action under the FCA.

359.    Relator engaged in activity protected by the False Claims Act when he advocated for Kaiser to take immediate and significant corrective action to address the upcoding and overpayments he and other identified, when he expressed concerns with Kaiser's ability and willingness to comply with the 60-Day Overpayment Rule, and when he continued to press these issues verbally and in writing with his superiors despite instructions not to look into this fraud anymore.

360.    Kaiser violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done in furtherance of efforts to stop one or more violations alleged in this action.

361.    Kaiser knew of Relator's protected activity, as he reported his findings to his superiors, including Laurel Sutcliffe and Marita Janiga.

362.    As a result of Kaiser's actions, Relator suffered damages in an amount to be shown at trial, including but not limited to statutory damages, loss of pay, interest, attorney's fees, front pay, reinstatement, and make whole damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relator Jeffrey Mazik prays for judgment against all of the Defendants as to Counts 1, 2, and 4, and against Defendants Kaiser and KP as to Count 3, and Defendant Kaiser as to Count 5, and for the Court to:

(a)     award the United States treble damages sustained by it for each of the false claims;

(b)     award the United States the maximum civil penalty allowed for each of the false claims;

(c)     award Relator 30% of the proceeds of this action or the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act, and any alternate remedy or the settlement of any such claims;

(d)     award Relator all allowable damages, interest, fees and costs resulting from Defendant Kaiser's retaliation;

(e)     award Relator his litigation costs, expenses and reasonable attorney's fees; and

(f)     grant such other relief as the Court may deem just and proper.

## <u>COUNT 6</u>
## CALIFORNIA FALSE CLAIMS ACT

363.     All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

364.     This is a claim brought by Relator and the State of California to recover treble damages, civil penalties and the fees and cost of this action, under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

365.     Cal. Gov't Code § 12651(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;
(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

80

(4) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

366.    Defendants Kaiser, KP, and Easterseals furthermore violated Cal. Gov't Code § 12651(a)(1),(2),(3),(4) ) by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of California; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; (4) discovering and knowing about the falsity of these claims but, failing to disclose, and not notifying the State and returning the payments.

367.    Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

368.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

369.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

370.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

371.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

372.    Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

373.    Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

374.    By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

375.    In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose

identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

376.    There were numerous false claims intentionally submitted by Easterseals that was overpaid, but Kaiser and KP did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. In fact, Easterseals continued to submit false claims for payment.

377.    Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

378.    Compliance with applicable Medicare, Medi-Cal and the various other Federal and state laws cited herein was an implied, and also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of California.

379.    Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants through healthcare providers and third party payers in connection with that conduct.

380.    As a result of Defendants' violations of Cal. Gov't Code § 12651 (a), California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

381.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

382.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the State Of California**:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator**:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## <u>COUNT 7</u>
### HAWAII FALSE CLAIMS ACT

383.   All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

384.   This is a claim brought by Relator and Hawaii to recover treble damages, civil penalties and the fees and cost of this action, under the Hawaii False Claims Act, Haw. Rev. Stat. 661-21 *et seq.*

385.   Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

   (1) Knowingly presents, or causes to be presented, a false or-fraudulent claim for payment or approval;

   (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

…

   (7) Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim; or

   (8) Conspires to commit any of the conduct described in this subsection,

386.   Defendants Kaiser, KP, and Easterseals violated Haw. Rev. Stat. §661-21(a) by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State of Hawaii; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) failing to disclose the false claim to the State within a reasonable time after discovery of the false claim.

387.   Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and

agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

388.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

389.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

390.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

391.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

392.    Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of

dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

393.    Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

394.    By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

395.    In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

396.    There were numerous false claims intentionally submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. In fact, Easterseals continued to submit false claims for payment.

397.    Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

398.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes, regulations and manuals was also an express condition of payment of claims submitted to the State of Hawaii.

399.     Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants through healthcare providers and third party payers in connection with that conduct.

400.     As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

401.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of himself and the State of Hawaii.

402.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Realtor respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the State of Hawaii:**

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 8
### DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

403.    All paragraphs of this Complaint are realleged and expressly adopted and

incorporated as if fully set forth herein.

404.    This is a claim brought by Relator and the District of Columbia to recover treble

damages, civil penalties and the fees and cost of this action, under the District of Columbia

Procurement Reform Amendment Act, D.C. Code § 2-381.01 *et seq.*

405.    D.C. Code § 2-381.02(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) Conspires to defraud the District by getting a false claim allowed or paid by the District;

…

(7) Knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District;

(8) Is a beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District; or

406.    Defendants Kaiser, KP, and Easterseals furthermore violated D.C. Code § 2-308.14(a) by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the District; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) by failing to disclose the false claim to the District.

407.    Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

408.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

409.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for

identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

410.   To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

411.   Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

412.   Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

413.   Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

414.   By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

415.     In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

416.     There were numerous false claims submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. In fact, Easterseals continued to submit false claims for payment.

417.     Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

418.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection, with Defendants' illegal conduct.

419.     Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants through healthcare providers and third party payers in connection with that conduct.

420.    As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

421.    Realtor is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

422.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the District of Columbia**:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 9
## COMMONWEALTH OF VIRGINIA

423.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

424.    This is a claim brought by Relator and the Commonwealth of Virginia to recover treble damages, civil penalties and the fees and cost of this action, under the Virginia Fraud Against TaxPayers Act, Va. Code Ann. §8.01-216.1 *et seq.*  Section 8.01-216.3 provides liability for any person who:

> 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> 2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> 3. Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;
> …

> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

425.    Defendants Kaiser, KP, and Easterseals furthermore violated Virginia Fraud Against TaxPayers Act §8.01-216.1 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; and (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid.

426.    Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified

overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

427.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

428.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

429.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

430.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

431.    Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of

dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

432.    Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

433.    By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

434.    In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

435.    There were numerous false claims submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. Instead, Easterseals continued to submit false claims for payment.

436.    Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

437.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct.

438.     Had the Commonwealth of Virginia known that Defendants were violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendants through healthcare providers and third party payer in connection with that conduct.

439.     As a result of Defendants' violations of the Virginia Fraud Against Tax Payers Act, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

440.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia Fraud Against TaxPayers Act on behalf of himself and the Commonwealth of Virginia.

441.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the Commonwealth of Virginia**:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to Va. Code Ann. § 32.1-315, §8.01-216.1 *et seq.*, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

<u>**COUNT 10**</u>
**MARYLAND FALSE CLAIMS AGAINST STATE HEALTH PLANS AND STATE HEALTH PROGRAMS ACT**

442.    All paragraphs of this Complaint are realleged and expressly adopted and

incorporated as if fully set forth herein.

443.    This is a claim brought by Relator and Maryland to recover treble damages, civil

penalties and the fees and cost of this action, under the Maryland False Claims Against State

Health Plans And State Health Programs Act, Md. HEALTH-GENERAL Code Ann. § 2-601 e*t*

*seq.*

444.    Section 2-602 provides, in part, liability for anyone who:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;
… or

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

445.    Defendants Kaiser, KP, and Easterseals furthermore violated Md. HEALTH-GENERAL Code Ann. § 2-601 et seq. by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) concealing the fraud.

446.    Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

447.    Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

448.    Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance

mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

449.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

450.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

451.    Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

452.    Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

453.    By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

454.    In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

455.    There were numerous false claims submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. In fact, Easterseals continued to submit false claims for payment.

456.    Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

457.    Compliance with applicable Medicare, Medicaid and various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct.

458.    Had the State of Maryland known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

459.    As a result of Defendants' violations of Md. HEALTH-GENERAL Code Ann. §
2-601 e*t seq.*, the State of Maryland has been damaged in an amount far in excess of millions of
dollars, exclusive of interest.

460.    Relator is a private citizen with direct and independent knowledge of the
allegations of this Complaint, who has brought this action pursuant to Md. HEALTH-GENERAL
Code Ann. § 2-601 e*t seq.* on behalf of himself and the State of Maryland.

461.    This Court is requested to accept pendant jurisdiction of this related state claim as
it is predicated upon the exact same facts as the federal claims and merely asserts separate
damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following
damages to the following parties and against Defendants:

**To the State of Maryland**:

(1) Three times the amount of actual damages which the State of Maryland has sustained
as a result of Defendants' conduct;

(2) A civil penalty of not more than $10,000 for each false claim which Defendants
caused to be presented to the State of Maryland;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1 ) The maximum amount allowed pursuant to Md. HEALTH-GENERAL Code Ann. §
2-601 e*t seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with
this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under
State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 11
## GEORGIA TAXPAYER PROTECTION AGAINST FALSE CLAIMS ACT

462.     All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

463.     This is a claim brought by Relator and Georgia to recover treble damages, civil penalties and the fees and cost of this action, under the Georgia Taxpayer Protection Against False Claims Act, Ga. Code Ann. § 23-3-120 *et seq*.

464.     Ga. Code Ann. § 23-3-121 provides, in part, liability for anyone who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;

 … or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or local government, or knowingly conceals, knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or a local government.

465.     Defendants Kaiser, KP, and Easterseals furthermore violated Ga. Code Ann. § 23-3-120 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) knowingly concealing, knowingly and improperly avoiding, or decreasing an obligation to pay.

466.     Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

467.     Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

468.     Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

469.     To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

470.     Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

471.     Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

472.     Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

473.     By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

474.     In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

475.     There were numerous false claims submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. Instead, Easterseals continued to submit false claims for payment.

476.    Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

477.    Compliance with applicable Medicare, Medicaid and various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct.

478.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

479.    As a result of Defendants' violations of Ga. Code Ann. § 23-3-120 *et seq.*, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

480.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ga. Code Ann. § 23-3-120 *et seq.* on behalf of himself and the State of Georgia.

481.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the State of Georgia**:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 or more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to Ga. Code Ann. § 23-3-120 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## <u>COUNT 12</u>
## COLORADO MEDICAID FALSE CLAIMS ACT

482.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

483.    This is a claim brought by Relator and Colorado to recover treble damages, civil penalties and the fees and cost of this action, under the Colorado Medicaid False Claims Act, C.R.S. 25.5-4-303.5 *et seq.*

484.    C.R.S. § 25.5-4-305 provides, in part, liability for anyone who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

 …

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

485.     Defendants Kaiser, KP, and Easterseals furthermore violated Colorado law, including C.R.S. 25.5-4-303.5 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (3) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (4) concealing the fraud.

486.     Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

487.     Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

488.     Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for

identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

489.    To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

490.    Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

491.    Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

492.    Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

493.    By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

494.     In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

495.     There were numerous false claims submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. In fact, Easterseals continued to submit false claims for payment.

496.     Rather than recoup money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

497.     Had the State of Colorado known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

498.     As a result of Defendants' violations of Colorado law, the State has been damaged in an amount far in excess of millions of dollars exclusive of interest.

499.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to C.R.S. 25.5-4-303.5 *et seq.* on behalf of himself and the State of Colorado.

500.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the State of Colorado:**

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to C.R.S. 25.5-4-303.5 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

## COUNT 13
## Washington Medicaid Fraud False Claims Act

501.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

502.    This is a claim brought by Relator and Washington to recover treble damages, civil penalties and the fees and cost of this action, under the Medicaid Fraud False Claims Act, Rev. Code Wash. (ARCW) § 74.66.005 *et seq.*

503.    Rev. Code Wash. (ARCW) § 74.66.020 provides, in part, liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (c) Conspires to commit one or more of the violations in this subsection (1);
>
> … or
>
> (g) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

504.    Defendants Kaiser, KP, and Easterseals furthermore violated Washington law, including Rev. Code Wash. (ARCW) § 74.66.005 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the state; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the state; (3) conspiring to defraud the state by getting a false or fraudulent claim allowed or paid; and (4) concealing the fraud.

505.    Defendants Kaiser and KP knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified

overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

506.     Kaiser intentionally concealed identified overpayments from the government and purposefully failed to fully identify all claim overpayments or investigate potential claim overpayments that are identified, resulting in massive overpayments. As a result, Kaiser unlawfully retained, failed to disclose and repay government funds to which it was not entitled and should have timely returned.

507.     Moreover, Kaiser's intentional failure to properly utilize fraud detection tools to monitor and track potential claims errors, lack of enforcement of proper compliance mechanisms, lack of transparency with regional offices on implementing corrective actions for identified defects, and misrepresentations to the OIG, ultimately prevented the government from recouping overpayments from Kaiser, to which the government was rightfully entitled.

508.     To be compliant with Medicare and Medicaid requirements, Kaiser is obligated to perform routine self-audits and good faith compliance checks, as a way to take proactive measures to identify potential overpayments of claims.

509.     Upon detection, Kaiser is further required to fully investigate and then ensure recovery for those overpayments through claims adjustments, credit balances, self-reported refunds, and/or other government accepted avenues for reporting and returning overpayments within sixty (60) days of the actual overpayment or when Kaiser receives notice of the overpayment from qualified compliance staff.

510.     Kaiser was intentional and strategic, making it appear externally that it was compliant, mostly to deter questions from the government, while internally collecting millions of

dollars in profit by unlawfully retaining overpayments that should have been paid back. In doing so, Kaiser repeatedly violated the law in various ways described herein.

511.    Kaiser intentionally turned on only a limited number of the claims editing functionalities of these tools to avoid the identification of more claim errors. In other words, Kaiser used standard compliance tools, only to turn on very few of the functions in order to avoid detecting claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and tracking tools to be compliant, when in fact, Kaiser was simultaneously working to avoid detecting and avoid correcting the fraud.

512.    By failing to report and return millions of dollars in overpayments, Kaiser secured a steady stream of revenue from false and fraudulent claims submitted to the government at the expense of government payors.

513.    In addition, Defendant Easterseals knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

514.    There were numerous false claims submitted by Easterseals that was overpaid, but Kaiser did nothing to address the situation because it did not want to upset Easterseals or cause any type of provider abrasion. Easterseals also did nothing to report and repay the overpayments to the government. Instead, Easterseals continued to submit false claims for payment.

515.    Rather than recouping money from Easterseals, Kaiser intentionally allowed overpayments to go unfunded, unabated and not corrected or repaid.

516.    Compliance with federal and state laws were and continue to be material to Washington's decision to pay health claims.

517.    The state was unaware of this fraud and could not have uncovered the Defendants' scheme absent this disclosure by the Relator.

518.    Had the state of Washington known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

519.    As a result of Defendants' violations of Washington law, the state has been damaged in an amount to be hundreds of millions of dollars, exclusive of interest.

520.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Rev. Code Wash. (ARCW) § 74.66.005 *et seq.* on behalf of himself and the state of Washington.

521.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims, and merely asserts separate damage to the state of Washington in the operation of its state-based health care insurance programs, including Medicaid.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

**To the state of Washington:**

(1) Three times the amount of actual damages which the state of Washington has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $10,957 and not more than $21,916, or the adjusted penalty amount as provided by 31 U.S.C § 3729(a), for each false claim which Defendants caused to be presented to the State of Washington;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount allowed pursuant to Rev. Code Wash. (ARCW) § 74.66.005 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under state law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable and just.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury for all triable claims and issues.

**Dated: March 27, 2019**

By:   _____
       Dave Scher (CA Bar # 184562)
       dave@jameshoyer.com
       James Hoyer, P.A.
       1300 I Street NW Suite 400E
       Washington, DC 20005
       Ph: (202) 975-4994
       Fax: (813) 375-3710

       *Local Counsel for Plaintiff/Relator Jeffrey Mazik*

116

Veronica Nannis (*Pro Hac Vice to be filed*)
vnannis@jgllaw.com
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Ph: (301) 220-2200
Fax: (301) 220-1214

*Counsel for Plaintiff/Relator Jeffrey Mazik*

117