1   POLLOCK COHEN LLP
    Christopher K. Leung, CA Bar No. 210325
2   Adam Pollock (pro hac vice)
    201 Spear Street, Suite 1100
3   San Francisco, CA 94105
    Tel: (415) 825-8500
4   Email: Chris@PollockCohen.com

5   LAW OFFICE OF JEREMY L. FRIEDMAN
    Jeremy L. Friedman, CA Bar No. 142659
6   2801 Sylhowe Road
    Oakland, CA 94610
7   Tel: (510) 530-9060
    Email: jlfried@comcast.net

8

**FILED**

Apr 02, 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

9                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA

10  ┌─────────────────────────────────────┐   No.: 2:19-cv-00559-JAM-KJN
    │  UNITED STATES,
11  │
    │  STATE OF CALIFORNIA,
12  │  STATE OF COLORADO,
    │  STATE OF GEORGIA,                       **FIRST AMENDED *QUI TAM*
13  │  STATE OF HAWAII,                        COMPLAINT**
    │  STATE OF MARYLAND,
14  │  COMMONWEALTH OF VIRGINIA,               **JURY DEMANDED**
    │  STATE OF WASHINGTON,
15  │                                          **FILED UNDER SEAL**
    │  *ex rel.* JEFFREY MAZIK,
16  │
    │         Plaintiffs,
17  │
    │  v.
18  │
    │  KAISER FOUNDATION HEALTH PLAN,
19  │  INC., KAISER FOUNDATION HOSPITALS,
    │  INC., and THE PERMANENTE MEDICAL
20  │  GROUPS,
    │
21  │         Defendants.
    └─────────────────────────────────────┘

22

23

24

- 1 -

# **INTRODUCTION**

1.      This is a civil action by *qui tam* Plaintiff-Relator Jeffrey Mazik, who files this action on behalf and in the name of the United States of America, and California, Colorado, Georgia, Hawaii, Maryland, Virginia, and Washington (the "State Plaintiffs"), against the Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, Inc., and the regional Permanente Medical Groups (collectively, "Defendants" and/or "Kaiser") for damages and civil penalties arising from violations of the False Claims Act, 31 U.S.C. §§ 3729–3733 and the corresponding statutes of the State Plaintiffs.

2.      As alleged herein, Kaiser has engaged in a scheme to knowingly submit, cause to be submitted, and conspire to submit false claims for payment to the United States in connection with Medicare Advantage programs and its participation in Medicaid programs with the various states. Kaiser knowingly accepts false claims from non-Kaiser physicians for services rendered to its members, submits false and artificially inflated diagnostic coding for its plan enrollees to the Centers for Medicare & Medicaid Services ("CMS") and the State Plaintiffs, and uses those data to calculate "risk adjustment factors" for each enrollee. This, in turn, leads to false and artificially increased per-capita amounts that Kaiser receives as payment for each enrollee in its Medicare Advantage and Medicaid programs.

3.      Kaiser accomplishes this fraudulent scheme by knowingly allowing false and fraudulent diagnoses codes submitted in claims for payment by non-Kaiser providers ("outside providers"), incorporating those false data into its own electronic data for its Medicare Advantage and Medicaid program enrollees, and thereby making those individuals appear sicker or significantly less healthy than they actually are.

4. The Medicare Advantage program (also known as Medicare Part C) is a "managed care" program funded by the federal government and administered by private health insurance companies. Under this model, CMS pays a monthly per-member rate, known as a capitation rate, to Kaiser for each individual beneficiary enrolled in its Medicare Advantage plans, which Kaiser then uses to "manage" all costs associated with the plan. Under Medicaid (Title XIX), several states fund portions of enrollees' medical costs, through Dual Eligible Special Needs Plans (D-SNPs), when enrolled individuals are entitled to Medicare and medical assistance from a state Medicaid plan.

5. The capitation rate for each individual beneficiary enrolled in Kaiser's Medicare Advantage plans (and similar plans of the State Plaintiffs) is determined according to a "risk adjustment" formula that considers each individual beneficiary's particular demographics and health status. Thus, CMS and the State Plaintiffs pay substantially higher capitation rates for members who have previously been diagnosed with one or more serious medical conditions.

6. While this may have caused Kaiser to overpay outside providers on certain claims at its own expense in the short term, Kaiser willfully ignored this pattern of upcoding because it ultimately increased the amounts that Kaiser received for each participant in its Medicare Advantage plans and similar capitated programs of the State Plaintiffs.

**JURISDICTION AND VENUE**

7. This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. This case arises from the wrongful conduct of Defendants incident to obtaining funds

1    from the federal government. This Court also has subject matter jurisdiction under 31

2    U.S.C. § 3732(a) and supplemental jurisdiction over the state law causes of action

3    under 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

4         8.    This Court has personal jurisdiction under 31 U.S.C. § 3732(a) because

5    one or more Defendants can be found in, reside in, transact business in, and have

6    committed acts related to the allegations in this Complaint in the Eastern District of

7    California.

8         9.    Venue is proper, pursuant to 31 U.S.C. § 3732(a), as Defendants can be

9    found in, reside in, and/or transact business in the Eastern District of California, and

10   because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within

11   this judicial district.

12                          **PARTIES AND ENTITIES**

13   ***A.    Relator Jeffrey Mazik***

14        10.   Relator Jeffrey Mazik is a resident of California and the former Senior

15   Practice Leader for Kaiser's National Compliance Office, with over 25 years of expertise

16   in fraud control, audit, and compliance.

17        11.   Relator was employed by Kaiser for almost a decade, from 2008 to 2017.

18   He first joined Kaiser in May 2008 as an Information Technology Audit Specialist, and

19   eventually transitioned to the role of Senior Practice Leader in the Fraud Control

20   Program, in or around March 2012.

21        12.   In that role, Relator's duties and responsibilities included working closely

22   with regional compliance leadership to implement compliance and fraud control

23   initiatives; leading comprehensive risk assessments, using data analytics to drive

24   compliance, fraud control focus-areas, and fraud mitigation initiatives; investigating

cases of potential fraud, waste, and abuse; developing corrective action plans to address root causes of fraud risks—particularly for areas including medical claims, accounts payable, inventories, cash handling, durable medical equipment, IT and payroll; and overseeing Board reporting and mandatory regulatory reporting for the fraud control program.

13.     Relator continued to personally observe the ongoing fraud detailed herein until his retaliatory discharge, on or about January 5, 2017.

**B.     Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, Inc., and The Permanente Medical Groups**

14.     Kaiser Permanente is an American integrated managed care consortium made up of three distinct but interdependent groups of entities:

(a)     Kaiser Foundation Health Plan, Inc. is a nonprofit corporation, licensed as a health care service plan, headquartered in Alameda County, California. It enrolls members in individual and group plans, and provides hospital and medical services for its members through separate contracts with the Kaiser Foundation Hospitals, Inc., and the regional Permanente Medical Groups. As is relevant here, the Kaiser Foundation Health Plan, Inc. operates several Medicare Advantage health plans—and various other government-funded capitated rate plans—including certain Special Needs Plans ("SNPs") and state-administered Medicaid plans through regional subsidiaries in California, Georgia, Colorado, Hawaii, Maryland, Virginia, and Washington.

(b)     Kaiser Foundation Hospitals, Inc. is a nonprofit corporation that is also headquartered in Alameda County; it operates hospitals and medical centers that receive their funding from the Kaiser Foundation Health Plan and

1    provides infrastructure and facilities for the benefit of the regional Permanente

2    Medical Groups.

3              (c)      The regional Permanente Medical Groups are groups of physicians

4    organized as independent professional corporations. They are privately owned

5    and managed by physician shareholders, but contract with the other Kaiser

6    entities to provide various inpatient and outpatient medical services. Each

7    Permanente Medical Group operates as a separate for-profit partnership or

8    professional corporation in its individual territory. And while none publicly

9    reports its financial results, each is primarily funded by reimbursements from its

10   respective regional Kaiser Foundation Health Plan entity.

11         15.    The three aforementioned entities work in cooperation with each other to

12   form the largest managed care organization in the United States, which does business

13   under the trade name "Kaiser Permanente" in at least eight states (California,

14   Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, and Washington) and the

15   District of Columbia.

16         16.    The entities act in concert as a matrix organization, sharing knowledge

17   across corporate divisions and making centralized decisions with respect to CMS

18   compliance, claim making, responsibility for tracking and reporting information that

19   goes into claims for Medicare reimbursements, etc.

20         17.    As of December 2017, the Kaiser Foundation Health Plan and the Kaiser

21   Foundation Hospitals reported a combined $72.7 billion in operating revenues and $3.8

22   billion in net income.

23

24

1    <u>**RELEVANT LEGAL FRAMEWORK**</u>

2    ***A.    Medicare Advantage and Other Government-Funded Capitation Rate***
     ***Plans***

3

4            18.    Medicare beneficiaries have the option of receiving benefits through

5    private health plans as an alternative to the traditional fee-for-service Medicare

     program. Under this option, known as Medicare Advantage (or Medicare Part C), the
6
     government pays participating Medicare Advantage organizations a capitated (per
7
     enrollee) amount to provide medical benefits.
8
            19.    Medicare beneficiaries vary greatly in terms of their health status, which
9
     in turn affects their utilization of health care services and the total cost of services they
10
     receive. Those with serious illnesses, multiple chronic conditions—or who are frail—
11
     have persistent costs and may require more care, which will lead to higher medical
12
     costs on average than their healthier counterparts.
13
            20.    Accordingly, the government adjusts monthly payments to Medicare
14
     Advantage organizations to reflect the health status of their enrollees. 42 U.S.C.
15
     § 1395w-23(a)(1)(C)(i), (a)(3); 42 C.F.R. § 422.308(c)(2). This ensures that Medicare
16
     Advantage organizations are paid appropriately for their plan enrollees, in accordance
17
     with the general logic that healthier enrollees should cost less than those with serious
18
     or chronic medical conditions.
19
            21.    Broadly speaking, capitation rates are determined based on past and
20
     expected future medical expenses, the location of the plan's actual and expected
21
     members, the health status and demographics of those members, and whether the plan
22
     will include any additional benefits. As is relevant here, the health status of members is
23
     based upon diagnosis codes that Kaiser receives from healthcare providers following
24

1  medical encounters with its plan enrollees, which are then transmitted to CMS for the

2  purpose of calculating the appropriate capitation rates. *See generally* Medicare and

3  Medicaid Servs., Pub. No. 100-16, Medicare Managed Care Manual, ch. 7, § 40 (2014),

4  https://www.cms.gov/Regulations-and-

5  Guidance/Guidance/Manuals/Downloads/mc86c07.pdf). These diagnosis codes

6  contribute to an enrollee's risk score, which is used to adjust the base payment rate.

7        22.    The process of adjusting the capitation rate to reflect a member's health

8  status is known as "risk adjustment," and relies upon diagnosis classifications set forth

9  in the International Classification of Diseases, 9th or 10th Edition, Clinical

10  Modification ("ICD-9-CM" or "ICD-10-CM") system. *See* Report to Congress: Risk

11  Adjustment in Medicare Advantage (Dec. 2018), at 14,

12  https://www.cms.gov/Medicare/Health-

13  Plans/MedicareAdvtgSpecRateStats/Downloads/RTC-Dec2018.pdf. These individual

14  diagnosis codes are then organized into groups, called Hierarchical Condition

15  Categories ("HCCs"), upon which the capitation rates are based. *Id.* at 16–19. Every

16  HCC consists of several diagnosis codes that are clinically related and are expected to

17  require a similar level of resources to treat. Thus, for example, a patient who receives

18  ICD-10-CM diagnosis codes for conditions including diabetes, congestive heart failure,

19  acute myocardial infarction (AMI), angina pectoris, cough, contusions and sprains, over

20  the course of several hospital and physician visits, would be considered to have three

21  higher level conditions, or HCCs—(1) diabetes with chronic complications, (2)

22  congestive heart failure, and (3) acute myocardial infarction—for the purpose of

23  determining the appropriate capitation rate. *Id.* at 20.

24

23.     Obviously, if the diagnosis codes that Kaiser receives from health care providers are erroneous, false, or fraudulent, and Kaiser fails to identify or correct those errors through an effective internal compliance program before submitting them to CMS, then the capitation rates upon which they are based will also be wrong. *See U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018) ("The importance of accurate data certifications and effective compliance programs is obvious: if enrollee diagnoses are overstated, then the capitation payments to Medicare Advantage organizations will be improperly inflated.").

24.     Unfortunately, this system tends to provide improper incentives for Medicare Advantage organizations like Defendants to over-report diagnoses codes or engage in the practice of "upcoding" to increase their revenues by improperly inflating their enrollees' capitation rates.

25.     With data for millions of people being submitted each year, CMS is unable to adequately audit coding submissions or confirm diagnoses before calculating capitation rates. Instead, the agency accepts the diagnoses as submitted, and then audits some of the self-reported data several years later to ensure that they are adequately supported by medical documentation. 42 C.F.R. §§ 422.310(e), 422.311. These audits have revealed excess payments for unsupported diagnoses steadily increasing over the last decade, reaching an estimated $16.2 billion in fiscal year 2016. *See* U.S. Gov't Accountability Office, GAO-17-761T, Medicare Advantage Program Integrity: CMS's Efforts to Ensure Proper Payments and Identify and Recover Improper Payments 1 (2017), https://www.gao.gov/assets/690/685934.pdf (last visited Feb. 9, 2021).

26.     In order to counteract the potential temptation that Medicare Advantage organizations may have to submit unsupported diagnoses, Medicare regulations require risk adjustment data to be produced according to certain best practices; specifically, every diagnosis code submitted to CMS must be based on a "face-to-face" visit (with the exception of certain pathology services), and medical records must be validated by qualifying physician/practitioner signatures and credentials. *See generally* Medicare Managed Care Manual, ch. 7, §§ 40, 120.1.1, Further, electronic medical records must meet special signature requirements and use software that is protected against modification. *Id.* (citing Ctrs. for Medicare and Medicaid Servs., Pub. No. 100-08, Medicare Program Integrity Manual, ch. 3, § 3.3.2.4 (2018), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/PIM83c03.pdf (last visited Feb. 9, 2021)).

27.     CMS sets risk scores based on risk adjustment data submitted for services provided during the year preceding the payment year. 42 C.F.R. §§ 422.310(g), 423.329(b)(3). The annual deadline for submitting risk adjustment data to CMS is in early September. *Id.* The data submitted by the September deadline determines members' preliminary risk scores for the following year. Thereafter, CMS continues to accept risk adjustment data submissions through a reconciliation process that triggers additional payments or adjustments, to account for codes submitted after the September deadline.

28.     Because this process determines capitation rates, Medicare Advantage organizations must carefully monitor risk adjustment claims to ensure the completeness and accuracy of their submissions. Thus, Medicare Advantage

organizations are required to "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503 (b)(4)(vi).

29.    Importantly, Medicare Advantage organizations must certify the accuracy, completeness and truthfulness of the data they provide to CMS, including risk adjustment data, as a condition to receiving payment. 42 C.F.R. § 422.504. Specifically, CMS requires Medicare Advantage organizations to submit annual attestations, each signed by the CEO or CFO (or their authorized, direct subordinate), certifying that the risk adjustment data they submit annually to CMS are "accurate, complete, and truthful." The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments … and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution." The regulations also provide that if claims data are generated by a "related entity, contractor, or subcontractor of [a Medicare Advantage] organization," that entity must similarly certify "the accuracy, completeness, and truthfulness of the data." 42 C.F.R. § 422.504(*l*)(3).

30.    CMS also provides strict requirements governing Medicare Advantage plans' contractual relationship with external providers, affiliates, vendors, and other entities—also known as First Tier, Downstream, and Related Entities ("FDRs"), which are defined by CMS as any party that enters into a written arrangement with a Medicare Advantage organization to provide certain healthcare services—that the

Medicare Advantage plan will rely upon to provide services to its members. For example, applicable regulations provide, *inter alia*, that:

> (a)     the Sponsor must have a system in place to monitor FDRs per 42 C.F.R. §§ 422.503, 422.504, 423.505;

> (b)     the plan must have training and education for all employees and management of all FDRs per 42 C.F.R. § 422.503(b)(4)(C)(1);

> (c)     the plan must have established, effective lines of communication between all entities to report compliance issues per 42 C.F.R. § 422.503(b)(4)(D);

> (d)     compliance must not be delegated per 42 C.F.R. § 422.503(b)(4)(vi), 42 C.F.R. § 422.504(i)(1);

> (e)     the Plan must maintain and have "well publicized disciplinary standards" to "encourage the good faith participation in the compliance program" per 42 C.F.R. § 422.503(b)(4)(E); and

> (f)     the Plan must have a system for "promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensure ongoing compliance with CMS requirements" per 42 C.F.R. § 422.503(b)(4)(G).

31.     CMS also imposes certain obligations to undertake corrective actions where necessary to ensure compliance with other applicable laws and regulations, which includes the obligation to perform a root cause analysis to identify the source of any potential errors or issues. Such corrective actions must be tailored to address the

1    particular fraud, problem or deficiency identified, and must include timeframes for

2    specific achievements. *See* 42 C.F.R. § 422.504(i)(1). Medicare Advantage organizations

3    must also ensure that FDRs correct deficiencies and provide documentation of all

4    identified deficiencies and corrective actions taken. *Id.*

5         32.    Medicare Advantage organizations know that they are required to ensure

6    the integrity of the data they submit to CMS, and that they are subject to various

7    audits that could lead to the repayment of improper claims. In 2005, CMS implemented

8    a pilot Medicare Recovery Audit Contractor (RAC) Program applicable to Medicare

9    Parts A and B, which successfully corrected more than $1.03 billion in improper

10   payments to Medicare providers. Then, following the Patient Protection and Affordable

11   Care Act ("ACA"), enacted in March 2010, CMS expanded the Recovery Audit program

12   to the Medicare Part C programs. As a result of these statutes and associated

13   regulations, Medicare Advantage organizations are subject to various health plan

14   audits, including:

15        (a)    risk adjustment medical record reviews (MRRs), which are

16   designed to ensure medical record documentation validates claims data received;

17        (b)    risk adjustment data validation (RADV), where CMS may require

18   health plans to perform audits and send CMS "one best medical record" that

19   substantiates all submitted reporting; and

20        (c)    DRG Payment Integrity Reviews, which are ongoing

21   comprehensive review of hospital claims that have been submitted to plans for

22   payment, including the diagnosis related groups (DRGs) – the diagnosis codes

23

24

1    used to calculate risk adjustment scores – to make sure cases are properly coded

2    and sequenced, and that billed information matches the patient record.

3    **B.    *Medicaid and Dual Eligibility Special Needs Plans ("SNP")***

4         33.    Although the above-described risk adjustment model is primarily used in

5    conjunction with Medicare Advantage (Medicare Part C) plans, there are several other

6    government-funded capitation rate plans that rely upon substantially the same model—

7    including Special Needs Plans ("SNPs"), which are focused on coordinating care for

8    persons with disabilities and other special needs—and various state-administered

9    Medicaid programs—such as Medi-Cal in California, and other similar plans of the

10   State Plaintiffs.

11        34.    A Special Needs Plan ("SNP") is a Medicare Advantage coordinated care

12   plan specifically designed to provide targeted care and limit enrollment to special needs

13   individuals. These plans were first authorized by Congress in the Medicare

14   Modernization Act of 2003, which identified "special needs individuals," including (1)

15   "dual eligible" individuals – those qualifying for both Medicare and Medicaid coverage;

16   (2) individuals with chronic conditions; and (3) institutionalized individuals. Plans

17   covering such individuals are called D-SNPs, C-SNPs and I-SNPs, respectively.

18   Because of the overlap with state Medicaid programs, the various states that

19   implement such programs will pay part of the costs associated with SNPs.

20        35.    Since the initial enactment in 2003, the program has been extended by

21   Congress repeatedly, including by the Medicare, Medicaid, and State Children's Health

22   Insurance Program (SCHIP) Extension Act of 2007 (extending the SNP program to

23   December 31, 2009); The Medicare Improvements for Patients and Providers Act of

24   2008 (MIPPA) (extending the SNP program through December 31, 2010); The Patient

Protection and Affordable Care Act ("ACA") effective in 2011 (extending the SNP

program through December 31, 2013); The American Taxpayer Relief Act of 2012

(ATRA) (extending the SNP program through December 31, 2014); the Bipartisan

Budget Act of 2013 (Pub. L. 113-67) (extending the SNP program through December 31,

2015); the Protecting Access to Medicare Act of 2014 (extending the SNP program

through December 31, 2016) and the Medicare Access and CHIP Reauthorization Act of

2015 (MACRA) (extending the SNP program through December 31, 2018).

36.     SNPs are expected to follow existing Medicare Advantage program rules,

including Medicare Advantage regulations at 42 C.F.R. § 422, as modified by guidance,

with regard to Medicare-covered services and Prescription Drug Benefit program rules.

Under CMS rules, SNPs should assume that, if no modification is contained in

guidance, existing Part C and D rules apply. Payment procedures for SNPs mirror the

procedures that CMS uses to make payments to non-SNP Medicare Advantage plans.

SNPs must prepare and submit bids like other Medicare Advantage plans, and are paid

in the same manner as other Medicare Advantage plans based on the plan's enrollment

and risk adjustment payment methodology. All SNPs must abide by current CMS

guidance on cost sharing requirements.

**C.     The False Claims Act ("FCA")**

37.     The U.S. Court of Appeals for the Ninth Circuit has explicitly held that

"the Medicare Advantage capitation payment system is subject to the False Claims

Act." *Silingo*, 904 F.3d at 673–74.

38.     As is relevant here, the FCA prohibits, *inter alia*: (a) knowingly

presenting (or causing to be presented) to the federal government a false or fraudulent

claim for payment or approval; (b) knowingly making or using, or causing to be made or

used, a false or fraudulent record or statement material to a false or fraudulent claim;

(c) knowingly making, using, or causing to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the government, or

knowingly concealing or knowingly and improperly avoiding or decreasing an obligation

to pay or transmit money or property to the government; and (d) conspiring to violate

any of these three sections of the FCA. *See* 31 U.S.C. §§ 3729(a)(1)(A)-(C), and (G). The

FCA also imposes an independent duty to correct known errors that will cause, or have

caused, a government overpayment. Accordingly, Medicare Advantage plans not only

have a duty to submit correct data to CMS, but also, for data they have already

submitted, must delete records known to be incorrect from CMS's database using a

"delete code."

39.     Any person who violates the FCA is liable for a civil penalty of up to

$23,331 for each violation, plus three times the amount of the damages sustained by

the United States. 31 U.S.C. § 3729(a)(1).

**FACTUAL ALLEGATIONS**

**A.     Defendants allow false claims by outside providers in order to artificially inflate per capita payments by Medicare and Medicaid.**

**1.     Defendants' Scheme to Allow False Claims by Outside Providers**

40.     Over the course of at least a decade, Kaiser has been engaged in a

deliberate scheme to defraud the United States by allowing non-Kaiser providers to

submit to it, as a Medicare Advantage Organization, false claims for payment. Because

Kaiser is a recipient of Medicare and Medicaid funds, each false or fraudulent claim for

payment by outside providers violates the False Claims Act. Kaiser knowingly allows

such claims despite its obligations as a Medicare Advantage organization, because

those claims provide false or fraudulent diagnostic codes which Kaiser allows into data maintained for each of its members. It then submits those data to CMS in order to falsely inflate risk adjustment factors used to calculate its capitation rates.

41. Kaiser Foundation Health Plan, from its headquarters and through six subsidiaries, operates various Medicare Advantage organizations and SNPs in eight regions throughout the country. In all regions, the structure of the interdependent components of Kaiser Permanente is the same: Kaiser Foundation Health Plan enrolls members through Medicare Advantage plans and SNPs, and members receive a majority of their care from "in-network" providers at Kaiser Foundation Hospitals and regional Permanente Medical Groups. Kaiser Foundation Health Plan collects data regarding the care delivered to its members, and the diagnosis codes that are entered into its members' electronic records. It then provides data to CMS regarding the health status of those members, and claims and collects monthly capitated rates according to the risk adjustment score for each member.

42. Despite the extensive network of Kaiser-related providers, each year some members enrolled in Kaiser's Medicare Advantage plans and SNPs require medical care from outside providers. Under Medicare rules and procedures, outside providers of care to Kaiser Medicare or Medicaid enrollees are required to submit to Kaiser a Health Insurance Claim Form (CMS-1500) that reflects appropriate medical diagnosis and procedure codes. Unlike claims under Medicare Part A and Part B, these forms are not received by CMS until later, if at all.

43. Kaiser knows that it must audit claims by outside providers to ensure the integrity of the data it submits to CMS. Part of maintaining compliant relationships

1   with outsourced services requires plan sponsors, like Kaiser, to oversee procedures for

2   auditing claim submissions by outside providers. Plan sponsors must undertake

3   corrective actions in response to potential noncompliance or potential fraud. Because

4   the provider claims are submitted to Kaiser rather than directly to Medicare, Kaiser

5   acts as the gatekeeper for fraudulent claims, and must take on the responsibility to

6   report only accurate information from those claim submissions to CMS.

7         44.   But since at least 2008, Kaiser has knowingly misused healthcare

8   compliance software and fraud-detection programs that are designed to monitor and

9   track potential errors—so as to purposely overlook widespread fraudulent upcoding by

10  the various medical providers that treat members enrolled in Kaiser's government-

11  funded capitation rate plans. Kaiser's compliance program has been a complete sham –

12  intended to make the company appear as though it was engaged in comprehensive and

13  meaningful fraud-prevention efforts, while internally encouraging and embracing

14  providers that submitted false and fraudulent claims for payment.

15        45.   Although this may have caused Kaiser to lose some monies in the form of

16  overpayments to certain unaffiliated outside providers, Kaiser willingly overlooked

17  these overpayments because the subsequent submission of those unsupported

18  diagnostic codes to CMS served to increase the capitation rates that it received from the

19  government—all whilst allowing its affiliated hospitals, physicians, and other medical

20  providers to profit from higher reimbursement rates. When viewed from a purely profit-

21  driven business perspective, these overpayments were merely short-term losses that

22  effectively served as an investment in the longer-term profitability of Kaiser's Medicare

23  Advantage program, and other similar government-funded capitated plans.

24

## 2. *Intentionally improper use of fraud-detection software*

46.     Kaiser consistently and intentionally fails to properly utilize fraud-detection tools to monitor and track potential claims errors, lacks enforcement of proper compliance mechanisms, and lacks transparency with regional offices on implementing corrective actions for identified defects and misrepresentations.

47.     In an effort to appear facially compliant, Kaiser contracts with various data analytics vendors to perform claims review of Kaiser's outside claims for each regional office. Typically, the vendors provide software applications that perform various types of reviews. Some detect claims that are incorrectly billed or coded outside of an established payment, medical or contract policy; other programs identify intentionally manipulated claims that technically fall within plan rules; and other software programs identify excess administrative costs associated with inefficient manual processes.

48.     Although Kaiser purchases and uses various standard compliance and fraud detection tools and software, which if used properly would detect claims overpayments, Kaiser intentionally misused these tools to avoid identification and detection of overpayment. At best, Kaiser uses them at minimum capacity to decrease the chances of catching claims errors and anomalies.

49.     For instance, Kaiser intentionally disabled certain claims-editing functionalities in these auditing tools, so as to avoid the identification of certain types of errors. In other words, Kaiser used standard compliance tools, but turned on very few of those features that were designed to detect claim anomalies and overpayments. In doing so, Kaiser outwardly appeared to be engaging in efforts to utilize monitoring and

1    tracking tools to be compliant, when in fact, Kaiser was actively working to avoid

2    detecting and correcting the fraud.

3         50.    When Relator joined Kaiser's compliance office in 2012, he reported to

4    Mia Okinaga, who was then the Vice President of the National Compliance Office. Ms.

5    Okinaga personally recruited Relator to join the compliance team. She considered

6    Relator a valuable addition to the team, announcing that his role would focus on

7    integrating regional and national departments to enhance the effectiveness of

8    monitoring and tracking fraud control.

9         51.    Relator worked closely with Ms. Okinaga, who actively pushed her

10   initiative to direct Kaiser and the regional offices to effectively utilize various

11   diagnostic compliance and fraud detection tools. Such tools were developed by vendors

12   such as Verisk Health ("Verisk") and FICO, both of which are data analytics companies

13   that work with clients to identify fraud and abuse in various financial sectors. Ms.

14   Okinaga and Relator believed that such vendors and their tools could be used to

15   substantially reduce losses from health care billing error, abuse, and fraud.

16        52.    Relator also worked closely with Jay Loden, Assistant Director of

17   Information Analytics and Compliance Technology, on tools and analytical studies,

18   Judy Sarles, Senior Director, on compliance systems, and Daren Pursche, Director of

19   Government Audit & Reimbursement, on external and internal compliance standards.

20        53.    Ms. Okinaga was eventually pushed out because she lacked the full

21   support from senior management in the compliance office to prioritize those initiatives--

22   and because she was detecting and uncovering significant overpayments that had

23   previously been intentionally concealed.

24

1    54. Kaiser made the announcement that Ms. Okinaga's position was

2 eliminated on August 21, 2015. Thereafter, Relator reported to Marita Janiga,

3 Executive Director of Investigations in Kaiser's National Compliance, Ethics &

4 Integrity Office, for about a year—and then to Lauren Sutcliffe, a Senior Manager in

5 the Special Investigations Unit.

6    55. Towards the end of 2015, Relator was tasked with conducting a

7 comparative analysis between the functionalities provided by McKesson (another

8 claims data vendor) and Verisk.

9    56. McKesson and Verisk are notable key vendors that contracted, and still

10 continue to contract, with Kaiser to perform claims data review, purportedly in efforts

11 to monitor and detect potential overpayments and other fraud.

12    57. McKesson offers a rules-driven auditing process, utilizing a software

13 called ClaimsXten that provides Kaiser with a robust set of rules which, if used

14 properly, detects abusive billing and prevents wasteful payments. But Kaiser decided to

15 de-activate 25 of the 54 editing rules or features in ClaimsXten – the principal software

16 program that they were supposedly relying on detect such billing fraud.

17    58. Relator, Mr. Loden, Sean Kelly, Project Manager, and Dave

18 Bohnenstingel, Strategic Account Manager at Verisk, worked together on this project,

19 using claims data only from the Georgia region.

20    59. Their efforts, in collaboration with Verisk, identified $5.3 million in

21 overpayments for the Georgia region alone, which stemmed directly from the Kaiser's

22 previous decision to deactivate various features in McKesson ClaimsXten.

23

24

60.     Of course, the most obvious solution or corrective action to undertake in response to these findings would have been for Kaiser to simply re-activate these built-in editing features in the ClaimsXten software. But that never happened.

61.     When Relator, Mr. Kelly, Mr. Loden, and Mr. Bohnenstingel presented their findings to Ms. Janiga and Ms. Sarles, neither supervisor expressed an intent to address or rectify the identified overpayments in the Georgia region.

62.     The findings were also brought before Sean Killeen, Executive Director of Payment Integrity in the Claims-Cost Containment Department and Mike Wathen, Vice President of Georgia Claims Administration. Mr. Killeen's response to the overpayments was indifferent. Mr. Wathen was interested in learning more about the issue, but Mr. Killeen got in the way of any follow-up with the matter by acknowledging his receipt of the issue. In short, nothing was ever done about these issues, either by the national compliance leadership or the regional claims management in Georgia.

63.     A few months later, in mid-February 2016, Relator detected significant amounts of overpayments due to erroneous codes from all other regions, discovering that they had not been recorded or included in any claims adjustment, credit balance, or self-reported refund. He then prepared a Webex presentation to report his findings to Ms. Janiga and Mr. Pursche.

64.     In this presentation, Relator also pointed out that, pursuant to applicable regulations, Kaiser was required to review and investigate all identified overpayments within 60 days. The purpose of Relator's analysis was to put his superiors on notice and lay out various options for the necessary corrective action.

65.     The presentation was received with a lack of interest from Ms. Janiga and Mr. Pursche. They admitted that compliance had "never done this before." Indeed, this very basic level review that Relator conducted to detect unsupported diagnostic codes and resulting overpayments had never been done before Relator took it upon himself in 2016.

66.     There was no follow-up action requested of Relator, no request for his data or root-cause analysis conducted by Ms. Janiga, Mr. Pursche, or anyone else. Instead, Kaiser dismissed, ignored, and buried Relator's findings. His superiors refused to investigate any further. Shockingly, they even took overt steps to prevent Relator from investigating any further himself.

67.     Based on the foregoing, Kaiser clearly failed to perform one of the most basic functions of a Medicare Advantage plan sponsor—that is, to monitor and supervise providers, and to identify overpayments and/or other forms of waste, fraud, and abuse.

68.     Medicare Advantage plan sponsors like Kaiser are not simple pass-through entities; they must undertake corrective actions in response to instances of noncompliance and/or fraud by providers of medical services. As alleged herein, Kaiser had a particular responsibility to prevent false or fraudulent claims data from outside physicians, since it – and not CMS – was the only entity in a position to monitor such claims and detect fraudulent activities.

69.     But even after the identification of widespread overpayments to outside providers, Kaiser refused to take appropriate corrective actions, and refused to address known compliance lapses that were facilitating continuous billing and claims errors.

70.     Kaiser knew that these issues were causing it to submit false data to CMS and yet continually failed to disclose these errors (or the resulting false claims) to the appropriate government authorities.

71.     In summary, Kaiser's intentional failure to properly oversee and monitor the claims of its external providers led to significant upcoding and overpayments, which were never corrected as required by law, and drove up capitation rates without any legitimate lawful basis, so that Kaiser and its partners could continue to line their own pockets at the public's expense.

72.     Kaiser's claims for payment to CMS and the State Plaintiffs were false because they were knowingly derived from false data.

73.     Kaiser's claims for payment were also false because Kaiser repeatedly provided expressly false certifications that its risk adjustment data submissions to CMS were "accurate, complete, and truthful," while knowing that the data were, in fact, plagued with errors, and despite knowing that those errors would cause CMS to pay unjustifiably and falsely higher capitation rates.

74.     And Kaiser's claims for payment were also false because, as detailed above, Kaiser did not, *inter alia*: (a) have an effective system in place to monitor FDRs; (b) have an effective system for "promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensure ongoing compliance with CMS requirements" per 42 C.F.R. § 422.503(b)(4)(G); (c) undertake corrective actions; or (d) ensure that FDRs correct deficiencies.

### 3.  *Kaiser knowingly covered up its misconduct so as to avoid scrutiny by the Office of the Inspector General.*

75.     Relator subsequently discovered that Kaiser was also misrepresenting its structure and operations to the government, including during a phone call with the U.S. Department of Health & Human Services: Office of Inspector General (HHS OIG) on June 30, 2016.

76.     The call was a kick-off call held by HHS OIG with Kaiser to discuss medical loss ratio reporting and audits, addressing issues surrounding claims accuracy and claims recovered through fraud reduction efforts. Several people participated on the call including: Relator, Ms. Janiga, Brian Mesaris, OPM-OIG Auditor, Stephanie Oliver, OPM-OIG Manager, and Robin Richardson, OPM-OIG counsel.

77.     During the call, OIG asked Kaiser about its general stance on claims operations, informing Kaiser that part of OIG's initiative was to address potential problems and raise additional concerns that prevented Kaiser from maintaining accuracy and consistency of claims payments.

78.     In response to a majority of the OIG's questions, Ms. Janiga explained that the questions were irrelevant because "claims were not [Kaiser's] business." This was a clear misrepresentation to the OIG since Kaiser processed outside medical claims of at least $7 billion annually.

79.     Ms. Janiga also misrepresented that Kaiser and its regional offices were "fully integrated," so there was no need for the OIG to inquire into its claims process. This was also a misrepresentation, since, in fact, that was only partly true in certain regions. These misrepresentations were intended to preclude the OIG from inquiring into Kaiser's claims process.

80. Ms. Janiga was aware that Relator knew that her statements were untrue. She was concerned that if he spoke during the OIG call, Relator might contradict Ms. Janiga and correct her misrepresentations to the OIG. She was also concerned that Relator might raise his compliance and overpayments findings with the OIG.

81. So in the middle of the phone call with the OIG, Ms. Janiga messaged Relator on intercompany messaging and instructed him to "[not] say a word."

82. Relator understood this as a direct order not to correct or contradict anyone on the call, especially Ms. Janiga's misrepresentations to the OIG. He did as instructed and stayed quiet on the call.

83. This episode had the intended chilling effect on Relator, confirming his worries that Kaiser was not interested in compliance on this issue, let alone fraud detection and correction.

### 4. *Kaiser's scheme results in false claims.*

84. As a result of the scheme as described herein, Kaiser has allowed, approved and made false claims for payment in violation of the False Claims Act. *First*, as a Medicare Advantage organization, Kaiser is a contractor, grantee or recipient of government money to be used to advance government programs or interests. When it allows false or fraudulent claims for overpayment by outside physicians, it approves of false claims as defined under § 3729(b)(2)(A)(ii).

85. For example, Kaiser subcontracts with Easterseals to provide health care services for members diagnosed with autism. As revealed in 2013 audit with respect to Easterseals, Kaiser knew that there was a 50% billing error rate, resulting in 40% claims payment inaccuracies. Despite knowing that false claims for payment had been

1  made for Medicare and Medicaid funds, it ignored the violations and approved of the

2  claims.

3        86.    An even larger example was witnessed by relator in September 2016,

4  when he reviewed and performed a broader audit of claims data from all of the regional

5  offices, dating from August 3, 2010 through July 30, 2016. The audit found that

6  unsupported diagnostic codes had led to over $209 million in overpayments for services

7  provided to members of Kaiser's Medicare Advantage program, $181 million in

8  overpayments for services provided to members of Kaiser's Medi-Cal program, and $181

9  million overpayments for services provided to members of Kaiser's other Medicaid

10  programs during that six-year period. Despite its knowledge of these claims for

11  overpayment in violation of the Act, Kaiser approved of them.

12        87.    *Second*, as part of its responsibilities under the Medicare Advantage

13  program, Kaiser is paid to conduct meaningful reviews outside physician claims. When

14  it seeks payment of Medicare and Medicaid funds, the request for payment is a "claim"

15  under the Act, including an explicit and implicit certification that it had performed core

16  functions of the Medicare Advantage organizations. Kaiser, however, did not provide

17  meaningful reviews of outside physician claims, either before paying them, or within a

18  period of time thereafter when the claim approvals could have been corrected. In

19  essence, Kaiser simply did not perform reviews, or conducted them in such a fashion

20  that the service provided was worthless. Indeed, as described herein, Kaiser's sham

21  compliance program ensured that such meaningful reviews would not be conducted,

22  protecting the claims from further scrutiny internally or by CMS.

23

24

88.     Kaiser's false certifications and attestations that it had performed the responsibilities of a Medicare Advantage organization were material. The United States and the State Plaintiffs would not have paid these monies to Kaiser had they known that the certifications were false. As a result, Kaiser has knowingly received payments from CMS and the State Plaintiffs, and government payors were damaged in the amounts paid to Kaiser for the performance of its function as a Medicare Advantage organization.

89.     *Third*, Kaiser has knowingly received inflated payments from CMS and the State Plaintiffs in the form of capitation rates that were significantly higher than they would have been, if based upon patient data that were true and accurate. Kaiser repeatedly submitted false certifications and attestations with respect to the accuracy, completeness, and truthfulness of the diagnosis code data it provided to CMS and the State Plaintiffs. Kaiser knew it had misused healthcare compliance software and fraud-detection programs necessary to ensure the integrity of the data submitted to CMS and the State Plaintiff, and with a sham compliance program, it could not truthfully certify that the data accurately reflected the health status of its members. Indeed, it knew that an actual compliance program would raise red flags regarding overpayments to outside physicians, and that Kaiser had in fact submitted data that led to artificially inflated capitation rates.

90.     Kaiser certifies the "accuracy, completeness, and truthfulness of the data" because CMS and the State Plaintiffs have neither the access nor the resources to verify Kaiser's compliance efforts. When Kaiser annually submitted data for its members' preliminary risk scores, and in any subsequent submission of data during the

reconciliation process, CMS and the State Plaintiffs relied upon these false data to derive risk adjustment scores, which in turn set the capitation rates. Each month after the inflated risk adjustment scores were determined based upon the false record data, Kaiser made false claims for artificially elevated capitated payments for a growing number of its members.

91.     As a result, Kaiser has continually submitted and caused the submission of false and unsupported diagnostic codes to CMS, despite knowing that the members did not have the claimed diagnoses and/or had not been treated for those diagnoses. Additionally, Kaiser has continually refused to correct previously submitted risk adjustment claims, despite knowing that the information therein was patently false. These false diagnostic codes and false risk adjustment claims were very material as they directly caused the inflated payments.

92.     For Kaiser, overpayments to outside providers function as a nominal investment in the long-term profitability of its fraudulent capitation rate scheme. The submission of erroneous and unsupported diagnostic codes actually served to increase Kaiser's overall revenues by increasing the capitation rates that it received from the CMS and the State Plaintiffs according to their risk adjustment frameworks.

93.     Moreover, Kaiser's various partners and affiliates—which provide the vast majority of health services to members enrolled in Kaiser's government-funded health plans—also profited at the public's expense when Kaiser failed to take appropriate corrective actions against rampant false coding.

**B.**     ***Unlawful Retaliation and Wrongful Termination***

94.     As recounted above, numerous widespread operational and compliance issues became readily apparent to Relator after Ms. Okinaga left her position at Kaiser in 2015.

95.     Relator uncovered multiple instances of identified overpayments that were not further investigated, were not disclosed, and were not corrected. Rather than acting on the information given by Relator, Kaiser failed to take proper measures to comply with rules, regulations, and laws on overpayments.

96.     In fact, the more Relator spoke up about Kaiser's improper processes for handling unsupported diagnostic codes and the resulting overpayments, and the more Relator tried to steer Kaiser in the direction of full compliance and disclosure—the more he was sidelined and closed out from data and documents, which prevented the systemic operational and compliance violations from being corrected going forward. Instead of taking prompt and proper corrective actions, Kaiser continued to resist, obstruct, and dismiss Relator's efforts. This was especially true after Relator began reporting to Ms. Sutcliffe, in or around July 2016.

97.     Despite the lack of feedback and investigation following Relator's presentations and analysis, and Ms. Janiga's instruction to keep quiet during the OIG call, Relator continued his efforts to pinpoint these ongoing issues.

98.     For example, on October 12, 2016, Relator approached Ms. Sutcliffe about an analysis he had performed that uncovered approximately $380,000 in suspected overpayments relating to a particular procedure code error. Rather than acknowledge Relator's efforts and the associated cost savings, and proceed to correct the systematic overpayments, Ms. Sutcliffe severely criticized him for performing such an analysis

1    without obtaining her prior approval, and then placed him on a Performance

2    Improvement Plan ("PIP").

3        99.    In addition, at various points in October 2016, Relator was denied access

4    to the very software tools that were necessary for him to fully and properly perform his

5    job. For example:

6            (a)    On October 15, 2016, Relator was denied access to the Claims Data

7            Warehouse, Kaiser's internal data repository system to collect and analyze

8            claims information. Relator was looking to review some of the CDW data,

9            specifically for his ongoing triage of FICO-identified providers.

10           (b)    On October 16, 2016, Relator was denied access to Kaiser

11           Permanente Health Connect, Kaiser's internal electronic health record database

12           system. Similar to his needs for CDW access, Relator was also looking to review

13           some claims data, specifically for his ongoing triage of FICO-identified providers.

14           (c)    On October 17, 2016, Ms. Sutcliffe pushed off, and ultimately never

15           followed up with, Relator's request for access to the Member Complaint's

16           database system. She told Relator that she needed to discuss with Ms. Janiga

17           first, but never approved this request.

18       100.    In sum, Relator was denied access to every data repository necessary to

19   perform his compliance job. Given that he had never had any problems with access

20   during his long career at Kaiser, and these tools were necessary for his job, by refusing

21   to allow him access, Kaiser actively stopped or prevented Relator from being able to

22   perform his regular job.

23

24

101.   These actions were undertaken in direct retaliation for Relator's persistent investigations, findings, and recommendations on claims overpayments. Ms. Sutcliffe's denial of Relator's access was meant to be punitive and to sideline the Relator. Moreover, it was also a stripping of his duties and responsibilities even though claims data review was the central role assigned to Relator on the compliance team.

102.   In addition to the foregoing, Ms. Sutcliffe forbade Relator from holding any meetings with anyone at Kaiser that was above her level, without her prior, express approval. This directive from Ms. Sutcliffe restricted Relator's access to communicating with key people at Kaiser. It also purposefully disincentivized internal complaints and whistleblowing. In addition, Relator's situation also directly hindered him from accomplishing one of the PIP objectives of building relationships with others.

103.   These circumstances created an impossible work environment for Relator, who became fearful of speaking up or identifying further instances of overpayments stemming from unsupported diagnostic codes.

104.   Nevertheless, Relator continued performing his duties proficiently, just as he had done throughout his long career at Kaiser. And although Relator had a strong speculation that he had been placed on a PIP because he had repeatedly spoken up about massive overpayments, Relator made every effort to demonstrate objective and measurable improvement in each of the areas identified by the PIP.

105.   But Ms. Sutcliffe's deliberate retaliatory actions only intensified over subsequent months. Furthermore, Relator's repeated requests for software and tools necessary to perform his job were rejected, ignored, and rebuffed.

1    106.   Ms. Sutcliffe further retaliated against Relator on or about November 3,

2   2016, by forbidding Relator from communicating with other employees, via phone or

3   Kaiser's internal instant messaging system. Instead, Relator was told that he should

4   only use email communications moving forward and was instructed to copy Ms.

5   Sutcliffe on all outgoing emails.

6    107.   In sum, despite Relator's suggestions and continuous recommendations to

7   take proper measures to comply with stringent billing methods applicable to Medicare

8   and Medicaid claims, the more Relator tried to address issues and recommend

9   corrective actions, the more Relator was sidelined, refused access to personnel, software

10   and tools, severely limited in communications, and excluded from access to his duties.

11    108.   Moreover, because Relator was one of the few that spoke out about

12   Kaiser's improper processes for handling overpayments, and lack thereof, Relator was

13   openly stripped of his duties and responsibilities, as well as opportunities to build and

14   maintain relationship with Kaiser employees, which was a big part of integrating

15   various sectors of Kaiser that dealt with claims and/or claims data review. He was

16   basically stripped of his ability to perform many of his core duties.

17    109.   On December 13, 2016, Relator met with Ms. Janiga, summarizing the

18   retaliatory actions that had been taken against him by Ms. Sutcliffe, due to his raising

19   the above-described issues compliance issues. But Ms. Janiga failed to take any action

20   to address Relator's situation.

21    110.   On December 23, 2016, Relator also requested a meeting with Jacqueline

22   Thomas in Human Resources. He had planned to complain about the harassing

23

24

1    environment that arose from him bringing unwelcomed compliance issues to light. But

2    the meeting schedule was adjusted several times and ultimately, never happened.

3          111.    Instead, mere days later, on January 5, 2017, Relator was notified that

4    his employment with Kaiser was terminated. Ms. Sutcliffe inaccurately stated in

5    Relator's Termination Memo that Relator did not maintain "consistent and satisfactory

6    performance" as one of the reasons for termination, when in fact, that was not true.

7          112.    Since Relator's start date at Kaiser in 2008, he had received numerous

8    performance reviews, which were consistently "successful" and "excellent" between

9    2012 and 2016, he performed exceedingly; it was not until Relator made his first

10   presentation on overpayments and Ms. Sutcliffe came into the picture in 2016, that he

11   suddenly received his first, below- level "performance needs improvement" performance

12   review—and then was placed on the PIP several months later, before ultimately being

13   terminated from his position.

14                              **COUNT I**
                   **Violations of the False Claims Act**
15                 **31 U.S.C. §§ 3729(a)(1)(A)–(C), (G)**

16         113.    Relator hereby incorporates, by reference, all of the allegations from each

17   of the preceding paragraphs.

18         114.    This is a claim for treble damages, civil penalties, and the fees and costs of

19   this action under the False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

20         115.    Through the acts described above, Defendants, their agents, employees,

21   and co-conspirators, knowingly presented, or caused to be presented, to the United

22   States false and fraudulent claims, and knowingly failed to disclose material facts, in

23   order to obtain payment or approval from the United States and its contractors,

24   grantees, and other recipients of its funds.

116.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the United States to approve and pay false and fraudulent claims.

117.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the United States, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States.

118.    Through the acts described above, Defendants, their agents, employees, and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of causing the United States to pay or allow false or fraudulent claims.

119.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

120.    By reason of the payments made by the United States, as a result of Defendants' fraud, the United States has suffered damages and continues to be damaged.

## COUNT II
### Violations of the California False Claims Act
### Cal. Gov't. Code §§ 12650, *et seq.*

121.    Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

122.   This is a claim brought by Relator and the State of California to recover treble damages, civil penalties, and the fees and costs of this action, under the California False Claims Act, Cal. Gov't. Code §§ 12650 *et seq.*

123.   The California False Claims Act provides liability for any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision; (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision; or (8) is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim. Cal. Gov't Code § 12651(a).

124.   Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the State of California false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the State of California and its contractors, grantees, and other recipients of its funds.

125.   Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the State of California to approve and pay false and fraudulent claims.

126.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the State of California, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the State of California.

127.    Through the acts described above, Defendants, their agents, employees, and other co-conspirators knowingly conspired to submit false claims to the State of California and to deceive the State of California for the purpose of causing the State of California to pay or allow false or fraudulent claims.

128.    At a minimum, Defendants were the beneficiaries of inadvertent submissions of false claims to the State of California, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California within a reasonable time after discovery of the false claim.

129.    The State of California, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

130.    By reason of the payments made by the State of California, as a result of Defendants' fraud, the State of California has suffered damages and continues to be damaged.

**<u>COUNT III</u>**
**Violations of the Colorado Medicaid False Claims Act**
**C.R.S. 25.5-4-303.5, *et seq*.**

131.    Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

132.    This is a claim brought by Relator and Colorado to recover treble damages, civil penalties, and the fees and costs of this action, under the Colorado Medicaid False Claims Act, C.R.S. 25.5-4-303.5, et seq.

133.    The Colorado Medicaid False Claims Act provides liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> …
>
> (f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";
>
> (g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

C.R.S. § 25.5-4-305.

134.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the State of Colorado false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the State of Colorado and its contractors, grantees, and other recipients of its funds.

135.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false

1   records and statements, which also omitted material facts, in order to induce the State

2   of Colorado to approve and pay false and fraudulent claims.

3        136.    Through the acts described above, Defendants, their agents, employees,

4   and co-conspirators, knowingly made, used, and caused to be made and used false

5   records and statements material to an obligation to pay and transmit money to the

6   State of Colorado, and knowingly concealed and improperly avoided and decreased an

7   obligation to pay and transmit money to the State of Colorado.

8        137.    Through the acts described above, Defendants, their agents, employees,

9   and other co-conspirators knowingly conspired to submit false claims to the State of

10  Colorado and to deceive the State of Colorado for the purpose of causing the State of

11  Colorado to pay or allow false or fraudulent claims.

12       138.    The State of Colorado, unaware of the falsity of the records, statements,

13  and claims made and submitted by Defendants, its agents, employees, and co-

14  conspirators, and as a result thereof, paid money that it otherwise would not have paid.

15       139.    By reason of the payments made by the State of Colorado, as a result of

16  Defendants' fraud, the State of Colorado has suffered damages and continues to be

17  damaged.

18                                  **<u>COUNT IV</u>**
      **Violations of the Georgia Taxpayer Protection Against False Claims Act**

19                      **Ga. Code §§ 23-3-120, *et seq.***

20       140.    Relator hereby incorporates, by reference, all of the allegations from each

21  of the preceding paragraphs.

22       141.    This is a claim brought by Relator and Georgia to recover treble damages,

23  civil penalties and the fees and cost of this action, under the Georgia Taxpayer

24  Protection Against False Claims Act, Ga. Code §§ 23-3-120 *et seq.*

142.    The Georgia Taxpayer Protection Against False Claims Act provides

liability for any person who:

> (1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> (3) Conspires to commit a violation of paragraph[s] [1-7] of this subsection;
>
> … or … (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or local government, or knowingly conceals, knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or a local government.

Ga. Code § 23-3-121(a).

143.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the State of Georgia false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the State of Georgia and its contractors, grantees, and other recipients of its funds.

144.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the State of Georgia to approve and pay false and fraudulent claims.

145.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the

1   State of Georgia, and knowingly concealed and improperly avoided and decreased an

2   obligation to pay and transmit money to the State of Georgia.

3         146.    Through the acts described above, Defendants, their agents, employees,

4   and other co-conspirators knowingly conspired to submit false claims to the State of

5   Georgia and to deceive the State of Georgia for the purpose of causing the State of

6   Georgia to pay or allow false or fraudulent claims.

7         147.    The State of Georgia, unaware of the falsity of the records, statements,

8   and claims made and submitted by Defendants, its agents, employees, and co-

9   conspirators, and as a result thereof, paid money that it otherwise would not have paid.

10        148.    By reason of the payments made by the State of Georgia, as a result of

11   Defendants' fraud, the State of Georgia has suffered damages and continues to be

12   damaged.

13                              **COUNT V**
                  **Violations of the Hawaii False Claims Act**
14                 **Haw. Rev. Stat. §§ 661-21, *et seq*.**

15        149.    Relator hereby incorporates, by reference, all of the allegations from each

16   of the preceding paragraphs.

17        150.    This is a claim brought by Relator and Hawaii to recover treble damages,

18   civil penalties, and the fees and costs of this action, pursuant to the Hawaii False

19   Claims Act, Haw. Rev. Stat. §§ 661-21, *et seq.*

20        151.    The Hawaii False Claims Act provides liability for any person who:

21              (1) Knowingly presents, or causes to be presented, a false or
                fraudulent claim for payment or approval;
22
                (2) Knowingly makes, uses, or causes to be made or used, a false
23              record or statement material to a false or fraudulent claim;

24              ...

1      (7) Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim; or

2

3      (8) Conspires to commit any of the conduct described in this subsection.

4

5   Haw. Rev. Stat. § 661-21(a).

6          152.   Through the acts described above, Defendants, their agents, employees,

7   and co-conspirators, knowingly presented, or caused to be presented, to the State of

8   Hawaii false and fraudulent claims, and knowingly failed to disclose material facts, in

9   order to obtain payment or approval from the State of Hawaii and its contractors,

10  grantees, and other recipients of its funds.

11         153.   Through the acts described above, Defendants, their agents, employees,

12  and co-conspirators, knowingly made, used, and caused to be made and used false

13  records and statements, which also omitted material facts, in order to induce the State

14  of Hawaii to approve and pay false and fraudulent claims.

15         154.   Through the acts described above, Defendants, their agents, employees,

16  and co-conspirators, knowingly made, used, and caused to be made and used false

17  records and statements material to an obligation to pay and transmit money to the

18  State of Hawaii, and knowingly concealed and improperly avoided and decreased an

19  obligation to pay and transmit money to the State of Hawaii.

20         155.   Through the acts described above, Defendants, their agents, employees,

21  and other co-conspirators knowingly conspired to submit false claims to the State of

22  Hawaii and to deceive the State of Hawaii for the purpose of causing the State of

23  Hawaii to pay or allow false or fraudulent claims.

24

156.    At a minimum, Defendants were the beneficiaries of inadvertent submissions of false claims to the State of Hawaii, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of Hawaii within a reasonable time after discovery of the false claim.

157.    The State of Hawaii, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

158.    By reason of the payments made by the State of Hawaii, as a result of Defendants' fraud, the State of Hawaii has suffered damages and continues to be damaged.

**COUNT VI**
**Violations of the Maryland False Claims**
**Against State Health Plans and Programs Act**
**Md. Code, Health-Gen. §§ 2-601, *et seq*.**

159.    Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

160.    This is a claim brought by Relator and Maryland to recover treble damages, civil penalties, and the fees and costs of this action, pursuant to the Maryland False Claims Against State Health Plans And State Health Programs Act, Md. Code, Health-Gen. §§ 2-601, *et seq*.

161.    The Maryland False Claims Against State Health Plans And State Health Programs Act provides liability for any persons who:

> (1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;
>
> (2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

…

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

Md. Code, Health-Gen. § 2-602.

162.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the State of Maryland false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the State of Maryland and its contractors, grantees, and other recipients of its funds.

163.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the State of Maryland to approve and pay false and fraudulent claims.

164.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the State of Maryland, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the State of Maryland.

1     165.    Through the acts described above, Defendants, their agents, employees,

2 and other co-conspirators knowingly conspired to submit false claims to the State of

3 Maryland and to deceive the State of Maryland for the purpose of causing the State of

4 Maryland to pay or allow false or fraudulent claims.

5     166.    The State of Maryland, unaware of the falsity of the records, statements,

6 and claims made and submitted by Defendants, its agents, employees, and co-

7 conspirators, and as a result thereof, paid money that it otherwise would not have paid.

8     167.    By reason of the payments made by the State of Maryland, as a result of

9 Defendants' fraud, the State of Maryland has suffered damages and continues to be

10 damaged.

11

12

**COUNT VII**
**Violations of the Virginia Fraud Against Taxpayers Act**
**Va. Code §§ 8.01-216.1, *et seq.***

13

14     168.    Relator hereby incorporates, by reference, all of the allegations from each

of the preceding paragraphs.

15     169.    This is a claim brought by Relator and the Commonwealth of Virginia to

16 recover treble damages, civil penalties and the fees and cost of this action, under the

17 Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1, *et seq.*

18     170.    The Virginia Fraud Against Taxpayers Act provides liability for any

19 person who:

20     1. Knowingly presents, or causes to be presented, a false or
21     fraudulent claim for payment or approval;

22     2. Knowingly makes, uses, or causes to be made or used, a false
     record or statement material to a false or fraudulent claim;

23     3. Conspires to commit a violation of [this] subdivision …;

24

1          …

2          8. Knowingly makes, uses, or causes to be made or used, a false
           record or statement material to an obligation to pay or transmit
3          money or property to the Commonwealth or knowingly conceals
           or knowingly and improperly avoids or decreases an obligation to
4          pay or transmit money or property to the Commonwealth.

5    Va. Code § 8.01-216.3.

6          171.   Through the acts described above, Defendants, their agents, employees,

7    and co-conspirators, knowingly presented, or caused to be presented, to the State of

8    Virginia false and fraudulent claims, and knowingly failed to disclose material facts, in

9    order to obtain payment or approval from the State of Virginia and its contractors,

10   grantees, and other recipients of its funds.

11         172.   Through the acts described above, Defendants, their agents, employees,

12   and co-conspirators, knowingly made, used, and caused to be made and used false

13   records and statements, which also omitted material facts, in order to induce the State

14   of Virginia to approve and pay false and fraudulent claims.

15         173.   Through the acts described above, Defendants, their agents, employees,

16   and co-conspirators, knowingly made, used, and caused to be made and used false

17   records and statements material to an obligation to pay and transmit money to the

18   State of Virginia, and knowingly concealed and improperly avoided and decreased an

19   obligation to pay and transmit money to the State of Virginia.

20         174.   Through the acts described above, Defendants, their agents, employees,

21   and other co-conspirators knowingly conspired to submit false claims to the State of

22   Virginia and to deceive the State of Virginia for the purpose of causing the State of

23   Virginia to pay or allow false or fraudulent claims.

24

175.   The State of Virginia, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

176.   By reason of the payments made by the State of Virginia, as a result of Defendants' fraud, the State of Virginia has suffered millions of dollars in damages and continues to be damaged.

## COUNT VIII
### Violations of the Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.005, *et seq.*

177.   Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

178.   This is a claim brought by Relator and Washington to recover treble damages, civil penalties, and the fees and costs of this action, under the Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005, *et seq.*

179.   The Washington State Medicaid Fraud False Claims Act provides liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) Conspires to commit one or more of the violations in this subsection (1);

… or

(g) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

1   Wash. Rev. Code § 74.66.020(1).

2        180.    Through the acts described above, Defendants, their agents, employees,

3   and co-conspirators, knowingly presented, or caused to be presented, to the State of

4   Washington false and fraudulent claims, and knowingly failed to disclose material

5   facts, in order to obtain payment or approval from the State of Washington and its

6   contractors, grantees, and other recipients of its funds.

7        181.    Through the acts described above, Defendants, their agents, employees,

8   and co-conspirators, knowingly made, used, and caused to be made and used false

9   records and statements, which also omitted material facts, in order to induce the State

10  of Washington to approve and pay false and fraudulent claims.

11       182.    Through the acts described above, Defendants, their agents, employees,

12  and co-conspirators, knowingly made, used, and caused to be made and used false

13  records and statements material to an obligation to pay and transmit money to the

14  State of Washington, and knowingly concealed and improperly avoided and decreased

15  an obligation to pay and transmit money to the State of Washington.

16       183.    Through the acts described above, Defendants, their agents, employees,

17  and other co-conspirators knowingly conspired to submit false claims to the State of

18  Washington and to deceive the State of Washington for the purpose of causing the State

19  of Washington to pay or allow false or fraudulent claims.

20       184.    The State of Washington, unaware of the falsity of the records,

21  statements, and claims made and submitted by Defendants, its agents, employees, and

22  co-conspirators, and as a result thereof, paid money that it otherwise would not have

23  paid.

24

185.   By reason of the payments made by the State of Washington as a result of Defendants' fraud, the State of Washington has suffered damages and continues to be damaged.

**COUNT IX**
**Unlawful Retaliation Pursuant to the False Claims Act**
**31 U.S.C. § 3730(h)**

186.   Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

187.   Through the acts described above, Defendants, their agents, employees, and co-conspirators, unlawfully retaliated against Relator, in violation of the False Claims Act, 31 U.S.C. § 3730(h), which prohibits the discharge, demotion, suspension, threatening, harassment or other discrimination against an employee because of any lawful act done by the employee on behalf of the employee or others in furtherance of an action under the FCA.

188.   As a direct and proximate result of Defendants' unlawful retaliation, Relator has suffered, and will continue to suffer, economic and non-economic harm for which Defendants are liable, including but not limited to back pay, interest on the back pay, front pay, compensation for any special damages sustained as a result of the discrimination, punitive damages, and attorneys' fees.

**COUNT X**
**Unlawful Retaliation Pursuant to the California False Claims Act**
**Cal. Gov't Code § 12653**

189.   Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

190.   Through the acts described above, Defendants, their agents, employees, and co-conspirators, unlawfully retaliated against Relator, in violation of the California

1    False Claims Act, Cal. Gov't Code § 12653, which prohibits the discharge, demotion,

2    suspension, threatening, harassment, or other discrimination against an employee

3    because of any lawful act done by the employee or others in furtherance of an action

4    under that statute.

5        191.    As a direct and proximate result of Defendants' unlawful retaliation,

6    Relator has suffered, and will continue to suffer, economic and non-economic harm for

7    which Defendants are liable, including but not limited to back pay, interest on the back

8    pay, front pay, compensation for any special damages sustained as a result of the

9    discrimination, punitive damages, and attorneys' fees.

10                          **<u>COUNT XI</u>**
     **Unlawful Retaliation in Violation of the California Labor Code**
11                 **Cal. Lab. Code § 1102.5(b)**

12        192.    Relator hereby incorporates, by reference, all of the allegations from each

13    of the preceding paragraphs.

14        193.    Through the acts described above, Defendants, their agents, employees,

15    and co-conspirators, unlawfully retaliated against Relator, in violation of the California

16    Labor Code, which provides that an employer "shall not retaliate against an employee

17    for disclosing information … to a person with authority over the employee or another

18    employee who has the authority to investigate, discover, or correct the violation or

19    noncompliance … if the employee has reasonable cause to believe that the information

20    discloses a violation of state or federal statute, or a violation of or noncompliance with a

21    local, state, or federal rule or regulation, regardless of whether disclosing the

22    information is part of the employee's job duties." Cal. Lab. Code § 1102.5(b).

23        194.    As a direct and proximate result of Defendants' unlawful conduct, Relator

24    has suffered, and will continue to suffer, economic and non-economic harm for which

Defendants are liable, including but not limited to back pay, interest on the back pay, front pay, compensation for any special damages sustained as a result of the discrimination, punitive damages, and attorneys' fees.

## COUNT XII
### Retaliatory Common Law Termination in Violation of Public Policy

195.    Relator hereby incorporates, by reference, all of the allegations from each of the preceding paragraphs.

196.    At all times relevant herein, Relator was an employee and Defendants were his employer, as recognized by California common law.

197.    It is the public policy of the State of California, as expressed through its statutes and regulations, that employees with information regarding improper, wasteful and unlawful activities by government entities and employees be encouraged to disclose such information both internally within the government agencies and externally with government or law enforcement officials, without fear of retaliation. Through such public policies, the State of California recognizes that whistleblowing disclosures, such as those made by the Relator in this case, are in the public interest, and that both private and public sector employees should be afforded protection from retaliation in order to achieve said public interest.

198.    Defendants' retaliatory actions against violated clear public policy and are the actual and proximate cause of his injuries, as described herein.

## PRAYER

WHEREFORE, *qui tam* Relator Jeffrey Mazik prays for a judgment against Defendants, as follows:

1      (a)      that Defendants cease and desist from violating the federal False

2      Claims Act, 31 U.S.C. §§ 3729–33, and the analogue state versions of the False

3      Claims Act in California, Colorado, Georgia, Hawaii, Maryland, Virginia, and

4      Washington;

5      (b)      that the Court enter judgment against Defendants in an amount

6      equal to three times the amount of damages sustained by the United States and

7      all States named herein, as a result of Defendants' actions, as well as a civil

8      penalty of $23,331 for each violation of 31 U.S.C. § 3729, and additional civil

9      penalties under the applicable provisions of each analogue state version of the

10      False Claims Act in California, Colorado, Georgia, Hawaii, Maryland, Virginia,

11      and Washington;

12      (c)      that Plaintiff-Relator be awarded the maximum amount allowed

13      pursuant to 31 U.S.C. § 3730(d) of the federal False Claims Act, and in

14      accordance with the maximum amount permitted by the *qui tam* provisions of

15      each analogue state version of the False Claims Act in California, Colorado,

16      Georgia, Hawaii, Maryland, Virginia, and Washington;

17      (d)      that Plaintiff-Relator be awarded front pay compensation in lieu of

18      reinstating Plaintiff-Relator to a position similar to that he would have had, but-

19      for the retaliation; two times back pay, plus interest; and compensation for

20      additional and special damages sustained as a result of the retaliation, including

21      litigation costs and reasonable attorneys' fees.

22      (e)      that Plaintiff-Relator be awarded all costs of this action, including

23      attorneys' fees and expenses; and

24

1          (f)      any other such relief as the Court deems just and proper.

1

## <u>DEMAND FOR JURY TRIAL</u>

2          Plaintiff-Relator Jeffrey Mazik hereby demands a jury trial with respect to all

3   issues triable of right by jury.

4   Dated: March 31, 2021

5                                    POLLOCK COHEN LLP

6
                                     By:  /s/ *Adam Pollock*
7                                        Adam Pollock (pro hac vice)

8                                    Christopher K. Leung, CA Bar No. 210325
                                     201 Spear St., Suite 1100
                                     San Francisco, CA 94105
9                                    Tel.: (415) 825-8500
                                     Chris@PollockCohen.com
10

11                                   LAW OFFICE OF JEREMY L. FRIEDMAN

12                                   By:  /s/ *Jeremy L. Friedman*
                                         Jeremy L. Friedman, CA Bar No. 142659
13
                                     2801 Sylhowe Road
14                                   Oakland, CA 94610
                                     Tel: (510) 530-9060
                                     Email: jlfried@comcast.net
15

16                                   *Counsel for Relator Jeffrey Mazik*

17

18

19

20

21

22

23

24