UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFREY MAZIK,

               Plaintiff-Relator,

     v.

KAISER PERMANENTE, INC., et al.

               Defendants.

No. 19-cv-00559-DAD-KJN

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT

(Doc. No. 78)

This matter is before the court on the motion to dismiss relator's first amended complaint filed on July 13, 2022, by defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), Kaiser Foundation Hospitals ("KF Hospitals"), The Permanente Medical Group, Inc., Southern California Permanente Medical Group, and Colorado Permanente Medical Group, P.C. (the latter three defendants will be referred to herein collectively as "the PMG defendants").[1]  (Doc. No. 78.)  On October 4, 2022, the pending motion was taken under submission by the previously

---

[1] In his first amended complaint, relator named as a defendant "The Permanente Medical Groups," which defendants argue is not an existing entity.  (*See* Doc. No. 78 at 2.)  Pursuant to the parties' stipulation and the court's order, that defendant has been replaced with The Permanente Medical Group, Inc., Southern California Permanente Medical Group, and Colorado Permanente Medical Group, P.C.  (Doc. No. 69 at 4.)  Throughout his first amended complaint, relator refers to all defendants collectively as "Kaiser."  (*See* Doc. No. 48 at ¶ 1.)

1

assigned district judge.[2]  (Doc. No. 92.)  For the reasons explained below, defendants' motion to dismiss will be denied in part and granted in part, with leave to amend also being granted.

## BACKGROUND

On April 2, 2021, relator Jeffrey Mazik filed his operative first amended complaint ("FAC") under seal on behalf of the United States of America and the states of California, Colorado, Georgia, Hawaiʻi, Maryland, Virginia, and Washington (collectively, "the plaintiff states") against defendants pursuant to the federal False Claims Act, 31 U.S.C. §§ 3279, *et seq.* (Doc. No. 48.)  In his FAC, relator alleges the following.

"Kaiser Permanente" is an "integrated managed care consortium made up of three distinct but interdependent groups of entities:"  defendant KFHP, defendant KF Hospitals, and several regional Permanente Medical Groups, including the PMG defendants.  (*Id.* at ¶ 14.)  The PMG defendants are groups of physicians that "contract with the other Kaiser entities" to provide medical services.  (*Id.*)  Each PMG defendant operates within its individual territory and is funded primarily by reimbursements from its respective regional Kaiser Foundation Health Plan entity. (*Id.*)  Defendant KF Hospitals is a nonprofit corporation headquartered in California that operates hospitals and provides facilities for the benefit of the PMG defendants.  (*Id.*)  It also receives its funding from defendant KFHP.  (*Id.*)  Defendant KFHP is a nonprofit corporation headquartered in California that enrolls members in health plans and provides medical services for its members through contracts with defendant KF Hospitals and the PMG defendants.  (*Id.*)

Medicare beneficiaries may opt to receive benefits through private health plans instead of the traditional fee-for-service Medicare program.  (*Id.* at ¶ 18.)  Under that option, known as Medicare Advantage, the federal government pays Medicare Advantage organizations such as defendants a "capitated" (i.e., per enrollee) amount for the purpose of providing medical benefits. (*Id.*)  The capitated rates vary depending on the health status of the enrollees; less healthy enrollees require more medical care, which necessitates higher capitation reimbursement

---

[2]  On October 26, 2022, this case was reassigned to the undersigned.  (Doc. No. 93.)  The undersigned has endeavored to work through a backlog of inherited submitted motions in civil cases as quickly as possible since returning to the Sacramento courthouse in late August of 2022.

payments to the Medicare Advantage organizations.  (*Id.* at ¶¶ 19, 20.)  Health status in turn depends on the diagnosis codes generated by healthcare providers following encounters with enrollees.  (*Id.* at ¶ 21.)  In sum, enrollees see doctors such as those in the PMG defendants, who then provide diagnosis codes to defendant KFHP, which then submits the diagnosis codes to the Centers for Medicare & Medicaid Services ("CMS").  (*Id.* at ¶¶ 2, 21.)  CMS uses the diagnosis codes to adjust the capitation rate for each enrollee, a process known as "risk adjustment."  (*Id.* at ¶ 22.)  More severe diagnosis codes lead to higher capitation rates, resulting in greater profits for all defendants—including defendant KF Hospitals and the PMG defendants.  (*Id.* at ¶ 45.)  Many government-funded plans other than Medicare Advantage also rely upon "substantially the same model" of risk adjustment for capitation rates, such as state-funded Special Needs Plans and "various state-administered Medicaid programs—such as Medi-Cal in California, and other similar plans of the State Plaintiffs."  (*Id.* at ¶¶ 33, 34, 36.)

Medicare regulations impose certain requirements on Medicare Advantage organizations such as defendants in an effort to curb the potential for organizations to submit unsupported diagnosis codes, which would lead to improperly high capitation rates and inflated revenues to providers.  (*Id.* at ¶¶ 24, 26.)  For instance, Medicare Advantage organizations must adopt and implement "an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  (*Id.* at ¶ 28) (quoting 42 C.F.R. § 422.503(b)(4)(vi)). Medicare Advantage organizations must also certify the accuracy, completeness, and truthfulness of the data provided to CMS as a condition of receiving payment.  (*Id.* at ¶ 29) (citing 42 C.F.R. § 422.504.  Similarly, the organization must submit an annual attestation signed by its Chief Executive Officer or Chief Financial Officer certifying that the risk adjustment data submitted to CMS is "accurate, complete, and truthful," acknowledging that risk adjustment data "directly affects the calculation of CMS payments," and recognizing that "misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."  (*Id.*)  CMS also imposes strict requirements on Medicare Advantage organizations' contractual relationships with entities that provide medical services to the organization's

3

members.  (*Id.* at ¶ 30.)  Finally, CMS requires organizations to take corrective actions where necessary to ensure compliance with applicable laws and regulations, including the requirement to perform a "root cause analysis" to identify the source of any potential errors or issues.  (*Id.* at ¶ 31) (citing 42 C.F.R. § 422.504).  State-funded Special Needs Plans are expected to follow Medicare Advantage compliance regulations such as those listed above.[3]  (*Id.* at ¶ 36.)

Relator, a resident of California, is the former "Senior Practice Leader for Kaiser's National Compliance Office" and has over 25 years of experience in fraud control, auditing, and compliance.  (*Id.* at ¶ 10.)  He was "employed by Kaiser" from 2008 to 2017, joining as an "Information Technology Audit Specialist" in May 2008 and transitioning to the role of "Senior Practice Leader in the Fraud Control Program" in March 2012.  (*Id.* at ¶ 11.)  Relator's duties included working with regional compliance leadership to implement compliance and fraud control initiatives, using data analytics to improve compliance and fraud-mitigation initiatives, investigating potential fraud, and developing corrective action plans to address fraud risks.  (*Id.* at ¶ 12.)

Since 2008 at the latest, defendants have schemed to defraud the federal government by allowing external, i.e., "non-Kaiser," healthcare providers to submit false diagnosis codes, which defendants in turn submit to CMS in order to inflate their capitation rates.  (*Id.* at ¶¶ 40, 44.)  In particular, defendants intentionally fail to properly use fraud-detection tools to monitor claims errors.  (*Id.* at ¶ 46.)  Defendants contract with data analytics vendors to review their external provider claims for each region.  (*Id.* at ¶ 47.)  The vendors provide software applications that perform various types of reviews.  (*Id.*)  For instance, some programs "detect claims that are incorrectly billed . . . [while] other programs identify intentionally manipulated claims that technically fall within plan rules . . . ."  (*Id.*)  However, defendants intentionally misused these programs and used them at minimum capacity, such as by disabling key features, in order to reduce the chances of detecting claims errors.  (*Id.* at ¶¶ 48, 49.)  In this way, defendants were actively working to avoid detecting and correcting fraudulent claims.  (*Id.* at ¶ 50.)

---

[3]  Relator's allegations in his FAC are ambiguous as to whether state-run Medicaid programs impose similar compliance regulations.

In late 2015, relator was tasked with comparing the functionalities offered by two claims analytics vendors, McKesson and Verisk, with which defendants routinely contracted.  (*Id.* at ¶¶ 55, 56.)  McKesson offers auditing software called ClaimsXten that detects fraudulent billing practices using "a robust set of rules."  (*Id.* at ¶ 57.)  However, defendants chose to deactivate 25 of the 54 rules used by ClaimsXten—"the principal software program that they were supposedly relying on [to] detect such billing fraud."  (*Id.*)  When a group of employees including relator used a Verisk program to double-check data from "the Georgia region" produced by ClaimsXten, the group found $5.3 million in overpayments stemming from defendants' decision to deactivate nearly half the rules in ClaimsXten.  (*Id.* at ¶ 59.)  Defendants neither reactivated the disabled rules nor rectified the $5.3 million in overpayments.  (*Id.* at ¶¶ 60, 61.)  Relator presented the group's findings on the Georgia region to several Kaiser executives named in the FAC, but none of those executives took any action.  (*Id.* at ¶¶ 61, 62.)

In February 2016, relator detected significant overpayments due to erroneous diagnosis codes in "all other regions."[4]  (*Id.* at ¶ 63.)  Relator prepared another presentation on the overpayments for his superiors and pointed out that defendants were required by the applicable regulations to review and investigate all identified overpayments within 60 days.  (*Id.* at ¶¶ 63, 64.)  His superiors did not request a root cause analysis, did not investigate further, and "even took overt steps to prevent Relator from investigating any further himself."  (*Id.* at ¶ 66.)

On June 30, 2016, relator participated in a call with Marita Janiga, "Executive Director of Investigations in Kaiser's National Compliance, Ethics & Integrity Office," and the U.S. Department of Health and Human Services' Office of the Inspector General ("OIG").  (*Id.* at ¶¶ 54, 76.)  The purpose of the call was to discuss issues surrounding claims accuracy and claims recovered through fraud reduction efforts.  (*Id.* at ¶ 76.)  Janiga made several false statements during the call related to compliance issues, such as claiming that "Kaiser and its regional offices were 'fully integrated,' so there was no need for the OIG to inquire into its claims processes."  (*Id.* at ¶ 79.)  Worried that relator would speak up to correct her or to discuss his overpayment

---

[4]  Relator's allegations in the FAC are ambiguous as to whether or not these overpayments were also due to defendants tampering with compliance software.

findings, Janiga messaged him "[not] to say a word." (*Id.* at ¶¶ 78–81.)  Relator obeyed this command and remained silent during the call.  (*Id.* at ¶ 82.)

In September 2016, relator performed an audit of claims data from all regional offices dating from August 3, 2010 through July 30, 2016.  (*Id.* at ¶ 86.)  He found that unsupported diagnosis codes had led to over $209 million in Medicare Advantage overpayments, $181 million in Medi-Cal overpayments, and $181 million in overpayments relating to "other Medicaid programs during that six-year period."[5]  (*Id.*)

Despite all of relator's findings, defendants certified that their risk adjustment data was accurate and truthful and failed to correct the overpayments.  (*Id.* at ¶¶ 90, 91.)  All defendants profited from the overpayments and the inflated capitation rates.  (*Id.* at ¶ 93.)

Eventually, defendants retaliated against relator for his activities.  (*Id.* at ¶ 96.)  The more that relator spoke up about unsupported diagnosis codes and overpayments, and the more that he "tried to steer Kaiser in the direction of full compliance," the more he was "sidelined and closed out from data and documents."  (*Id.*)  On October 12, 2016, relator approached Lauren Sutcliffe, "a Senior Manager in the Special Investigations Unit," regarding an analysis relator had performed uncovering approximately $380,000 in overpayments.  (*Id.* at ¶¶ 54, 98.)  Sutcliffe severely criticized relator for performing the analysis without her approval and placed him on a performance improvement plan.  (*Id.* at ¶ 98.)  Several times in October 2016, relator was denied access to "every data repository necessary to perform his compliance job."  (*Id.* at ¶¶ 99, 100.)  Because claims data review was relator's central focus on the compliance team, he was thereby stripped of his duties and responsibilities.  (*Id.* at ¶ 101.)  In an attempt to prevent whistleblowing, Sutcliffe also prohibited relator from meeting with anyone above Sutcliffe's level without her prior approval.  (*Id.* at ¶ 102.)  On November 3, 2016, Sutcliffe forbade relator from communicating with other employees by phone or instant messaging; he was instructed instead to use only email and to copy Sutcliffe on all outgoing emails.  (*Id.* at ¶ 106.)  On January 5, 2017, relator was fired.  (*Id.* at ¶ 111.)  Throughout his time working for defendants, relator's

---

[5]  Again, relator does not specify whether or not the overpayments were due to defendants tampering with auditing software.

1    performance reviews were consistently "successful" or "excellent," and it was only after his

2    presentations on overpayments that he received his first "performance needs improvement"

3    review.  (*Id.* at ¶ 112.)

4         Based on the above allegations, relator asserts the following eleven claims in his FAC[6]:

5    (1) violation of the federal False Claims Act ("federal FCA"), 31 U.S.C § 3279(a)(1);

6    (2) violation of the California FCA, California Government Code §§ 12650, *et seq.*; (3) violation

7    of the Colorado Medicaid FCA, Colorado Revised Statutes §§ 25.5-4-303.5, *et seq.*; (4) violation

8    of the Georgia Taxpayer Protection Against False Claims Act ("TPAFCA"), Georgia Code §§ 23-

9    3-120, *et seq.*; (5) violation of the Hawaiʻi FCA, Hawaiʻi Revised Statutes §§ 661-21, *et seq.*;

10   (6) violation of the Virginia Fraud Against Taxpayers Act, Virginia Code §§ 8.01-216.1, *et seq.*;

11   (7) violation of the Washington Medicaid Fraud FCA, Washington Revised Code §§ 74.66.005, *et*

12   *seq.*; (8) unlawful retaliation in violation of the federal FCA, 31 U.S.C. § 3730(h); (9) unlawful

13   retaliation in violation of the California FCA, California Government Code § 12653;

14   (10) unlawful retaliation in violation of California Labor Code § 1102.5(b); and (11) retaliatory

15   common law termination in violation of public policy.

16        On December 1, 2021, the United States filed a notice informing the court of its decision

17   to decline to intervene; the plaintiff states filed a similar notice on December 6, 2021.  (Doc.

18   Nos. 62, 66.)  The court unsealed relator's FAC on the same day that the plaintiff states declined

19   to intervene, December 6, 2021.  (Doc. No. 67.)

20        On July 13, 2022, defendants filed their pending motion to dismiss relator's FAC.  (Doc.

21   No. 78.)  On August 29, 2022, relator filed his opposition to the pending motion.  (Doc. No. 85.)

22   Defendants filed their reply thereto on September 27, 2022.  (Doc. No. 91.)

23   /////

24   /////

25   /////

26

---

27   [6]  In his FAC, relator also asserted a claim for violation of the Maryland False Claims Against
     State Health Plans and Programs Act.  (Doc. No. 48 at ¶¶ 159–67.)  This claim has already been
28   dismissed with prejudice because the state of Maryland declined to intervene as required by the
     aforementioned Act.  (Doc. No. 67.)

1      **LEGAL STANDARD**

2      **A.      Motion to Dismiss Under Rule 12(b)(6)**

3              The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

4      sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

5      1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

6      sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

7      F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to

8      relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

9      claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

10     the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

11     Iqbal*, 556 U.S. 662, 678 (2009).

12             In determining whether a complaint states a claim on which relief may be granted, the

13     court accepts as true the allegations in the complaint and construes the allegations in the light

14     most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However,

15     the court need not assume the truth of legal conclusions cast in the form of factual allegations.

16     *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not

17     require detailed factual allegations, "it demands more than an unadorned, the-defendant-

18     unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers

19     mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."

20     *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements

21     of a cause of action, supported by mere conclusory statements, do not suffice.").  It is

22     inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the

23     defendants have violated the . . . laws in ways that have not been alleged."  *Associated Gen.

24     Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

25             In ruling on a motion to dismiss brought under Rule 12(b)(6), the court is permitted to

26     consider material that is properly submitted as part of the complaint, documents that are not

27     physically attached to the complaint if their authenticity is not contested and the plaintiffs'

28     /////

1  complaint necessarily relies on them, and matters of public record.  *Lee v. City of Los Angeles*,
2  250 F.3d. 668, 688–89 (9th Cir. 2001).

3  **B.      Heightened Pleading Standard Under Rule 9(b)**

4         "When an entire complaint, or an entire claim within a complaint, is grounded in fraud
5  and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district
6  court may dismiss the complaint or claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107
7  (9th Cir. 2003).  Under Rule 9(b), the "circumstances constituting the alleged fraud [must] be
8  specific enough to give defendants notice of the particular misconduct . . . so that they can defend
9  against the charge and not just deny that they have done anything wrong."  *Kearns v. Ford Motor
10  Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted) (quoting *Bly-Magee
11  v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  To satisfy the particularity standard of
12  Rule 9(b), "a pleading must identify the who, what, when, where, and how of the misconduct
13  charged, as well as what is false or misleading about the purportedly fraudulent statement, and
14  why it is false."  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 (9th Cir. 2020)
15  (quotations omitted) (quoting *Davidson v. Kimberley-Clark Corp.*, 889 F.3d 956, 964 (9th Cir.
16  2018)).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be
17  alleged generally."  *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404
18  (9th Cir. 2021) (quoting Fed. R. Civ. P. 9(b)); *see also Klaehn v. Cali Bamboo LLC*, No. 21-
19  55738, 2022 WL 1830685, at *2 (9th Cir. 2022)[7] ("Under Fed. R. Civ. P. 9(b), a plaintiff must
20  plead circumstances from which a court can plausibly infer the defendant's knowledge.").

21                                          **ANALYSIS**

22  **A.      Federal FCA Claim**

23         Relator's first cause of action alleges a violation of 31 U.S.C. § 3279(a)(1), which subjects
24  a person to liability who "knowingly presents . . . a false or fraudulent claim for payment,"
25  "knowingly makes . . . a false record or statement material to a false or fraudulent claim,"
26  "knowingly makes . . . a false record or statement material to an obligation to pay or transmit

27  ───────────────────
[7]  Citation to the unpublished Ninth Circuit opinions such as those cited here and elsewhere in this
28  order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

money or property to the Government," or "conspires to commit" any of the previously listed violations.

        1.   <u>First-to-File Bar</u>

"When a person brings [a *qui tam* action under the federal FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). "[T]he facts underlying the later-filed complaint need not be 'identical' to those underlying the earlier-filed complaint for the later complaint to be barred." *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1130 (9th Cir. 2015). Rather, complaints that allege the same "material facts" as an earlier-filed complaint will be barred. *Id.* at 1123. "As a practical matter, the material facts test often has a court consider 'whether the [later-filed] complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the [first-filed] complaint.'" *United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 601 F. Supp. 3d 536, 552 (N.D. Cal. 2022) ("*Osinek I*") (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011)); *see also Hartpence*, 792 F.3d at 1131 (holding that the district court erred in finding a later complaint barred in part because the Ninth Circuit "disagree[d] that [the later relator's] action provided no additional benefit to the government").

      In their pending motion, defendants argue that relator's federal FCA claim is barred by the first-to-file rule and the first amended complaint filed by the relator, Dr. James Taylor, in *United States ex rel. Taylor v. Kaiser Permanente*, No. 21-cv-03894-EMC (N.D. Cal.) ("the Taylor Complaint").[8] (Doc. No. 78 at 14–17.) Below, the court will therefore compare the allegations in

/////

/////

---

[8] Defendants request that the court take judicial notice of the Taylor Complaint. (Doc. No. 79.) Courts "may take notice of proceedings in other courts . . . if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979); *see also id.* (taking notice of another court's "final judgment" and "related filings")). Accordingly, the court takes judicial notice of the Taylor Complaint.

the Taylor Complaint with relator's allegations in his FAC.[9]

The relevant allegations from the Taylor Complaint are as follows.  Defendant "Kaiser Permanente" is a nonprofit managed-care consortium consisting of "three main groups:  (1) the Kaiser Foundation Health Plan, Inc. and its subsidiaries; (2) the Kaiser Foundation Hospitals and their subsidiaries; and (3) the Permanente Medical Groups."  (Taylor Complaint ¶ 16.)  "Kaiser routinely conducted . . . audits to determine the accuracy of its risk adjustment claims submissions," and these audits regularly identified categories of claims that had high rates of falsity.  (*Id.* ¶ 60.)  In particular, the "audits have identified significant error rates in risk adjustment claims Kaiser submitted to CMS based on diagnoses provided by external providers."  (*Id.* ¶ 81.)  Despite the results of the audits, "Kaiser rarely took even minimal steps" to prevent the future submission of false claims or to audit prior submissions to find previously submitted false claims.  (*Id.* ¶ 60.)[10]

/////

---

[9]  Defendants argue that the appropriate comparison is between relator's original complaint and the Taylor Complaint, i.e., Taylor's first amended complaint.  (Doc. No. 78 at 15); *see also Osinek I*, 601 F. Supp. 3d at 551 (holding that courts should compare the original complaint in the later-filed action with the operative complaint in the first-filed action at the time the later-filed action was filed).  If the court were to follow the reasoning underpinning the district court's decision in *Osinek I*, the appropriate comparison would indeed be between relator Mazik's original complaint and Taylor's first amended complaint.  However, a recent unpublished decision by the Ninth Circuit reviewing the district court's decision in *Osinek I* casts doubt on this approach and suggests courts should instead compare "all pending amended complaints, *i.e.* all operative complaints at the time of the first-to-file analysis."  *United States ex rel. Stein v. Kaiser Found. Health Plan, Inc.*, No. 22-15862, 2024 WL 107099, at *1 (9th Cir. 2024); *see also Hartpence*, 792 F.3d at 1125 n.2 ("For purposes of determining jurisdiction, we look to the allegations in the amended complaints.").  Ultimately, the resolution of this question does not affect the outcome of the first-to-file analysis in this case, because the relevant allegations in Taylor's original and amended complaints are virtually identical, as are the relevant allegations in relator Mazik's.  *See Stein*, 2024 WL 107099, at *1 ("Without deciding whether the district court erred in selecting the proper comparators in applying the first-to-file bar, we conclude any error would be harmless because the district court considered in the alternative the allegations Relators added in their amended complaint.  Moreover . . . there were no material differences in the amended *Osinek* and *Taylor* complaints.").

[10]  The Taylor Complaint describes the audits, and the defendants' failure to act on those audits, in considerable detail.  These more detailed allegations are omitted because they are not ultimately necessary to decide the first-to-file issue in this case for the reasons discussed below.

Defendants argue that Taylor and relator have both alleged fraudulent schemes wherein external providers supply erroneous diagnosis codes to defendants, who then knowingly submit the erroneous codes to CMS to reimbursement.  (Doc. No. 78 at 15–16.)  In particular, defendants argue that Taylor and relator describe the same three specific practices:  (1) audits revealing that the diagnosis codes supplied by external providers had high error rates; (2) defendants' failure to take appropriate corrective action in response to the audits revealing high error rates; and (3) defendants' failure to use oversight tools that would have allowed defendants to identify the high error rates.  (*Id.* at 16–17.)  Consequently, defendants argue, the Taylor Complaint "gave 'the government grounds to investigate all that is in' Mazik's FAC, and the first-to-file bar requires dismissal of Mazik's federal FCA claim."  (*Id.* at 17) (quoting *Batiste*, 659 F.3d at 1210).

In his opposition, relator acknowledges that:

> [t]here are, of course, similarities between the two cases.  Like *Taylor*, the allegations in *Mazik* generally pertain to a 'nationwide or corporate-wide fraud' to increase the payments that Defendants received from various government entities by knowingly submitting false, fraudulent, and/or unsupported diagnostic codes in its risk adjustment data.  And like *Taylor*, Mazik also alleges that Kaiser's failure to correct 'improper coding by external providers' was a central component of that fraud."

(Doc. No. 85 at 11) (internal citations omitted).  However, relator argues that the allegations of his FAC describe an entirely different mechanism by which this alleged fraud operates, a mechanism not hinted at in the Taylor Complaint.  (*Id.*)  That is, relator asserts that his allegations here focus "almost exclusively on Kaiser's defunct compliance operations, including but not limited to its intentional manipulation of fraud detection software . . . ."  (*Id.*)  Relator also argues that he "is the first to put the government on notice about Kaiser's practice of acquiring and utilizing recognized fraud-detecting programs to make it appear as though it has a robust compliance operation, but purposefully configuring those programs to overlook readily identifiable instances of fraud . . . ."  (*Id.* at 13.)

The court concludes that relator's FCA claim is barred by the first-to-file rule except to the extent relator alleges that defendants deliberately tampered with compliance software to ensure that it did not identify erroneous diagnosis codes.  As relator acknowledges, the Taylor

Complaint and relator's FAC both broadly allege schemes wherein defendants knowingly requested CMS reimbursements premised on erroneous diagnosis codes.  Consequently, the government was "already . . . equipped to investigate" the broader scheme alleged by relator here. *Batiste*, 659 F.3d at 1209.  Relator's allegations as to this general scheme "have no additional benefit for the government," which was already on notice of the alleged fraud from the Taylor Complaint.  *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).  Accordingly, relator's federal FCA claim is barred insofar as it alleges a general fraudulent scheme wherein defendants knowingly requested CMS reimbursements premised on erroneous diagnosis codes.  *See Osinek I*, 601 F. Supp. 3d at 567 ("Based on *Osinek*, the government had grounds to investigate all that is in the Taylor Complaint which points to the same basic problem. . . . [A]t bottom, Dr. Taylor's broader claim is that high-value conditions were diagnosed without following the practices required by Medicare regulations.  This is fundamentally the same charge that Ms. Osinek makes.").

However, plaintiff is correct that there is one aspect of his federal FCA claim that does not appear in the Taylor Complaint, namely defendants' alleged tampering with compliance software.  With respect to these allegations, "the nature of wrongdoing claimed by [relator Mazik] here involves different 'material elements' from" the wrongdoing alleged in the Taylor Complaint.  *Osinek I*, 601 F. Supp 3d at 569; *see also id.* at 568 ("Here, the Court agrees with Dr. Taylor that this specific aspect of his case is not related to *Osinek*.").  The Taylor Complaint describes various Kaiser entities discovering errors in the diagnosis codes via audits and then failing to act on those discoveries.  (*See, e.g.*, Taylor Complaint ¶¶ 60, 63, 71, 160); *see also Osinek I*, 601 F. Supp. 3d at 565–69 (describing how Taylor's theories of fraud all rely on allegations that "Kaiser failed to act even after audits revealed high error rates").  By contrast, here relator's allegations in his FAC describe defendants' decision to disable compliance software so that the audits would *not* identify erroneous codes and defendants would not discover the errors in the first place. (Doc. No. 48 at ¶¶ 48, 49, 57, 59.)  In contrast, the Taylor Complaint alleges that the audits were "relatively successful," "showed that Kaiser continued to have a high error rate," and "identified not only specific [categories of codes] that had high error rates, but also the individual diagnosis

1  codes that were problematic."  (Taylor Complaint ¶¶ 156, 157.)  There is nothing in these

2  allegations that would have prompted the government to question the validity of the audits.

3  Relator Mazik's allegations that the audits were themselves compromised would therefore

4  "provide[] [some] additional benefit to the government."  *Hartpence*, 792 F.3d at 1131.

5       Accordingly, relator's federal FCA claim will be dismissed without leave to amend,

6  except to the extent it is premised on defendants' alleged tampering with compliance software.

7  *See Osinek I*, 601 F. Supp. 3d at 569 (holding that "[t]he *Taylor* case is not dismissed in its

8  entirety but only in part" because "*Taylor* differs materially from *Osinek* in three ways"); *id.* at

9  574 ("*Taylor* is dismissed except to the extent that it pleads (1) a nationwide or corporate-wide

10  fraud; (2) a fraud based on improper coding by external providers; and (3) a fraud based on True

11  Positive results from the NLP program."); *see also United States ex rel. Jahr v. Tetra Tech EC,

12  Inc.*, 2022 WL 2317268, at *6 (N.D. Cal. June 28, 2022) (holding that certain "allegations [were]

13  dismissed under the first-to-file bar" where the prior complaint "would plausibly have provided

14  the government with notice of the material facts of similar claims," but also concluding that other

15  allegations appearing in the earlier filed complaint "are much too general to preclude [the

16  relator's] allegations about soil sampling").

17       2.   Falsity

18       A "claim for payment can be factually false or legally false."  *United States ex rel. Osinek

19  v. Permanente Med. Grp., Inc.*, 640 F. Supp. 3d 885, 897 (N.D. Cal. 2022) ("*Osinek IV*").  "A

20  factually false claim is one in which the claim for payment is itself literally false or fraudulent,

21  such as when the claim involves an incorrect description of goods or services provided or a

22  request for reimbursement for goods or services never provided."  *United States ex rel. Anita

23  Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675 (9th Cir. 2018) (internal citations omitted).  A

24  legally false claim can take one of two forms:  express false certification or implied false

25  certification.  *Id.*  "Express false certification involves an entity's representation of compliance

26  with the law as part of the process for submitting a claim when it is actually not compliant."  *Id.*

27  at 675–76.  "By contrast, implied false certification occurs when an entity has previously

28  undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated

1  by submitting a claim for payment even though a certification of compliance is not required in the

2  process of submitting the claim." *Id.* at 676 (citations, brackets, and internal quotation marks

3  omitted). "Although the circumstances of a fraud must be pleaded with particularity, knowledge

4  may be pleaded generally." *Id.* at 679 (citing Fed. R. Civ. P. 9(b)).

5       Defendants argue that relator has failed to allege falsity or any fraudulent scheme with the

6  particularity required by Rule 9(b). (Doc. No. 78 at 18.) Defendants offer a laundry list of details

7  that they argue relator has failed to allege. (*See id.* at 18–19) (arguing that relator has failed to

8  allege, among other things, "the purpose of those 25 [deactivated] rules, how deactivating those

9  rules could result in inaccurate diagnosis codes," or whether "he reviewed any actual medical

10 records"). In his opposition, relator directs the court's attention to more than 40 paragraphs in his

11 FAC which he contends clearly allege a fraudulent scheme with the required particularity. (Doc.

12 No. 85 at 16, 17 & n.9) (citing Doc. No. 48 at ¶¶ 2–6, 19–23, 40–74).

13      The court concludes that relator has sufficiently alleged a fraudulent scheme in his FAC.

14 Relator has alleged the "who" (defendants), the "what" (tampering with auditing software), the

15 "when" ("since at least 2008"), the "why" (to decrease the chance of identifying errors in claims),

16 and "how" the alleged scheme is fraudulent ("Kaiser repeatedly provided expressly false

17 certifications that its risk adjustment data submissions to CMS were 'accurate, complete, and

18 truthful,' while knowing that the data were, in fact, plagued with errors, and despite knowing that

19 those errors would cause CMS to pay unjustifiably and falsely higher capitation rates."). (Doc.

20 No. 48 at ¶¶ 44, 48, 55, 57–61, 73.) Moreover, relator alleges that defendants "decided to de-

21 activate 25 of the 54 editing rules or features in ClaimsXten—the principal software program that

22 they were supposedly relying on [to] detect such billing fraud." (*Id.* at ¶ 57.) He further alleges

23 that when he used similar auditing software from another company, Verisk, to double-check the

24 results of the ClaimsXten program, he identified $5.3 million in overpayments "for the Georgia

25 region alone" resulting directly from defendants' decision to deactivate the relevant ClaimsXten

26 features. (*Id.* at ¶¶ 57–59.) Despite relator allegedly presenting his findings to several authorities

27 within defendants' corporate structure, defendants never implemented "the most obvious . . .

28 corrective action" of "simply re-activat[ing] these built-in editing features . . . ." (*Id.* at ¶¶ 60,

61.)  Relator has thereby sufficiently alleged falsity, as well as defendants' knowledge of the falsity.  *See United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1175 (9th Cir. 2016) ("[W]hen, as alleged here, Medicare Advantage organizations design retrospective reviews of enrollees' medical records deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence, they can no longer certify, based on best knowledge, information and belief, the accuracy, completeness and truthfulness of the data submitted to CMS.").

    3.    Materiality

        "Under the [federal] False Claims Act, the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018).  "[T]here is not a bright-line test for determining whether the [federal] FCA's materiality requirement has been met." *United States ex rel. Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1212 (9th Cir. 2019).  "No single fact or occurrence determines materiality"; indeed, even "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *United States ex rel. Winter v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1121 (9th Cir. 2020) (internal quotation marks omitted).

        Defendants argue that relator's allegations regarding materiality are conclusory and that he has failed to allege "any specific facts to show that the government would not have paid Defendants had it known about the purported fraud . . . ."  (Doc. No. 78 at 19.)  Relator argues in response that CMS would not have paid such high capitation rates but for the falsely inflated risk adjustment data that defendants deliberately failed to discover through sham audits.  (Doc. No. 85 at 17.)

        The court concludes that relator has sufficiently alleged materiality.  Relator has alleged that CMS pays capitation rates to defendants based on a risk adjustment formula that considers plan beneficiaries' demographics and health status, that health status is in turn based on diagnosis codes that defendants receive from healthcare providers, and that defendants have purposefully disabled features of their compliance software in order to avoid discovering certain errors in

diagnosis codes that would reduce the capitation rates they receive.  (Doc. No. 48 at ¶¶ 4, 5, 21, 57); *see also United States ex rel. Osinek v. Kaiser Permanente*, No. 13-cv-03891-EMC, 2023 WL 4053797, at *4 (N.D. Cal. June 15, 2023) ("*Osinek V*") ("For example, materiality is supported by allegations that CMS makes risk-adjustment payments based directly on the diagnosis codes submitted by health plans."); *cf. Silingo*, 904 F.3d at 673 ("The importance of accurate data certifications and effective compliance programs is obvious:  if enrollee diagnoses are overstated, then the capitation payments to Medicare Advantage organizations will be improperly inflated.").  Moreover, relator has alleged that defendants' scheme led to $5.3 million in overpayments "for the Georgia region alone."  (Doc. No. 48 at ¶ 59); *see also Osinek IV*, 640 F. Supp. 3d at 910 ("[T]he magnitude of the noncompliance weighs in favor of materiality, as the government has asserted that Kaiser has 'reap[ed] thousands of dollars for each inaccurate diagnosis code and hundreds of millions of dollars for its scheme.'"); *cf. Rose*, 909 F.3d at 1022 ("[W]ere a school to offer admissions representatives cups of coffee or $10 gift cards for recruiting higher numbers of students, there would be no viable claim under the False Claims Act. That is not the case here.  Under Defendant's 2006–2008 compensation scheme, admissions representatives stood to gain as much as $30,000 and a trip to Hawaii . . . .  [These] tremendous bonuses . . . also counsel against a finding that Defendant's noncompliance was immaterial.").  Relator has additionally alleged that defendants must certify the truthfulness of the data provided to CMS as a condition of receiving payment.  (Doc. No. 48 at ¶ 29) (citing 42 C.F.R. § 422.504). Lastly, relator alleges that defendants must submit an annual attestation certifying that the risk adjustment data is truthful, acknowledging that risk adjustment data "directly affects the calculation of CMS payments," and recognizing that "misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."  (*Id.* at ¶ 29.)  *Cf. Rose*, 909 F.3d at 1020 (affirming the denial of the defendant's motion for summary judgment and concluding that "the government condition[ing] the payment of Title IV funds on compliance with . . . statute, regulation, and contract" is "certainly probative evidence of materiality").

/////

1     4.   <u>Lumping</u>

2        Defendants next argue that relator's allegations in the FAC impermissibly lump

3 defendants together in violation of Rule 9(b).  (Doc. No. 78 at 21); *see also Swartz v. KPMG LLP*,

4 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump

5 multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing

6 more than one defendant . . . and inform each defendant separately of the allegations surrounding

7 [their] alleged participation in the fraud.").  Defendants argue that relator has failed to allege what

8 role each defendant played in the alleged scheme and that it is not "plausible" that all defendants

9 engaged in precisely the same conduct.  (Doc. No. 78 at 21–22); *see also Swoben*, 848 F.3d at

10 1184 (noting that while lumping is prohibited, "[t]here is no flaw in a pleading, however, where

11 collective allegations are used to describe the actions of multiple defendants who are alleged to

12 have engaged in precisely the same conduct").  In his opposition to the pending motion, relator

13 argues that "the Ninth Circuit has rejected nearly identical arguments in at least two other FCA

14 actions against other Medicare Advantage organizations."  (Doc. No. 85 at 18) (citing *Swoben*,

15 848 F.3d at 1184; *Silingo*, 904 F.3d at 677).

16        The court concludes that relator's federal FCA claim need not be dismissed due to the

17 lumping of defendants together in violation of Rule 9(b).  At the outset, the court notes it has

18 already concluded that relator's federal FCA claim survives only to the extent it is premised on

19 defendants' alleged tampering with compliance software.  In his FAC, relator provides allegations

20 detailing each defendant's role in the general fraudulent scheme.[11]  More importantly, relator

21 provides allegations regarding each defendant's role in the specific fraudulent scheme to tamper

22

---

[11]  Relator alleges as follows.  The PMG defendants are groups of physicians that "contract with
23 the other Kaiser entities" to provide medical services and are primarily funded by reimbursements
from their respective regional KFHP entities.  (Doc. No. 48 at ¶ 14.)  Defendant KF Hospitals
24 operates hospitals and medical centers that provide infrastructure and facilities for use by the
PMG defendants.  (*Id.*)  Defendant KF Hospitals receives its funding from defendant KFHP.  (*Id.*)
25 Lastly, defendant KFHP enrolls members in health insurance plans, provides hospital and medical
services for its members through contracts with defendant KF Hospitals and the regional PMGs,
26 and collects its members' diagnosis codes.  (*Id.* at ¶¶ 14, 41.)  Defendant KFHP then provides
data based on the diagnosis codes to CMS regarding its members' health status and collects the
27 corresponding capitated rates.  (*Id.* at ¶ 41.)  All defendants then profit from these higher
reimbursement rates.  (*Id.* at ¶ 45.)
28

1   with the auditing software:  All defendants "work in cooperation with each other," "act in

2   concert," and, crucially, "mak[e] centralized decisions with respect to CMS compliance, claim

3   making, [and] responsibility for tracking and reporting information that goes into claims for

4   Medicare reimbursements . . . ."[12]  (Doc. No. 48 at ¶¶ 15, 16.)  In doing so, relator has sufficiently

5   alleged that each defendant decided, or acquiesced in the decision, to tamper with defendants'

6   auditing software and disable some of its key features.  *See Silingo*, 904 F.3d at 677 ("[A]

7   complaint need not distinguish between defendants that had the exact same role in a fraud.");

8   *United States ex rel. Osinek v. Kaiser Permanente*, No. 13-cv-03891-EMC, 2023 WL 4054279, at

9   *10 (N.D. Cal. June 15, 2023) ("*Osinek VI*") (finding the relator had not improperly lumped the

10   defendants together in part because "[t]he FAC provides sufficient details" as to "the general

11   roles played by the health plans and the physician medical groups with respect to risk adjustment"

12   and because the relator's "allegations that Kaiser's risk adjustment operations were integrated

13   and/or involved collaboration" substantiated the relator's allegations that "the various Kaiser

14   entities have allegedly engaged in the same basic conduct").

15        Defendants argue that it is not "plausible" that "a nonprofit health plan that provides

16   healthcare coverage (KFHP), a nonprofit hospital that provides hospital services [KF Hospitals],

17   and privately run medical groups that provide other medical care (the PMGs) engaged in

18   precisely the same conduct."  (Doc. No. 78 at 21–22.)  But defendants do not argue that relator's

19   allegations regarding centralized decision-making with respect to CMS compliance are

20   conclusory.[13]  Because relator's allegations are indeed not conclusory, they are to be taken as true

21

22   [12]  Defendants argue that relator has conceded that defendants did not engage in precisely the
same conduct because relator "admits that not all regions where Defendants operated were 'fully
23   integrated' in terms of processing claims."  (Doc. No. 78 at 22) (quoting Doc. No. 48 at ¶ 79).  In
fact, relator has alleged that defendants' employee represented "that Kaiser and its regional
24   offices were 'fully integrated'" even though "that was only partly true in certain regions."  (Doc.
No. 48 at ¶ 79.)  Taken in its proper context, this allegation does not undercut, but rather supports,
25   relator's claim for two reasons.  First, relator is alleging that defendants' own employee described
defendants as "fully integrated."  Second, there is nothing contradictory in theory about the
26   named defendants being fully integrated while, hypothetically, KFHP was only partly integrated
27   with other regional PMGs that were not named as defendants.

28   [13]  Nor would the court agree with such an argument were it advanced.

at this stage of the litigation.  *See Iqbal*, 556 U.S. at 678.  The court therefore understands defendants' argument to be an invitation to judge the credibility of the allegations in relator's FAC and the likelihood that they are true, which is of course improper at the pleading stage.

     5.    <u>Conspiracy</u>

"General civil conspiracy principles apply to conspiracy claims under the False Claims Act."  *United States ex rel. Calisesi v. Hot Chalk, Inc.*, No. 13-cv-01150-PHX-NVW, 2015 WL 1966463, at *13 (D. Ariz May 1, 2015).  "Thus, 'to prove a False Claims Act conspiracy, a relator must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement.'"  *Osinek VI*, 2023 WL 4054279, at *8 (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009)).

Defendants argue that relator has failed to allege an agreement among defendants to violate the law.  However, as described above, relator has alleged that defendants engaged in centralized decision-making with respect to CMS compliance and that defendants tampered with the auditing software despite, and indeed because of, the decreased ability to identify claims errors that would result.  It is plausible from these allegations that defendants agreed "to get a false or fraudulent claim allowed or paid by [the Government]."  *Grubbs*, 565 F.3d at 193.

Accordingly, defendants' motion to dismiss relator's federal FCA claim, to the extent that claim is premised on defendants' alleged tampering with compliance software, will be denied.

**B.**    **State FCA Claims**

     1.    <u>Georgia TPAFCA</u>

Defendants argue that relator's Georgia TPAFCA claim must be dismissed because it is premised on fraud purportedly perpetrated against a state-administered Medicaid program and must therefore be brought instead under the Georgia False Medicaid Claims Act.  (Doc. No. 78 at 21 n.11.)  Relator does not respond to this argument in his opposition brief.

The final section of the Georgia TPAFCA states:  "If a civil action can be commenced pursuant to . . . the 'State False Medicaid Claims Act,' the claimant shall proceed under [that Act]."  Ga. Code Ann. § 23-3-127; *see also* Ga. Code Ann. § 49-4-168.1 ("Any person who . . .

knowingly presents or causes to be presented to the Georgia Medicaid program a false or

fraudulent claim for payment or approval . . . shall be liable to the State of Georgia for a civil

penalty consistent with the civil penalties provision of the federal False Claims Act . . . .").

Relator alleges that defendants submitted false claims to "Medicaid programs with the various

states."  (Doc. No. 48 at ¶ 2.)  Consequently, relator must bring this claim under the Georgia

False Medicaid Claims Act.

Accordingly, relator's Georgia TPAFCA claim will be dismissed without leave to amend.

*See United States ex rel. Miller v. Reckitt Benckiser Grp. PLC*, __ F. Supp. 3d __, 2023 WL

6849436, at *19 (W.D. Va. 2023) (dismissing the relator's claim "as it pertains to the Georgia

Taxpayer Protection False Claims Act but allow[ing] Miller to proceed under the Georgia False

Medicaid Claims Act").

### 2.   All Other States

Relator brings claims under several states' false claims statutes.  State FCAs are generally

modeled on the federal FCA, and violations of each of the state Acts relevant here are analyzed

similarly to violations of the federal FCA.[14]  That is, each state Act requires relator to allege a

fraudulent scheme with particularity.  *See* Fed. R. Civ. P. 9(b).

---

[14]  *See State v. Altus Fin., S.A.*, 36 Cal. 4th 1284, 1299 (2005) ("[T]he CFCA 'is patterned on similar federal legislation' and it is appropriate to look to precedent construing the equivalent federal act.") (quoting *Laraway v. Sutro & Co., Inc.*, 96 Cal. App. 4th 266, 274 (2002)); *United States ex rel. Lovato v. Kindred Healthcare, Inc.*, No. 15-cv-02758-CMA-NYW, 2020 WL 9160872, at *8 n.5 (D. Colo. Dec. 14, 2020) (finding that the relator's CMFCA claim "rise[s] and fall[s] on the adequacy of the relator's [federal] FCA claims"), *adopted by Colorado ex rel. Lovato v. Kindred Healthcare, Inc.*, No. 15-cv-02759-CMA, 2021 WL 1085423 (D. Colo. Mar. 22, 2021); *United States ex rel. Lockyer v. Hawaii Pac. Health*, 490 F. Supp. 2d 1062, 1072 (D. Haw. 2007) ("Hawaii's False Claims Act extends liability in situations nearly identical to the federal FCA."); *United States ex rel. Forunatè v. Ndutime Youth & Fam. Servs., Inc.*, No. 16-cv-00653, 2020 WL 5507217, at *15 (E.D. Va. Sept. 11, 2020) ("'[T]he VFATA is based on the federal civil False Claims Act' . . . .  Because the [federal] FCA and the VFATA contain similar provisions, federal courts in Virginia apply the same standard to VFATA claims.") (quoting *Lewis v. City of Alexandria*, 756 S.E.2d 465, 469 (Va. 2014)); *United States ex rel. Siegel v. Novo Nordisk, Inc.*, No. 15-cv-00114-PRW, 2022 WL 16716299, at *8 (W.D. Okla. Nov. 4, 2022) ("For the reasons explained with respect to Plaintiffs' claims . . . based upon alleged violations of the [federal] FCA, the Court concludes that Plaintiffs' claims related to alleged violations of the [Washington Medicaid Fraud FCA] . . . satisfy Rule 9(b)'s heightened pleading standard for fraud-based claims.").

Defendants argue that relator has failed to allege violations of the state FCAs with the required particularity.  (Doc. No. 78 at 20–21.)  For instance, defendants argue that relator has failed to allege how he determined that overpayments had been made to state programs, whether the state programs used risk-adjustment models based on diagnosis codes such that incorrect codes caused any overpayments, or even which state programs were presented with false claims. (*Id.*)  Defendants further argue that relator has failed to allege falsity and materiality with respect to his state FCA claims.  (*Id.*)  Relator argues in response that because he has sufficiently alleged a federal FCA claim, and because the state FCAs mirror the federal FCA in relevant parts, he has also sufficiently alleged his state FCA claims.

The court concludes that relator has failed to allege all but one of his state FCA claims with sufficient particularity.  With the exception of California and Medi-Cal, discussed below, he does not specifically identify any of the state programs to which he alleges defendants presented false claims.  This failure alone renders relator's allegations insufficient under the heightened standards of Rule 9(b), with the exception of those allegations relating to California.  *See United States ex rel. Everest Principals, LLC v. Abbott Lab'ys, Inc.*, 622 F. Supp. 3d 920, 935 (S.D. Cal. 2022) (dismissing the relator's state FCA claims because "Relator has not alleged with particularity how any false claims were submitted to each state identified in the FAC"); *cf. United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 357 (D. Mass. 2011) (dismissing the relator's state FCA claims because she "fails to identify any specific fraudulent or false claim submitted to any state").  Accordingly, relator's claims brought under the Colorado, Hawai'i, Virginia, and Washington false claims statutes will be dismissed.  Nonetheless, because these deficiencies can "possibly be cured by the allegation of other facts," leave to amend will be granted as to these claims.  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Servs.*, 911 F.2d 242, 247 (9th Cir. 1990).

The California FCA imposes civil liability on "any person who . . . knowingly presents or causes to be presented a false or fraudulent claim for payment or approval" or is "a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time

22

1   after discovery of the false claim."  Cal. Gov. Code § 12651(a).  Relator alleges that, "[a]t a

2   minimum," defendants were the beneficiaries of false claims, subsequently discovered those

3   claims' falsity, and failed to disclose the falsity of the claims to the state of California.

4   Defendants argue that relator has failed to allege falsity, materiality, or a fraudulent scheme with

5   sufficient particularity.  (Doc. No. 78 at 20.)

6          The court finds that relator has sufficiently alleged falsity and knowledge as to his

7   California FCA claim.  Relator alleges that he conducted an audit in September 2016 of claims

8   data from August 3, 2010 through July 30, 2016 and that this audit revealed $181 million in

9   overpayments from Medi-Cal[15] arising from unsupported diagnosis codes.[16]  (Doc. No. 48 at

10  ¶ 86.)  Relator has thereby alleged the "who, what, when, where, and how" of the fraudulent

11  scheme with sufficient particularity.  *Silingo*, 904 F.3d at 677 (quoting *United States ex rel.*

12  *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).  Moreover, relator

13  alleges that defendants approved these claims for overpayments despite their knowledge of their

14  falsity.  (Doc. No. 48 at ¶ 86.)  Relator further alleges that the more he "spoke up about Kaiser's

15  improper processes for handling unsupported diagnostic codes and the resulting overpayments . . .

16  the more he was sidelined" and denied access to defendants' compliance data.  (*Id.* at ¶ 96.)

17  Instead of taking corrective action, relator alleges that defendants "continued to resist, obstruct,

18  and dismiss" his efforts, "especially" after relator began reporting to Sutcliffe in approximately

19  July 2016.  (*Id.*)  Relator's allegations are therefore also sufficient to permit the court to draw the

20  reasonable inference of defendants' knowledge, which need only be alleged generally.  *See* Fed.

21  _____

22  [15]  Relator also alleges that the same audit uncovered $181 million in overpayments from "other
    Medicaid programs," but he again does not specify which programs or states were involved.

23

24  [16]  Relator does not specify whether the unsupported diagnosis codes were overlooked because
    defendants allegedly tampered with the auditing software and disabled its key features, or

25  whether the unsupported codes were submitted due to some different reason.  However, this is not
    fatal to relator's claim.  Defendants do not argue that relator's California FCA claim is barred by

26  any first-to-file doctrine, nor do they provide the court with an earlier-filed complaint that would
    support such an argument.  Consequently, for his California FCA claim, relator may allege a

27  fraudulent scheme arising from all of his allegations in the FAC.  That is, unlike for his federal
    FCA claim, relator is not restricted to alleging a fraudulent scheme based only on defendants

28  tampering with auditing software.

1    R. Civ. P. 9(b).  Lastly, relator alleges that all defendants profited from the overpayments.  (Doc.

2    No. 48 at ¶ 45.)  In sum, relator has sufficiently alleged, at minimum, that defendants were the

3    "beneficiaries" of false claims, "subsequently discover[ed] the falsity of the claim[s], and fail[ed]

4    to disclose the false claim[s] to the state or the political subdivision within a reasonable

5    time . . . ."  Cal. Gov. Code § 12651(a).

6           The court finds that relator has also adequately alleged materiality.  Defendants argue that

7    relator has failed to allege that any of the state programs used risk-adjustment models based on

8    diagnosis code data, making it unclear how the codes could affect any purported overpayments.

9    (Doc. No. 78 at 20–21.)  But in the court's view, relator expressly alleges exactly this

10   information:  "Although the above-described risk adjustment model is primarily used in

11   conjunction with Medicare Advantage (Medicare Part C) plans, there are several other

12   government-funded capitation rate plans that rely upon substantially the same model . . . such as

13   Medi-Cal in California . . . ."  (Doc. No. 48 at ¶ 33.)  Given this allegation and the enormous size

14   of the alleged overpayments, the court finds that relator has alleged materiality.  *See Osinek IV*,

15   640 F. Supp. 3d at 910 ("[T]he magnitude of the noncompliance weighs in favor of materiality, as

16   the government has asserted that Kaiser has 'reap[ed] thousands of dollars for each inaccurate

17   diagnosis code and hundreds of millions of dollars for its scheme.'"); *cf. Silingo*, 904 F.3d at 673

18   ("The importance of accurate data certifications and effective compliance programs is obvious:  if

19   enrollee diagnoses are overstated, then the capitation payments . . . will be improperly inflated.").

20   Defendants' motion to dismiss relator's California FCA claim will therefore be denied.

21   **C.     Retaliation Claims**

22          Relator also asserts claims for retaliation under the federal FCA, 31 U.S.C § 3730(h); the

23   California FCA, California Government Code § 12653; California Labor Code § 1102.5(b); and

24   California common law.

25          To state "claims for retaliation under the [federal] FCA and CFCA[, a relator] must allege

26   that (1) she was engaged in protected conduct; (2) [the defendant] knew she engaged in such

27   conduct; and (3) [the defendant] retaliated against her because of the conduct."  *Mendiondo v.*

28   /////

1   *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).[17]  Retaliation claims under the

2   California Labor Code and common law have similar elements.  *See* Cal. Lab. Code § 1102.5(b)

3   ("An employer . . . shall not retaliate against an employee for disclosing information . . . to a

4   person with authority over the employee . . . if the employee has reasonable cause to believe that

5   the information discloses a violation of . . . or noncompliance with" a state or federal statute or

6   regulation); *McVeigh v. Recology S.F.*, 213 Cal. App. 4th 443, 472 (2013) (collecting cases

7   describing how a California common law retaliation claim is analogous to one brought under the

8   California FCA).  "Protected conduct" under the federal FCA requires "an objectively reasonable,

9   good faith belief that [the defendant] was possibly committing fraud against the government."

10  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017); *see also*

11  *McVeigh*, 213 Cal. App. 4th at 456, 469, 472 (noting that a relator must have "reasonably based

12  suspicions" of false claims or illegal activity under the California FCA, California Labor Code

13  § 1102.5(b), and California common law).

14      1.      Against PMG Defendants

15      Defendants argue that relator's retaliation claims must be dismissed because he has failed

16  to identify his employer.  (Doc. No. 78 at 22.)  Relator also does not respond to this argument in

17  his opposition brief.

18      Relator alleges that he was employed by "Kaiser," meaning all named defendants.  (Doc.

19  No. 48 at ¶ 11.)  But the court "need not accept Relator's conclusory allegation that [he] was [a

20  defendant's] employee for the purposes of a motion to dismiss."  *United States ex rel. O'Neill v.*

21  *Somnia, Inc.*, No. 1:15-cv-00433-DAD-EPG, 2018 WL 684765, at *11 (E.D. Cal. Feb. 2, 2018).

22      Relator also alleges as follows.  He was employed first "as an Information Technology

23  Audit Specialist," later as "Senior Practice Leader in the Fraud Control Program," and eventually

24  as "Senior Practice Leader for Kaiser's *National* Compliance Office . . . ."  (*Id.* at ¶¶ 10, 11)

25  (emphasis added).  He alleges that "he reported to . . . the Vice President of the *National*

26  ─────────────────

27  [17]  "[U]nlike a [federal] FCA violation claim, a [federal] FCA retaliation claim 'does not require a
    showing of fraud and therefore need not meet the heightened pleading requirements of
    Rule 9(b).'"  *Mendiondo*, 521 F.3d at 1103 (quoting *United States ex rel. Karvelas v. Melrose-*

28  *Wakefield Hosp.*, 360 F.3d 220, 238 n.23 (1st Cir. 2004)).

Compliance Office" and later to the "Executive Director of Investigations in Kaiser's *National Compliance, Ethics & Integrity Office*," and that he focused on "integrating regional and national departments . . . ." (*Id.* at ¶ 50, 54) (emphasis added). Lastly, relator alleges that he detected overpayments in "all" regions, not just one. (*Id.* at ¶ 63.)

It is plausible from relator's allegations recounted above that he was the employee of defendants KFHP and KF Hospitals, two nationwide entities. *See O'Neill*, 2018 WL 684765, at *11 (finding it plausible that the relator was an employee of the defendants because she "goes on to allege specific facts about the nature of her employment"). However, the court cannot draw the reasonable inference from relator's descriptions of his job functions, which all revolved around nationwide compliance programs, that he was employed by the PMG defendants, each a regional collection of physicians. Accordingly, relator's retaliation claims against the PMG defendants will be dismissed. Because this deficiency can "possibly be cured by the allegation of other facts," leave to amend will also be granted as to those claims. *Cook*, 911 F.2d at 247.

2.     Against Defendants KFHP and KF Hospitals

Defendants KFHP and KF Hospitals (collectively, "the employer defendants") argue that relator's retaliation claims must be dismissed because relator has failed to allege that he was engaged in protected activity or that defendants knew of his alleged activity. (Doc. No. 78 at 22.) Relator argues in response that he has alleged support for "an objectively reasonable, good faith belief that Kaiser's sham compliance operation was resulting in fraud," and that he has also alleged that he "engaged in protected conduct by reporting his concerns internally, to supervisors and others, on multiple occasions." (Doc. No. 85 at 14.)

The court finds that relator has adequately alleged that he was engaged in protected activity.[18] "An employee engages in a protected activity by investigating matters which are calculated or reasonably could lead to a viable [False Claims Act] action." *Campie*, 862 F.3d at 907 (internal quotation marks omitted). Relator's investigation actually led to a viable FCA action, and his allegations certainly support the reasonable inference that he had "an objectively

---

[18]  The court notes that defendants' single-sentence argument on this point is conclusory and foreclosed by the very decisions cited by defendants in their pending motion.

reasonable, good faith belief that [his employer] was possibly committing fraud against the government." *Id.* at 908.

The court further concludes that relator has alleged that the employer defendants knew of his engagement in protected activity. Defendants cite the Ninth Circuit's decision in *Campie*, 862 F.3d 890, which suggested that "when an employee is tasked with [monitoring and reporting activities and] such investigations, it takes more than an employer's knowledge of that activity to show that an employer was on notice of a potential *qui tam* suit." *Id.* at 908. However, the court's decision in *Campie* actually supports relator's retaliation claims here. The Ninth Circuit held in that case that the relator sufficiently alleged that the defendant had knowledge of his engagement in protected activity because he had alleged that he "was told it was 'none of his concern' when he discussed contamination and adulteration problems on multiple occasions" and that he had "explicitly complained that [his employer] was violating FDA regulations." *Id.* Here, relator similarly alleges that his supervisors "took overt steps to prevent [him] from investigating any further himself" and that he "pointed out that, pursuant to applicable regulations, Kaiser was required to review and investigate all identified overpayments within 60 days." (Doc. No. 48 at ¶¶ 66, 64.) The Ninth Circuit also stressed that the relator in *Campie* had alleged that "he was selectively circumvented and excluded from the regulatory review process in which he was meant to take part . . . ." *Campie*, 862 F.3d at 908 (brackets and internal quotation marks omitted). Similarly, relator here alleges that he was denied access to the software and databases necessary for his job in order to "sideline" him, "even though claims data review was the central role assigned to Relator on the compliance team." (Doc. No. 48 at ¶¶ 99–101.) Lastly, the Ninth Circuit highlighted the relator's allegation that he had threatened to inform the FDA if his employer continued its fraudulent conduct. *Campie*, 862 F.3d at 908. Here, relator alleges that his employer was so fearful that he would disclose information about fraudulent billing practices during a call with HHS OIG that his employer preemptively told him "[not to] say a word." (Doc. No. 48 at ¶ 81.) Taken as a whole, relator's allegations are similar to or even stronger than those found to be sufficient by other district courts to allege a defendant's knowledge of a relator's engagement in protected activity. *See United States ex rel. Osinek v. Permanente Med.*

27

1  *Grp., Inc.*, 2022 WL 16934763, at \*9 (N.D. Cal. Nov. 14, 2022) ("*Osinek II*") (finding that the

2  relator had adequately alleged the defendant's knowledge in part because she "was not just

3  reporting a coding problem but trying to remediate it, implicitly raising the point that the coding

4  was not legally permissible"); *United States ex rel. Garrett v. Kootenai Hosp. Dist.*, No. 17-cv-

5  00314-CWD, 2020 WL 3268277, at \*10 (D. Idaho June 17, 2020) (finding that the relator had

6  sufficiently alleged the defendant's knowledge where she had alleged that she made reports "to

7  correct alleged illegal fraudulent practices, not simply to report regulatory compliance issues in

8  the course of her employment" and that her employer had "responded by openly and actively

9  resisting her efforts").

10       Accordingly, defendants' motion to dismiss relator's retaliation claims brought against

11  defendants KFHP and KF Hospitals will be denied. [19]

12  **CONCLUSION**

13       For the reasons explained above,

14      1.    Defendants' motion to dismiss relator's complaint is granted in part and denied in

15          part as follows:

16          a.    Relator's claim for violation of the federal False Claims Act ("FCA") is

17              dismissed without leave to amend, except to the extent that claim is

18              premised on defendants alleged tampering with compliance software;

19          b.    Defendants' motion to dismiss relator's claim for violation of the federal

20              FCA, to the extent that claim is premised on defendants alleged tampering

21              with compliance software, is denied;

22          c.    Relator's claim brought pursuant to the Georgia Taxpayer Protection

23              Against False Claims Act is dismissed without leave to amend;

24  /////

---

25  [19]  In contrast to the federal FCA, California Labor Code § 1102.5(b) prohibits retaliating against

26  employees for disclosing information "regardless of whether disclosing the information is part of the employee's job duties." Cal. Lab. Code § 1102.5. "Thus, if anything, an argument could be made that a § 1102.5 retaliation claim is more easily proven than a [federal] FCA retaliation

27  claim. In any event, the § 1102.5 claim survives for the reasons stated above." *Osinek II*, 2022

28  WL 16934763, at \*9.

d.   Relator's claims brought pursuant to the Colorado Medicaid FCA, Hawaiʻi FCA, Virginia Fraud Against Taxpayers Act, and Washington Medicaid Fraud FCA are dismissed, with leave to amend;

e.   Defendants' motion to dismiss relator's claim brought pursuant to the California FCA is denied;

f.   Relator's retaliation claims brought against defendants The Permanente Medical Group, Inc., Southern California Permanente Medical Group, and Colorado Permanente Medical Group, P.C. are dismissed, with leave to amend;

g.   Defendants' motion to dismiss relator's retaliation claims brought against defendants Kaiser Foundation Health Plan and Kaiser Foundation Hospitals is denied;

2.   Within twenty-one (21) days from the date of entry of this order, relator shall file either a second amended complaint, or a notice of his intent not to file a second amended complaint and to proceed only on the claims found to be cognizable in this order; and

3.   Pursuant to the court's order (*see* Doc. No. 100), the parties shall file a joint status report regarding the scheduling of this action within 30 days from the date of entry of this order.  The court will thereafter issue a scheduling order.

IT IS SO ORDERED.

Dated:   **February 13, 2024**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

29