1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JEFFREY MAZIK, et al.,                    No.  2:19-cv-00559-DAD-JDP

12                 Plaintiffs,

13        v.                                   ORDER DENYING DEFENDANTS'
                                               MOTION TO TRANSFER VENUE
14   KAISER PERMANENTE, INC., et al.,
                                               (Doc. No. 109)
15                 Defendants.

16

17          This matter is before the court on the motion to transfer venue filed on April 8, 2024 by

18   defendants Kaiser Foundation Health Plan ("KFHP"), Kaiser Foundation Hospitals, Inc. ("KF

19   Hospitals"), Permanente Medical Groups, Permanente Medical Group, Inc., Southern California

20   Permanente Medical Group, and Colorado Permanente Medical Group, P.C.[1] (collectively,

21   "defendants").  (Doc. No. 109.)  On June 4, 2024, the pending motion was taken under

22   submission.  (Doc. No. 121.)  For the reasons explained below, defendants' motion to transfer

23   venue will be denied.

24   /////

25   /////

26

27   _____

     [1]  The court will refer to defendants Permanente Medical Groups, Permanente Medical Group,
28   Inc., Southern California Permanente Medical Group, and Colorado Permanente Medical Group,
     P.C. collectively as "the PMG Defendants."

                                                   1

**BACKGROUND**

On March 26, 2024, relator Jeffrey Mazik filed his operative second amended complaint ("SAC") on behalf of the United States of America and the states of California, Colorado, Georgia, Hawai'i, Virginia, and Washington (collectively, "the plaintiff states") against defendants pursuant to the federal False Claims Act and the corresponding state statutes. (Doc. No. 107.) Previously, on December 1, 2021, the United States had filed a notice informing the court of its decision to decline to intervene; the plaintiff states had filed a similar notice on December 6, 2021. (Doc. Nos. 62, 66.) In his SAC, relator alleges the following.

"Kaiser Permanente" is an "integrated managed care consortium made up of three distinct but interdependent groups of entities": defendant KFHP, defendant KF Hospitals, and several regional Permanente Medical Groups, including the PMG defendants. (*Id.* at ¶ 15.) The PMG defendants are groups of physicians that "contract with the other Kaiser entities" to provide medical services. (*Id.*) Each PMG defendant operates within its individual territory and is funded primarily by reimbursements from its respective regional Kaiser Foundation Health Plan entity. (*Id.*) Defendant KF Hospitals is a nonprofit corporation headquartered in Alameda County, California that operates hospitals and provides facilities for the benefit of the PMG defendants. (*Id.*) It also receives its funding from defendant KFHP. (*Id.*) Defendant KFHP is a nonprofit corporation headquartered in Alameda County, California that enrolls members in health plans and provides medical services for its members through contracts with defendant KF Hospitals and the PMG defendants. (*Id.*)

Medicare beneficiaries may opt to receive benefits through private health plans instead of the traditional fee-for-service Medicare program. (*Id.* at ¶ 20.) Under that option, known as Medicare Advantage, the federal government pays Medicare Advantage organizations such as defendants a "capitated" (i.e., per enrollee) amount for the purpose of providing medical benefits. (*Id.*) The capitated rates vary depending on the health status of the enrollees; less healthy enrollees require more medical care, which necessitates higher capitation reimbursement payments to the Medicare Advantage organizations. (*Id.* at ¶¶ 21, 22.) Health status in turn depends on the diagnosis codes generated by healthcare providers following encounters with

enrollees. (*Id.* at ¶¶ 23, 24.)  In sum, enrollees see doctors such as those in the PMG defendants, who then provide diagnosis codes to defendant KFHP, which then submits the diagnosis codes to the Centers for Medicare & Medicaid Services ("CMS"). (*Id.* at ¶¶ 2, 23.)  CMS uses the diagnosis codes to adjust the capitation rate for each enrollee, a process known as "risk adjustment." (*Id.* at ¶ 24.)  More severe diagnosis codes lead to higher capitation rates, resulting in greater profits for all defendants—including defendant KF Hospitals and the PMG defendants. (*Id.* at ¶ 50.)  Many government-funded plans other than Medicare Advantage also rely upon "substantially the same model" of risk adjustment for capitation rates, such as state-funded Special Needs Plans and "various state-administered Medicaid programs" such as those in California, Hawaiʻi, Virginia, and Washington. (*Id.* at ¶¶ 35–39.)

Medicare regulations impose certain requirements on Medicare Advantage organizations such as defendants in an effort to curb the potential for organizations to submit unsupported diagnosis codes, which would lead to improperly high capitation rates and inflated revenues to providers. (*Id.* at ¶¶ 28, 29.)  For instance, Medicare Advantage organizations must adopt and implement "an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." (*Id.* at ¶ 30) (quoting 42 C.F.R. § 422.503(b)(4)(vi)). Medicare Advantage organizations must also certify the accuracy, completeness, and truthfulness of the data provided to CMS as a condition of receiving payment. (*Id.* at ¶ 31) (citing 42 C.F.R. § 422.504).  Similarly, the organization must submit an annual attestation signed by its Chief Executive Officer or Chief Financial Officer certifying that the risk adjustment data submitted to CMS is "accurate, complete, and truthful," acknowledging that risk adjustment data "directly affects the calculation of CMS payments," and recognizing that "misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution." (*Id.*)  CMS also imposes strict requirements on Medicare Advantage organizations' contractual relationships with entities that provide medical services to the organization's members. (*Id.* at ¶ 32.)  Finally, CMS requires organizations to take corrective actions where necessary to ensure compliance with applicable laws and regulations, including the requirement

3

1   to perform a "root cause analysis" to identify the source of any potential errors or issues.  (*Id.* at
2   ¶ 33) (citing 42 C.F.R. § 422.504).  State-funded Special Needs Plans are expected to follow
3   Medicare Advantage compliance regulations such as those listed above.  (*Id.* at ¶ 39.)

4          Relator, a resident of California, is the former "Senior Practice Leader for Kaiser's
5   National Compliance Office" and has over 25 years of experience in fraud control, auditing, and
6   compliance.  (*Id.* at ¶ 11.)  He was employed by defendant KFHP from 2008 to 2017, joining as
7   an "Information Technology Audit Specialist" in May 2008 and transitioning to the role of
8   "Senior Practice Leader in the Fraud Control Program" in March 2012.  (*Id.* at ¶ 12.)  Relator's
9   duties included working with regional compliance leadership to implement compliance and fraud
10  control initiatives, using data analytics to improve compliance and fraud-mitigation initiatives,
11  investigating potential fraud, and developing corrective action plans to address fraud risks.  (*Id.* at
12  ¶ 13.)

13         According to relator, since 2008 at the latest, defendants have schemed to defraud the
14  federal government by allowing external, i.e., "non-Kaiser," healthcare providers to submit false
15  diagnosis codes, which defendants in turn submit to CMS in order to inflate their capitation rates.
16  (*Id.* at ¶¶ 45, 49.)  In particular, defendants intentionally fail to properly use fraud-detection tools
17  to monitor claims errors.  (*Id.* at ¶¶ 49, 51.)  Defendants contract with data analytics vendors to
18  review their external provider claims for each region.  (*Id.* at ¶ 52.)  The vendors provide software
19  applications that perform various types of reviews.  (*Id.*)  For instance, some programs "detect
20  claims that are incorrectly billed . . . [while] other programs identify intentionally manipulated
21  claims that technically fall within plan rules . . . ."  (*Id.*)  However, defendants intentionally
22  misused these programs and used them at minimum capacity, such as by disabling key features, in
23  order to reduce the chances of detecting claims errors.  (*Id.* at ¶¶ 53, 54.)  In this way, defendants
24  were actively working to avoid detecting and correcting fraudulent claims.  (*Id.* at ¶ 54.)

25         In late 2015, relator was tasked with comparing the functionalities offered by two claims
26  analytics vendors, McKesson and Verisk, with which defendants routinely contracted.  (*Id.* at
27  ¶¶ 60, 61.)  McKesson offers auditing software called ClaimsXten that detects fraudulent billing
28  practices using "a robust set of rules."  (*Id.* at ¶ 62.)  However, defendants chose to deactivate 25

of the 54 rules used by ClaimsXten—"the principal software program that they were supposedly relying on [to] detect such billing fraud."  (*Id.*)  When a group of employees including relator used a Verisk program to double-check data from "the Georgia region" produced by ClaimsXten, the group found $5.3 million in overpayments stemming from defendants' decision to deactivate nearly half the rules in ClaimsXten.  (*Id.* at ¶ 64.)  Defendants neither reactivated the disabled rules nor rectified the $5.3 million in overpayments.  (*Id.* at ¶¶ 65, 66.)  Relator presented the group's findings on the Georgia region to several Kaiser executives named in the FAC, but none of those executives took any action.  (*Id.* at ¶¶ 66, 67.)

In February 2016, relator detected significant overpayments due to erroneous diagnosis codes in "all other regions."[2]  (*Id.* at ¶ 68.)  Relator prepared another presentation on the overpayments for his superiors and pointed out that defendants were required by the applicable regulations to review and investigate all identified overpayments within 60 days.  (*Id.* at ¶¶ 68, 69.)  His superiors did not request a root cause analysis, did not investigate further, and "even took overt steps to prevent Relator from investigating any further himself."  (*Id.* at ¶ 71.)

On June 30, 2016, relator participated in a call with Marita Janiga, "Executive Director of Investigations in Kaiser's National Compliance, Ethics & Integrity Office," and the U.S. Department of Health and Human Services' Office of the Inspector General ("OIG").  (*Id.* at ¶¶ 59, 80, 81.)  The purpose of the call was to discuss issues surrounding claims accuracy and claims recovered through fraud reduction efforts.  (*Id.* at ¶ 81.)  Janiga made several false statements during the call related to compliance issues, such as claiming that "Kaiser and its regional offices were 'fully integrated,' so there was no need for the OIG to inquire into its claims processes."  (*Id.* at ¶ 84.)  Worried that relator would speak up to correct her or to discuss his overpayment findings, Janiga messaged him "[not] to say a word."  (*Id.* at ¶¶ 85–86.)  Relator obeyed this command and remained silent during the call.  (*Id.* at ¶ 87.)

Defendants "failed to activate (or disabled) the Verisk system" in states including Colorado, Georgia, Hawaiʻi, Virginia, and Washington.  (*Id.* at ¶¶ 93–98.)

---

[2]  Relator's allegations in the SAC are ambiguous as to whether or not these overpayments were also due to defendants tampering with compliance software.

In September 2016, relator "witnessed" an audit of claims data from all regional offices dating from August 3, 2010 through July 30, 2016. (*Id.* at ¶ 110.) The audit revealed that unsupported diagnosis codes had led to over $209 million in Medicare Advantage overpayments, $181 million in Medi-Cal overpayments, and $181 million in overpayments relating to "other Medicaid programs during that six-year period."[3] (*Id.*)

Despite all of relator's findings, defendants certified that their risk adjustment data was accurate and truthful and failed to correct the overpayments. (*Id.* at ¶¶ 90, 91.) All defendants profited from the overpayments and the inflated capitation rates. (*Id.* at ¶ 93.)

Eventually, defendants retaliated against relator for his activities. (*Id.* at ¶ 114.) The more that relator spoke up about unsupported diagnosis codes and overpayments, and the more that he "tried to steer Kaiser in the direction of full compliance," the more he was "sidelined and closed out from data and documents." (*Id.*) On October 12, 2016, relator approached Lauren Sutcliffe, "a Senior Manager in the Special Investigations Unit," regarding an analysis relator had performed uncovering approximately $380,000 in overpayments. (*Id.* at ¶¶ 59, 116.) Sutcliffe severely criticized relator for performing the analysis without her approval and placed him on a performance improvement plan. (*Id.* at ¶ 116.) Several times in October 2016, relator was denied access to "every data repository necessary to perform his compliance job." (*Id.* at ¶¶ 117, 118.) Because claims data review was relator's central focus on the compliance team, he was thereby stripped of his duties and responsibilities. (*Id.* at ¶ 119.) In an attempt to prevent whistleblowing, Sutcliffe also prohibited relator from meeting with anyone above Sutcliffe's level without her prior approval. (*Id.* at ¶ 120.) On November 3, 2016, Sutcliffe forbade relator from communicating with other employees by phone or instant messaging; he was instructed instead to use only email and to copy Sutcliffe on all outgoing emails. (*Id.* at ¶ 124.) On January 5, 2017, relator was fired. (*Id.* at ¶ 129.) Throughout his time working for defendants, relator's performance reviews were consistently "successful" or "excellent," and it was only after his

/////

---

[3] Again, relator does not specify whether or not the overpayments were allegedly due to defendants tampering with auditing software.

6

1    presentations on overpayments that he received his first "performance needs improvement"

2    review.  (*Id.* at ¶ 130.)

3         Based on the above allegations, relator asserts the following eleven claims in his SAC:

4    (1) violation of the federal False Claims Act ("federal FCA"), 31 U.S.C § 3279(a)(1);

5    (2) violation of the California FCA, California Government Code §§ 12650, *et seq.*; (3) violation

6    of the Colorado Medicaid FCA, Colorado Revised Statutes §§ 25.5-4-303.5, *et seq.*; (4) violation

7    of the Georgia False Medicaid Claims Act, Georgia Code §§ 49-4-168, *et seq.*; (5) violation of the

8    Hawaiʻi FCA, Hawaiʻi Revised Statutes §§ 661-21, *et seq.*; (6) violation of the Virginia Fraud

9    Against Taxpayers Act, Virginia Code §§ 8.01-216.1, *et seq.*; (7) violation of the Washington

10   Medicaid Fraud FCA, Washington Revised Code §§ 74.66.005, *et seq.*; (8) unlawful retaliation in

11   violation of the federal FCA, 31 U.S.C. § 3730(h); (9) unlawful retaliation in violation of the

12   California FCA, California Government Code § 12653; (10) unlawful retaliation in violation of

13   California Labor Code § 1102.5(b); and (11) retaliatory common law termination in violation of

14   public policy.  (Doc. No. 107 at ¶¶ 131–207.)

15        On July 13, 2022, defendants filed a motion to dismiss relator's first amended complaint

16   ("FAC") on the grounds that his federal FCA claims were subject to the first-to-file bar given

17   their similarity to claims being pursued in the Northern District of California.  (Doc. No. 78.)  The

18   court granted that motion in part, concluding that "relator's FCA claim is barred by the first-to-

19   file rule except to the extent relator alleges that defendants deliberately tampered with compliance

20   software to ensure that it did not identify erroneous diagnosis codes."  (Doc. No. 104 at 12.)

21        Thereafter, defendants filed their pending motion to transfer venue on April 8, 2024.  In

22   that motion, defendants argue among other things that the potential for consolidation of this

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

7

1   action with other allegedly related matters currently before Judge Chen in the Northern District[4]

2   strongly weighs in favor of transfer.  (Doc. No. 109 at 13–16.)  On April 22, 2024, the United

3   States filed a statement of interest opposing transfer.  (Doc. No. 111.)  Relator filed his opposition

4   to the pending motion on May 14, 2024.  (Doc. No. 114.)  Defendants filed their reply thereto on

5   May 31, 2024.  (Doc. No. 120.)

6                                      **LEGAL STANDARD**

7          Pursuant to 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other

8   district or division where it might have been brought" for the convenience of parties and

9   witnesses and in the interest of justice.  "[T]he purpose of [§ 1404(a)] is to prevent the waste of

10  time, energy and money and to protect litigants, witnesses and the public against unnecessary

11  inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal

12  quotation marks and citation omitted).  "Section 1404(a) is intended to place discretion in the

13  district court to adjudicate motions for transfer according to an 'individualized, case-by-case

14  consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29

15  (1988) (quoting *Van Dusen*, 376 U.S. at 622).

16         District courts employ a two-step analysis when determining whether to transfer an action.

17  *Robert Bosch Healthcare Sys., Inc. v. Cardiocom, LLC*, No. 3:14-cv-01575-EMC, 2014 WL

18  2702894, at *3 (N.D. Cal. June 13, 2014).  "A court must first consider the threshold question of

19  whether the case could have been brought in the forum to which the moving party seeks to

20  transfer the case."  *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1093 (N.D. Cal.

21  2013); *see also Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985) ("In determining

22  whether an action 'might have been brought' in a district, the court looks to whether the action

23  _____

24  [4]  Six cases were consolidated before Judge Chen:  (1) *United States ex rel. Osinek v. Kaiser
    Permanente*, No. 3:13-cv-03891-EMC (N.D. Cal.) ("*Osinek*"); (2) *United States ex rel. Taylor v.
    Kaiser Permanente*, No. 3:21-cv-03894-EMC (N.D. Cal.) ("*Taylor*"); (3) *United States ex rel.*

25  *Arefi v. Kaiser Found. Health Plan, Inc.*, No. 3:16-cv-01558-EMC (N.D. Cal.) ("*Arefi*");
    (4) *United States ex rel. Stein v. Kaiser Found. Health Plan, Inc.*, No. 3:16-cv-05337-EMC (N.D.

26  Cal.) ("*Stein*"); (5) *United States ex rel. Bryant v. Kaiser Permanente*, No. 3:18-cv-01347-EMC
    (N.D. Cal.) ("*Bryant*"); (6) *United States ex rel. Bicocca v. Permanente Med. Grp., Inc.*,

27  No. 3:21-cv-03124-EMC (N.D. Cal.) ("*Bicocca*").  The court will refer to these matters
    collectively as "the *Osinek* matters" in this order.

28

                                           8

1    initially could have been commenced in that district.")  "Once the party seeking transfer has made

2    this showing, district courts have discretion to consider motions to change venue based on an

3    'individualized, case-by-case consideration of convenience and fairness.'"  *Park*, 964 F. Supp. 2d

4    at 1093 (quoting *Stewart Org.*, 487 U.S. at 29).  In addition, "Section 1404(a) provides for

5    transfer to a more convenient forum, not to a forum likely to prove equally convenient or

6    inconvenient."  *Mainstay Bus. Sols. v. Indus. Staffing Servs.*, No. 2:10-cv-03344-KJM-GGH,

7    2012 WL 44643, at *1 (E.D. Cal. Jan 9, 2012) (citing *Van Dusen*, 376 U.S. at 645–46).  The

8    burden is on the moving party to show that transfer is appropriate.  *Commodity Futures Trading*

9    *Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979.)

10       "A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors

11   in its determination whether transfer is appropriate in a particular case."  *Jones v. GNC*

12   *Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).  "The primary factors to be considered are

13   convenience of witnesses and parties and concerns for judicial economy (including duplicative

14   effort, waste of time and money)."  *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1119

15   (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000).  Other factors include plaintiff's choice of

16   forum, administrative considerations, and the respective parties' contacts with the forum.  *See*

17   *Jones*, 211 F.3d at 498–99; *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 759 (C.D. Cal. 2016).

18                                        **ANALYSIS**

19       At step one of the transfer analysis, relator does not contest that his claims could have

20   been brought in the Northern District of California.  Consequently, the court moves to step two

21   and conducts "an 'individualized, case-by-case consideration of convenience and fairness.'"

22   *Park*, 964 F. Supp. 2d at 1093 (quoting *Stewart Org.*, 487 U.S. at 29.)

23   **A.      Choice of Forum**

24       "[G]reat weight is generally accorded plaintiff's choice of forum . . . ."  *Lou v. Belzberg*,

25   834 F.2d 730, 739.  However, the "degree to which courts defer to the plaintiff's chosen venue is

26   substantially reduced where the plaintiff's venue choice is not its residence."  *United States v.*

27   *Academy Mortg. Corp.*, No. 16-cv-02120-EMC, 2018 WL 4053484, at *5 (N.D. Cal. Aug. 24,

28   /////

1  2018) (citation omitted).  It is undisputed that relator resides in the Northern District of

2  California, not the Eastern District.  (*See* Doc. No. 114 at 13.)

3        "[A] plaintiff's forum choice is [also] given substantially less weight when the central

4  dispute in the action occurred primarily in another forum and lacks any significant contact with

5  the forum."  *A.F.P. v. United States*, No. 1:21-cv-00780-DAD-EPG, 2022 WL 2704570, at *5

6  (E.D. Cal. July 12, 2022).  Defendants argue that relator has not explained why he chose to

7  litigate his case in the Eastern District, and they contend that relator "does not point to any

8  allegation in the SAC that specifically concerns conduct occurring in the Eastern District."  (Doc.

9  No. 109 at 7–8.)

10       Relator argues in opposition that, the government's decision not to intervene

11 notwithstanding, plaintiff's counsel has conferred with the Assistant U.S. Attorney for the Eastern

12 District, Catherine Swann, throughout the course of this litigation.  (Doc. No. 114 at 13.)  Relator

13 further argues that Assistant U.S. Attorney Swann "is familiar with the claims and is actively

14 monitoring this action" (*id.*), though as defendants point out in reply, relator has not filed any

15 declarations or produced any evidence to support this argument (Doc. No. 120 at 7).

16       The court notes that relator alleges in his SAC that venue in the Eastern District is

17 appropriate because "defendants can be found in, reside in, and/or transact business in the Eastern

18 District of California, and because many of the violations of [the federal FCA] discussed herein

19 occurred within this judicial district."  (Doc. No. 107 at ¶ 10.)  While defendants argue that

20 relator has failed to make any allegations regarding conduct specifically occurring in the Eastern

21 District, defendants nowhere argue that venue in the Eastern District is inappropriate.  Indeed,

22 while relator could be more detailed in sections of his SAC, he appears to allege a fraudulent

23 scheme occurring throughout the state of California.[5]  (*See, e.g.*, Doc. No. 107 at ¶ 110.)

24 However, relator does not point to any allegations in his SAC purporting to show that defendants'

25

26 [5]  The court notes that even if relator's SAC was construed as alleging a fraudulent scheme
occurring only in the Northern District of California and not in the Eastern District, the court

27 would still deny the pending motion for the reasons discussed below.  Specifically, the court
ultimately concludes that defendants' delay in seeking transfer of venue and concerns for judicial

28 economy weigh significantly in favor of denying the pending motion.

1   interference with compliance software occurred in the Eastern District rather than at defendants'

2   headquarters located in the Northern District, where relator was employed.  The court therefore

3   finds that the conduct and parties in this case have some contacts with the Eastern District, but

4   that "the central dispute in the action occurred primarily in another forum."  *A.F.P.*, 2022 WL

5   2704570, at *5.

6          Finally, the weight accorded a plaintiff's choice of forum "is diminished . . . when the

7   plaintiff is a *qui tam* relator asserting the rights of the Government," because the government is

8   the real party in interest in a *qui tam* action.  *United States v. Janssen Biotech, Inc.*, No. 17-cv-

9   07250-JST, 2019 WL 13175808, at *2 (N.D. Cal. Apr. 29, 2019) (collecting cases).[6]

10         Accordingly, the court affords relator's choice of forum some, but very little, weight in

11  this case.  *See Academy Mortg. Corp.*, 2018 WL 4053484, at *5 ("Relator is a *qui tam* plaintiff

12  bringing suit on behalf of the U.S. government, and she does not work or reside in the district.

13  Plaintiff resides in the Eastern District of California, adjacent to this district.  Accordingly, her

14  choice of forum is given some, but very limited, weight.").

15  /////

16  /////

17  /////

18  ─────────────────────

19  [6]  Because the government is the real party in interest in a *qui tam* action, district courts
    considering a motion to transfer often give significant weight to the government's preferences

20  once the government has intervened.  *See, e.g.*, *United States ex rel. Westrick v. Second Chance
    Body Armor, Inc.*, 771 F. Supp. 2d 42, 47 (D.D.C. 2011) ("Because the United States is the real

21  party in interest in a *qui tam* action filed by a relator, the United States' choice of forum is
    entitled to principal deference.").  Here, the government has declined to intervene, but has

22  nevertheless filed a statement of interest opposing the pending motion.  (Doc. No. 111.)  At least
    one district court has found in similar circumstances that "the United States' preferred forum has

23  no bearing" on a motion to transfer when the government has filed a statement of interest but
    declined to intervene.  *See United States ex rel. Thomas v. Duke Univ.*, No. 4:13-cv-00017-JLK,

24  2017 WL 1169734, at *2 (W.D. Va. Mar. 28, 2017).  The court notes that the government
    nonetheless remains the real party in interest even after declining intervention.  *See United States

25  ex rel. Polansky v. Exec. Health Res.*, 599 U.S. 419, 425 (2009).  In any event, as discussed
    below, the court will deny the pending motion even if relator's and the government's choice of

26  forum is afforded only minimal deference.  Consequently, and particularly in light of the lack of
    briefing from the parties on the appropriate level of deference to be accorded under these

27  circumstances, the court need not—and therefore does not—consider whether a greater degree of

28  deference to the government's expressed preference is appropriate here.

1    **B.      Convenience of Witnesses**

2           While defendants "recognize that Sacramento, where this Court is located, and San

3    Francisco . . . are not distant," they nevertheless argue that the convenience of the witnesses

4    favors transfer.  (Doc. No. 109 at 16.)

5           The convenience of the witnesses is often the paramount factor in ruling on a motion to

6    transfer under § 1404(a).  *A.F.P.*, 2022 WL 2704570, at *6.  "Importantly, while the convenience

7    of party witnesses is a factor to be considered, the convenience of non-party witnesses is the more

8    important factor."  *Ironworkers Local Union No. 68 & Participating Employers Health and*

9    *Welfare Fund v. Amgen, Inc.*, No. 2:07-cv-05157-PSG-AGR, 2008 WL 312309, at *5 (C.D. Cal.

10   Jan. 22, 2008).  Likewise, the convenience of an employee of the party seeking transfer is

11   "entitled to little weight" because that party "will be able to compel [the employee's] testimony at

12   trial."  *Jaco Env't Inc. v. Appliance Recycling Ctrs. of Am., Inc.*, No. 3:06-cv-06601-JSW, 2007

13   WL 951274, at *4 (N.D. Cal. Mar. 27, 2007).  To show inconvenience for witnesses, "the moving

14   party should state the witnesses' identities, locations, and content and relevance of their

15   testimony."  *Meyer Mfg. Co. Ltd. v. Telebrands Corp.*, No. 2:11-cv-03153-LKK-DAD, 2012 WL

16   1189765, at *6 (E.D. Cal. Apr. 9, 2012) (citing *Florens Container v. Cho Yang Shipping*, 245 F.

17   Supp. 2d 1086, 1092–93 (N.D. Cal. 2002)); *see also E. & J. Gallo Winery v. F. & P. S.p.A.*, 899

18   F. Supp. 465, 466 (E.D. Cal. 1994) ("[a]ffidavits or declarations are required to identify key

19   witnesses and a generalized statement of their anticipated testimony").

20          Defendants argue that "most of the key witnesses" will be located in the Northern District.

21   (Doc. No. 109 at 16.)  Defendants also contend that of the 25 current and former employees

22   identified by the parties in their initial disclosures, "13 worked within the Northern District" and

23   only one lived in the Eastern District.[7]  (*Id.* at 17.)  In particular, defendants argue that current and

24   former employees such as relator's supervisors and colleagues all worked in the Northern District

---

25   [7]  The court notes that defendants do not assert that these potential witnesses currently live in the
26   Northern District.  Indeed, according to the declaration of Charlotte Tang, a human resources
     consultant for defendants, these former employees largely do not live in the Northern District, as
27   described below.  (*See* Doc. No. 109-2.)  In analyzing the convenience of the witnesses, the court
     attaches no weight to the location of their former employment, as opposed to their current
28   residence.

1    and are "likely to have important testimony" in connection with both the fraud and retaliation

2    claims.  (*Id.*) (identifying Judy Sarles, Jay Loden, Daren Pursche, Marita Janiga, Sean Kelly, and

3    Laurel Sutcliffe).

4          The court finds that the convenience of the witnesses weighs minimally, if at all, in favor

5    of transfer.  Defendants have provided evidence that two potential witnesses currently live in the

6    Northern District and two live in the Eastern District, balancing the scales equally.[8]  (Doc.

7    No. 109-2 at 2–4.)  These four potential witnesses are also defendants' current employees (*id.*),

8    meaning their convenience is given little weight.  *Jaco Env't Inc.*, 2007 WL 951274, at *4.

9          Defendants have also provided evidence that the last known addresses for three more

10   potential witnesses are in the Northern District.  (Doc. No. 109-2 at 2–4.)  While these three

11   potential witnesses are all former employees, and thus their presence cannot be compelled by

12   defendants, their last known addresses are in Contra Costa and Alameda Counties, located in the

13   East Bay region between the Sacramento and San Francisco courthouses.  (*Id.*)  The court notes

14   that depending on their exact locations within those counties, these potential witnesses might find

15   either courthouse more convenient.  *See Pratt v. Rowland*, 769 F. Supp. 1128, 1132 (N.D. Cal.

16   1991) ("First, it is unclear whether transfer to the Eastern District would in fact be more

17   convenient for the parties and witnesses.  Many defendants reside in distant Kern County.  For

18   them, the difference in travel time between this Court and the Eastern District is negligible.").

19   Moreover, these potential witnesses appear to live within 100 miles of either courthouse and are

20   thus subject to either court's subpoena power.  *See Galliani v. Citimortgage, Inc.*, No. 2:12-cv-

21   00411-KJM-KJN, 2013 WL 101411, at *5 (E.D. Cal. Jan. 7, 2013) ("[T]ransfer may be denied

22   when witnesses either live in the forum district or are within the 100-mile reach of the subpoena

23   power.") (citation omitted); Fed. R. Civ. P. 45(c) ("A subpoena may command a person to attend

24   a trial . . . within 100 miles of where the person resides . . . .").  These potential witnesses

25   therefore provide minimal support for transfer.

26   _____

27   [8]  In fact, given that these four potential witnesses live in Alameda, Contra Costa, Solano, and
     Sacramento Counties, it is likely that Sacramento would be more convenient for them overall than
28   San Francisco.

Lastly, defendants provide evidence that more than a dozen other witnesses live in various other parts of the country, such as Los Angeles, Oregon, Connecticut, Maryland, and Georgia. (Doc. No. 109-2 at 2–4.)  The court does not find the convenience of these witnesses to weigh in favor of transfer.  *Cf. Bristow v. Lycoming Engines*, No. 06-cv-01947-LKK-GGH, 2007 WL 1106098, at *4 n.2 (E.D. Cal. Apr. 10, 2007) ("The court does not consider the convenience of parties and witnesses who are located outside both the current and transferee fora.").

**C.      Location of Records and Evidence**

Defendants briefly argue that the location of the evidence favors transfer.  (Doc. No. 109 at 16.)  However, the location of evidence is not a significant consideration "because documentary evidence related to this case can be reproduced and transmitted electronically to this court."  *A.F.P.*, 2022 WL 2704570, at *7; *see also Williams v. Robert Half Int'l Inc.*, No. 4:20-cv-03989-KAW, 2020 WL 12655622, at *3 (N.D. Cal. Sept. 18, 2020) ("[I]n the digital age, the access to records is neutral given the portability of documents.").  Defendants have not argued that, for example, any important evidence cannot be easily transmitted to the Eastern District.  *See Martinez v. San Diego Cnty.*, No. 1:16-cv-01140-DAD-SKO, 2017 WL 1273822, at *4 (E.D. Cal. Apr. 4, 2017) ("Defendant San Diego County does not allege that discovery in this case [will] implicate any unique types of information that cannot be easily digitized or that any on-site inspections will be required in San Diego.").

**D.      Parties' Contacts with the Forum and Locus of the Action**

Relator has no discernible contacts with the Eastern District.  As noted above, he argues that an Assistant United States Attorney for the Eastern District is already familiar with this case, but he cites no authority—nor has the court found any—suggesting this supports denial of the pending motion to transfer.  Instead, it is undisputed that relator worked and resides in the Northern District, albeit in locations between both courthouses.  As also discussed above, relator alleges a fraudulent scheme with some relation to the Eastern District, though the locus of the alleged scheme was in the Northern District.  Overall, these factors weigh only slightly in favor of transfer.

/////

14

1       **E.      Judicial Economy and the Interests of Justice**

2               1.      Risk of Inconsistent Judgments

3               Defendants next argue that denying the pending motion would raise the risk of

4       inconsistent rulings on questions of law, specifically their anticipated defense that the diagnosis

5       codes they submitted to CMS are not "claims for payment" within the meaning of 31 U.S.C.

6       § 3729(b)(2).  (Doc. No. 109 at 16.)  Neither the undersigned nor Judge Chen has expressly

7       considered this precise question.  However, both courts have found that the materiality element of

8       the respective relators' federal FCA claims—that is, whether conduct has "a natural tendency to

9       influence . . . the payment or receipt of money," *United States ex rel. Rose v. Stephens Inst.*, 909

10      F.3d 1012, 1018 (9th Cir. 2018)—was "supported by allegations that CMS makes risk-adjustment

11      payments based directly on the diagnosis codes submitted by health plans."  (Doc. No. 104 at 16–

12      17); *United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F. Supp. 3d 885, 910 (N.D.

13      Cal. 2022); *cf. United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018)

14      ("The importance of accurate data certifications and effective compliance is obvious:  if enrollee

15      diagnoses are overstated, then the capitation payments to Medicare Advantage organizations will

16      be improperly inflated.").  The court therefore finds that consideration of the risk of inconsistent

17      judgments does not weigh in favor of transfer.

18              2.      Efficiencies and Judicial Economy

19              "The feasibility of consolidation is a significant factor in a transfer decision, although

20      even the pendency of an action in another district is important because of the positive effects it

21      might have in possible consolidation of discovery and convenience to the witnesses and parties."

22      *A.J. Indus., Inc. v. U.S. Dist. Ct. for Central Dist. of Cal.*, 503 F.2d 384, 389 (9th Cir. 1974)

23      (internal citation omitted).  However, when transfer would lead to delay, "the district court [does]

24      not abuse its discretion in denying [a party's] motion notwithstanding possible inconvenience to

25      the witnesses."  *Allen v. Scribner*, 812 F.2d 426, 436 (9th Cir. 1987).

26              Defendants argue that the potential for consolidation of this action with the *Osinek* matters

27      strongly weighs in favor of transfer.  (Doc. No. 109 at 13–16.)  Defendants argue, and relator

28      does not contest, that the present action (hereinafter, "*Mazik*") and the *Osinek* matters both

15

1    concern an alleged effort by defendants to knowingly submit false diagnosis codes to CMS in an
2    effort to defraud the Medicare Advantage program in violation of the federal FCA.  (*Id.* at 14.)
3    According to defendants, this similarity would permit Judge Chen to coordinate discovery and
4    case management more efficiently in the Northern District.  For instance, defendants argue, the
5    *Mazik* and *Osinek* matters both involve Medicare Advantage, defendants' risk-adjustment
6    business practices, and defendants' compliance programs, such that transfer would reduce the
7    duplication of discovery.  (*Id.* at 14–15.)  Moreover, defendants argue that Judge Chen and
8    Magistrate Judge Sallie Kim are already familiar with "the sort of discovery that is relevant in
9    these types of cases and with this specific group of Defendants," having already handled several
10   motions to dismiss and discovery motions.  (*Id.* at 16.)

11          Relator argues in opposition that consolidation of *Mazik* with the *Osinek* matters would be
12   infeasible.  (Doc. No. 114 at 14–17.)  As an initial matter, relator argues that the scopes of the
13   actions are different because he asserts state FCA claims and retaliation claims entirely unrelated
14   to the *Osinek* matters.  (*Id.* at 14.)  This court agrees with relator that the scope of *Mazik* is
15   different from that of the *Osinek* matters.  However, the court notes that this fact does not
16   necessarily undercut potential efficiencies to be gained from consolidating the federal FCA
17   claims, if the federal FCA claims are in fact similar.  To that point, relator argues that the one
18   commonality between the *Mazik* and *Osinek* matters, the presence of a federal FCA claim
19   predicated on defendants' Medicare Advantage compliance program, itself conceals a distinction:
20   The FCA claim in *Mazik* is predicated on defendants' alleged tampering with compliance
21   software, while the FCA claims in the *Osinek* matters is almost entirely predicated on defendants'
22   providers allegedly adding false diagnostic codes in addenda after patient encounters.  (*Id.*)

23          The government similarly argues in its statement of interest that the different factual bases
24   render any proposed benefits of consolidation "illusory" and that transfer would only delay the
25   completion of discovery and other pre-trial matters in the *Osinek* matters.  (Doc. No. 111 at 2.)  It
26   was these significant factual differences, the government argues, that led it to decline intervention
27   in *Mazik* and not to seek transfer to the Northern District at the time it moved to consolidate the
28   other six cases into the *Osinek* matters.  (*Id.* at 3.)  The government further argues that the parties

in the *Osinek* matters are more than two years into fact discovery and that "Judge Chen recently

approved a five-page revised pre-trial schedule that required months of negotiations among the

parties and motions practice focusing on the highly specific discovery issues presented by" the

*Osinek* matters.  (*Id.* at 10–11.)  Both relator and the government highlight this court's prior order

granting in part and denying in part defendants' motion to dismiss relator's FAC, which

dismissed relator's federal FCA claim to the extent it was predicated on similar "material facts"

as the claims presented in the *Osinek* matters.  (*See* Doc. Nos. 111 at 7; 114 at 16; *see also* Doc.

No. 104 at 10–14.)

The court concludes that the potential for gains in efficiency with consolidation weighs in

favor of transfer, though only slightly.  As defendants argue and relator does not contest, there are

some high-level similarities between *Mazik* and the *Osinek* matters.  Both involve defendants'

alleged violations of the federal FCA via incorrect diagnoses and deficient compliance programs.

But, because of defendants' prior motion to dismiss on first-to-file grounds, relator's federal FCA

claim survives only to the extent that it does not share a material factual basis with the *Osinek*

matters.  As the court discussed in its prior order, nothing in the *Osinek* matters deals with

defendants' intentional misuse of its own compliance software, which is the sole remaining basis

of relator's federal FCA claim in this case.  Perhaps as a result, as the government points out,

defendants have not identified a single witness expected to be deposed both in this action and the

*Osinek* matters (Doc. No. 111 at 9), likely because of the different underlying conduct in *Mazik*

and the *Osinek* matters.  The court finds that the lack of factual similarity between the actions

undercuts defendants' claim that consolidation would promote efficiency in discovery and case

management.  *See, e.g.*, *Lexington Ins. Co. v. Scott Homes Multifamily, Inc.*, No. 12-cv-02119-

JAT, 2013 WL 4026883, at *2 (D. Ariz. Aug. 7, 2013) (denying a motion to consolidate where

"the cases share a common factual background in a general sense" but "the specific facts in both

suits are completely different" because "there is unlikely to be a substantial duplication of effort

that would be saved if both cases were being heard by one judge"); *cf. In re Acetaminophen –

ASD/ADHD Prods. Liab. Litig.*, MDL No. 3043, 2023 WL 2843771, at *1 (U.S.J.P.M.L. Apr. 7,

/////

1     2023) (denying the plaintiffs' motion to transfer brought under 28 U.S.C § 1407 in part because

2     of the likely small "extent of overlapping discovery").

3            3.     <u>Potential for Delay</u>

4          Relator and the government argue that transfer would result in delay for both *Mazik* and

5     the *Osinek* matters. The government points out that the parties in the *Osinek* matters recently

6     spent nearly five months negotiating a case management order. (Doc. No. 111 at 11); *see also*

7     *Osinek*, No. 3:13-cv-03891-EMC, Admin. Mot. to Amend the Case Mgmt. Ord., Doc. No. 327, at

8     4 (N.D. Cal. Mar. 1, 2024) ("Plaintiffs have worked diligently to conduct an enormous volume of

9     written and document discovery to date in this complex and significant litigation. . . . And

10     further conferral will not be fruitful, as the parties have conferred about amending the current

11     case management order [ ] for the past four months."); *id.*, Ord. Granting Stipulation to Amend

12     the Case Mgmt. Ord., Doc. No. 332 (N.D. Cal. Apr. 3, 2024). Defendants argue in reply that

13     delay would be negligible because relator's proposed case schedule trails the schedule in the

14     *Osinek* matters "by a mere three months, and only for certain deadlines." (Doc. No. 120 at 12.)

15          This court does not share defendants' optimism regarding the ease with which case

16     management schedules could be aligned were transfer to be granted. Consolidating *Mazik* with

17     the *Osinek* matters appears likely to disrupt the laboriously negotiated schedule currently in place

18     in the cases pending before Judge Chen in the Northern District. Moreover, transfer runs the risk

19     of injecting relator into discovery disputes with little relation to his action given the factual

20     dissimilarity of his federal FCA claim. Accordingly, the court concludes that the potential for

21     delay weighs strongly in favor of denying the pending motion. *See Allen*, 812 F.2d at 436

22     ("Because the transfer of this case undoubtedly would have led to delay, the district court did not

23     abuse its discretion in denying Allen's motion notwithstanding possible inconvenience to the

24     witnesses.")

25            4.     <u>Timeliness of the Pending Motion</u>

26          A district court may consider the timing of a motion to transfer in relation to other

27     developments in the case. *See Moore v. Telfon Commc'ns Corp.*, 589 F.2d 959, 968 (9th Cir.

28     1978) (finding that the district court "justifiably found" the convenience of the parties and

1   witnesses "outweighed by other, more compelling, considerations" including "the duration of the

2   pendency of the litigation prior to the motion to transfer"); *Savage*, 611 F.2d at 279 (finding that

3   the district court did not abuse its discretion in denying the defendant's motion to transfer where

4   the "district court was familiar with the case"); *New Show Studios, LLC v. Howe*, 696 F. App'x

5   271, 272 (9th Cir. 2017) ("Denial of Howe's request to transfer venue was not an abuse of

6   discretion because Howe unreasonably delayed in seeking transfer . . . .") (citing *Allen*, 812 F.2d

7   at 436).[9]

8        Here, relator's original complaint was served upon defendants in February 2021 (Doc.

9   No. 40), the government intervened and sought to consolidate the *Osinek* matters in July 2021,

10  and yet defendants did not file the pending motion to transfer venue until April 2024 (Doc.

11  No. 109).  Moreover, this court has already resolved a motion to dismiss in *Mazik* (Doc. No. 104),

12  and Judge Chen has resolved eight motions to dismiss in the *Osinek* matters (*see Osinek*, 3:13-cv-

13  03891-EMC, Doc. Nos. 171, 223, 224, 225, 226, 275, 276, 277).  *See Pratt*, 769 F. Supp. at 1132

14  (denying the defendant's motion to transfer because "[t]he fact that a preliminary injunction has

15  already been issued in this action also militates against transfer" and because "this Court [is]

16  knowledgeable about the facts of the case"); *Right to Life of Central Cal. v. Bonta*, 614 F. Supp.

17  3d 729, 733 (E.D. Cal. July 6, 2022) (denying the defendant's motion to transfer where "the

18  undersigned issued the TRO in this case" and had already "engage[d] with the substantive issues

19  presented"); *compare Lixenberg v. Coogi Partners, LLC*, No. 17-cv-02537-MWF-MRW, 2018

20  WL 4850402, at *5 (C.D. Cal. Feb. 27, 2018) (granting the defendant's motion to transfer where

21  "this action ha[d] only been pending for a matter of months, not two years, before the Motion to

22  Transfer was filed" and where "no substantive motions [had been] decided").

23       The court also notes that one of defendants' primary arguments in support of the pending

24  motion to transfer is the alleged similarity between *Mazik* and the *Osinek* matters, but defendants

25  only filed the pending motion after this court dismissed those of relator's allegations that

26  resembled the allegations in the *Osinek* matters.  Defendants do not satisfactorily explain why

27  _____

28  [9]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit
    Rule 36-3(b).

they chose to wait three years to file their motion to transfer and only then filed it after the most similar allegations had been stripped out of relator's pleadings.  "In light of these case-specific circumstances, the court concludes that a transfer of this action to the Northern District of California at this time is not appropriate."  *Right to Life*, 614 F. Supp. 3d at 733.

## CONCLUSION

For all of the reasons explained above, defendants' motion to transfer venue (Doc. No. 109) is denied.

IT IS SO ORDERED.

Dated:   **June 13, 2024**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

20